EDELSBERG LAW, P.A.
Scott Edelsberg (SBN 330990)
scott@edelsberglaw.com
1925 Century Park E #1700
Los Angeles, California 90067
Telephone: (310) 438-5355

Attorneys for Plaintiffs and the Proposed Classes

*(Additional Attorneys Listed on Signature Page)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLIOT NAZOS, CHRISTINE BLIGHT, JACK PERRY, PATRICIA LOUGHNEY, THOMAS PASTORE, BRIAN HALE, TIMOTHY DOTSON, EMILY BARBOUR, JILL SILVERNALE and KYLE BLUMIN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TOYOTA MOTOR CORPORATION and TOYOTA MOTOR SALES, U.S.A., INC., <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION COMPLAINT</u> <br><br> <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................ 1

II.     JURISDICTION AND VENUE ...................................................... 4

III.    PARTIES ....................................................................................... 5

        A.    Plaintiffs.............................................................................. 5

        B.    Defendants ......................................................................... 6

IV.     FACTUAL ALLEGATIONS .......................................................... 7

        A.    The Class Vehicles and the Frame Defect ........................... 7

        B.    The Frame Defect Renders the Class Vehicles Unsafe ........ 8

        C.    Defendants' Knowledge of the Frame Defect in the Class Vehicles .. 10

              a.    Toyota's Limited-Service Campaigns, Bulletins, and
                    Recalls for Toyota Trucks ......................................... 11

              b.    Customer Complaints Regarding the Frame Defect ....... 15

        D.    Marketing and Concealment ............................................... 20

        E.    Plaintiffs' Experiences ....................................................... 26

              a.    Elliot Nazos ............................................................. 26

              b.    Christine Blight ........................................................ 28

              c.    Jack Perry ................................................................ 30

              d.    Patricia Loughney ..................................................... 31

              e.    Emily Barbour .......................................................... 33

              f.    Thomas Pastore ........................................................ 35

              g.    Brian Hale ................................................................ 37

              h.    Timothy Dotson ........................................................ 38

              i.    Jill Silvernale .......................................................... 41

              j.    Kyle Blumin ............................................................ 42

              k.    All Plaintiffs ........................................................... 44

        F.    Fraudulent Concealment Allegations ................................. 45

V.      TOLLING OF THE STATUTE OF LIMITATIONS ..................... 48

|    |    |           |                                                                |    |
|----|----|-----------|----------------------------------------------------------------|----|
| A. | | Fraudulent Concealment Tolling | 48 |
| B. | | Estoppel | 48 |
| C. | | Discovery Rule | 48 |

VI.    CLASS ALLEGATIONS ............................................................49

VII.    CLAIMS.........................................................................................53

     A.      Claims Brought on Behalf of the Nationwide Class...........................53

           Count I      Fraudulent Concealment...................................53

           Count II      Unjust Enrichment...........................................56

           Count III      Declaratory Relief...........................................57

     B.      Claims Brought on Behalf of The State Classes..................................58

           Count IV      Violation of Illinois Consumer Fraud and Deceptive Business Practices Act ................................58

           Count V      Violation of Maryland Unfair Trade Practices Act........60

           Count VI      Violation of Michigan Consumer Protection Act ..........63

           Count VII      Violations Of New Jersey Consumer Fraud Act............65

           Count VIII      Violation of New York Deceptive Acts and Practices...........................................67

           Count IX      Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law .......................................69

           Count X      Violation of Utah Consumer Sales Practices Act ..........71

           Count XI      Violation of Utah Truth In Advertising Law .................73

           Count XII      Violation of Virginia Consumer Protection Act............75

VIII.    PRAYER FOR RELIEF....................................................................78

IX.    DEMAND FOR JURY TRIAL.........................................................79

Plaintiffs Elliot Nazos, Christine Blight, Jack Perry, Thomas Pastore, Brian Hale, Timothy Dotson, Emily Barbour, Patricia Loughney, Jill Silvernale, and Kyle Blumin ("Plaintiffs"), on behalf of themselves and all other similarly situated members of the below-defined Nationwide Class and State Classes (collectively, the "Class"), bring this action against Defendants Toyota Motor Corporation ("TMC") and Toyota Motor Sales, U.S.A., Inc. ("TMS") (collectively, "Toyota" or "Defendants"), upon personal knowledge as to the factual allegations pertaining to themselves and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.     INTRODUCTION

1.     This action arises from Toyota's failure to disclose a dangerous defect in the frames of its model year 2007-2014 FJ Cruiser vehicles (the "Class Vehicles" or "Vehicles"), as well as its contemporaneous misrepresentations regarding the true nature of those frames, which Toyota prominently featured in the marketing and advertising campaigns it designed to increase their sales. The excessive corrosion caused by the defect in the Class Vehicles poses a safety threat to both drivers and occupants of the Vehicles. In fact, as a result of the defect, some Vehicles are no longer drivable, having failed to pass safety check(s). Further, Plaintiffs' extensive expert analysis, conducted over a period of months, confirms that Toyota was aware of these defects but has done nothing to cure them.

2.     As detailed below, Toyota's nationwide advertising campaigns made affirmative representations to Plaintiffs and Class members regarding the quality and rugged nature of the Class Vehicles.  In reality, however, the frames of the Vehicles are defective, as they lack adequate rust corrosion protection, causing them to

1

excessively and prematurely rust and corrode (the "Frame Defect" or "Defect"), as seen in the photographs below:[1]



3.     The Defect not only reduces the value (including market value) of the Class Vehicle, but it subjects the Vehicles' occupants to a significant safety risk. A vehicle's frame forms the basis of a vehicle's crashworthiness, including its ability to withstand or minimize damage to the occupant compartment in the event of an accident. Thus, the Defect compromises the strength of the frames and the overall structural integrity of the Class Vehicles.

4.     Plaintiffs, all of whom own Class Vehicles with frames that have manifested excessive and premature corrosion and rust as a result of the Defect, had no way of discerning or otherwise learning facts to reveal that Toyota's representations

---

[1] Sample photographs of the severe rust and corrosion on each of Plaintiff's Class Vehicles are attached hereto as composite **Exhibit A.**

pertaining to the Class Vehicles were false and misleading, as Toyota failed to disclose and knowingly concealed the Frame Defect from Plaintiffs (and Class members) in its marketing materials. It was only after Plaintiffs had purchased their Class Vehicles that Toyota's incomplete marketing, which omitted reference to the Frame Defect, was revealed.

5.     Toyota has long been aware of the Frame Defect in the Class Vehicles' frames, as well as the safety hazard caused by the excessively corroded frames. Similar frames on other Toyota vehicles exhibited the same excessive rust corrosion and perforation exhibited by the Class Vehicles. Toyota has issued numerous Limited Service Campaigns to address the same Defect at issue here in other vehicles.

6.     Despite this knowledge, Toyota failed to disclose the existence of the Defect to Plaintiffs, other Class members, and the public. Further, Toyota has not issued a recall to inspect and repair the Class Vehicles or offered to reimburse owners of the Class Vehicles for costs incurred to identify and repair the Defect. Toyota, despite actual knowledge of the Defect and the potential dangers of the Defect, has withheld from the Toyota owners and the public this important safety information.  In doing so, Toyota has misled the public with its promotional and technical materials and written guarantees regarding the rust prevention measures taken by Toyota.

7.     Plaintiffs and Class members have suffered ascertainable losses and actual damages as a direct and proximate result of Toyota's misrepresentations and omission of the Frame Defect in that they: (1) overpaid for the Class Vehicles because the Defect significantly diminished the value of the Vehicles at the point of purchase and reduced their market value; (2) have Vehicles that suffer premature and excessive corrosion; (3) must expend significant money to have their Vehicles' frames and related components (inadequately) repaired and/or replaced; and (4) must pay for replacement vehicles while their Class Vehicles are being repaired or are not drivable for failure to pass safety standards.

8.     Plaintiffs and Class members have purchased Class Vehicles that they would not otherwise have purchased, or would have paid less for, had they known of the Frame Defect at the point of sale.

9.     Accordingly, Plaintiffs bring claims for (1) fraudulent concealment; (2) unjust enrichment; (3) declaratory relief pursuant to 28 U.S.C. § 2201; and (4) violations of the consumer protection laws of the states of Illinois, Maryland, Michigan, New York, New Jersey, Pennsylvania, Virginia, and Utah.

## II.     <u>JURISDICTION AND VENUE</u>

10.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1332(d), because: (a) this action is brought as a proposed class action under Federal Rule of Civil Procedure 23; (b) the proposed Class includes more than 100 members; (c) many of the proposed Class members are citizens of states that are diverse from Defendants' citizenship; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

11.     This Court also has supplemental jurisdiction over Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting business activities in the state of California, because Defendant TMS is incorporated in the state of California, and because Defendant TMS's principal place of business was located in California until at least 2017. As such, a substantial portion of the relevant, unlawful conduct at issue in this case as to all Class members occurred primarily in California, in this District. Accordingly, Defendants have sufficient contacts with this District to subject Defendants to personal jurisdiction.

13.     Venue is proper in this judicial District under 28 U.S.C. §1391(b) because a substantial part of the challenged conduct or omissions giving rise to the claims occurred and/or emanated from this District, because Defendants have caused harm to Class members residing in this District, because Defendants regularly conduct business

in this District, because Defendants are residents of this District under 28 U.S.C. §1391(c)(2), because they are subject to personal jurisdiction in this District, and because Defendants have marketed, advertised, distributed, and sold Class Vehicles within this District.

## III.   PARTIES

### A.   Plaintiffs

14.   Plaintiff Elliot Nazos is a citizen of Florida and resides in Sarasota, Florida. Plaintiff owns a 2010 FJ Cruiser, which he purchased new in Matteson, Illinois, on or about February 10, 2010.

15.   Plaintiff Christine Blight is a citizen of Pennsylvania and resides in Bear Creek Township, Pennsylvania. Plaintiff owns a 2007 FJ Cruiser, which she purchased certified pre-owned in Scranton, Pennsylvania, on or about June 21, 2010.

16.   Plaintiff Jack Perry is a citizen of Ohio and resides in Canton, Ohio. Plaintiff owns a 2010 FJ Cruiser, which he purchased new in Meadville, Pennsylvania, on or about September 13, 2010.

17.   Plaintiff Patricia Loughney is a citizen of Colorado and resides in Loveland, Colorado. Plaintiff owns a 2010 FJ Cruiser, which she purchased new in Ledgewood, New Jersey, on or about April 21, 2010.

18.   Plaintiff Emily Barbour is a citizen of New Jersey and resides in Lebanon, New Jersey. Plaintiff owns a 2007 FJ Cruiser, which she purchased new, on or about July 29, 2006.

19.   Plaintiff Thomas Pastore is a citizen of New York and resides in West Islip, New York. Plaintiff owns a 2007 FJ Cruiser, which he bought new in Smithtown, New York, on or about August 1, 2006.

20.   Plaintiff Brian Hale is a citizen of Virginia and resides in Front Royal, Virginia. Plaintiff owns a 2007 FJ Cruiser, which he bought new in Winchester, Virginia, on or about November 23, 2007.

21.     Plaintiff Timothy Dotson is a citizen of Maryland and resides in Pasadena, Maryland. Plaintiff owns a 2007 FJ Cruiser, which he purchased new in Baltimore, Maryland, on or about August 11, 2007.

22.     Plaintiff Jill Silvernale is a citizen of Michigan and resides in Dowagiac, Michigan. Plaintiff owns a 2007 FJ Cruiser, which she purchased used in Benton Harbor, Michigan, on or about February 4, 2012.

23.     Plaintiff Kyle Blumin is a citizen of Utah and resides in Hideout, Utah. Plaintiff owns a 2013 FJ Cruiser, which he purchased used in Murray, Utah, on or about April 24, 2018.

**B.    Defendants**

24.     TMC is the world's largest automaker and largest seller of automobiles in the United States. TMC is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

25.     TMC sells, markets, distributes, and/or services vehicles throughout the United States, including the Class Vehicles. At all times relevant hereto, TMC transacted or conducted business in the state of California and derived substantial revenue from interstate commerce.

26.     TMS is a California corporation and at all material times relevant to this lawsuit maintained its corporate headquarters in Torrance, California. In 2017, after all the Class Vehicles had been manufactured and sold to Class members, TMS moved its corporate headquarters to Plano, Texas.

27.     TMS is the authorized importer and distributor of Toyota motor vehicles in the United States. TMS is responsible for advertising, marketing, and selling the Class Vehicles. TMS also manages and supports a network of Toyota dealerships located throughout the United States.

28.     Defendants jointly developed and disseminated to their exclusive distributors and authorized dealers the owner's manuals, warranty booklets,

maintenance schedules, advertisements, and other promotional and technical materials relating to the Class Vehicles.

29.     At all relevant times, and with the approval and at the direction of TMC, TMS acted through its authorized employees, agents, and distributor and dealer networks in performing activities, including but not limited to advertising, marketing, and selling Class Vehicles, providing warranties, disseminating technical information and mechanic training materials to dealers, and monitoring the performance of Class Vehicles in the United States.

## IV.     FACTUAL ALLEGATIONS

### A.     The Class Vehicles and the Frame Defect

30.     The FJ Cruiser was released in 2006 as a modern remake of the classic off-roading vehicles Toyota had produced in the late 1950s in the United States.

31.     The FJ Cruiser's design harkens back to the design of the original Land Cruiser, the FJ40, with which it shares many structural underpinnings. The FJ Cruiser remained practically unchanged from its release through when it was discontinued in 2014.

32.     Toyota called the FJ Cruiser "the most capable 4X4" in its lineup at the time, noting that it had "engineered the FJ Cruiser for serious trail driving capability."

33.     Toyota's December 26, 2005 press release stated that the 2007 FJ Cruiser "provides optimized off-road capabilities, value and styling clues reminiscent of Toyota's famed FJ40 4x4 utility vehicle" and "will deliver true off-road ruggedness, image and performance[.]"

34.     Unknown to consumers, however, the FJ Cruiser was manufactured with frames that lacked adequate rust corrosion protection and are prone to excessive and premature rust corrosion. The Frame Defect affects the structural integrity of the Class Vehicles and compromises the quality, durability, and safety of the Vehicles, requiring Class members to pay out-of-pocket to have their Vehicles' frames replaced or

"repaired" in a manner that does not remedy the Defect or otherwise prevent the recurrence of the problem caused as a result thereof.

35.    All model year FJ Cruisers are equipped with the same defective frames and, as a result, all Class Vehicles suffer from the same Frame Defect. In addition, Toyota marketed, distributed, and warranted the Class Vehicles in the United States in a uniform manner.

36.    The Frame Defect is a systemic problem associated with the materials and production processes used in connection with the Class Vehicles' frames and is not associated with normal geography or typical environmental factors. The premature and excessive corrosion and rust caused by the Frame Defect is found in the frames of Class Vehicles located throughout the United States.

**B.    The Frame Defect Renders the Class Vehicles Unsafe**

37.    A vehicle frame is the main supporting structure to which all other components are attached on a motor vehicle with a "body on frame" design. The function of frames includes handling static and dynamic loads with unintended deflection and distortion, preventing undesirable forces and twisting from driving over uneven surfaces, engine torque, vehicle handling and accelerating and decelerating. A vehicle's frame is also the primary component that guards against sudden impacts and collisions.

38.    The Class Vehicles were manufactured with frames lacking adequate rust corrosion protection. As a result, the Class Vehicle frames are prone to experiencing severe premature rust corrosion, which affects the structural integrity of the vehicles, rendering them unsafe to drive and a hazard on the roadways.

39.    Rust corrosion has a significant deleterious effect on metal items. It makes them weaker by replacing the strong iron or steel with flaky powder, ultimately leading to perforations. Rust corrosion is a progressive process. Once corrosion begins, it will not stop until adequately repaired.

40.     Because the damage is typically on the undercarriage of the Class Vehicles, it goes undetected unless purposefully inspected (for example, through a mandatory state safety inspection or otherwise).

41.     Corrosion of the Class Vehicles is unrelated to and separate from normal surface rust experienced after years of usage and/or exposure to typical environmental conditions. The excessive rust corrosion on the Class Vehicles compromises the vehicles' safety, stability, and crash-worthiness because important suspension components, engine mounts, transmission mounts, and body mounts anchor to the vehicles' frames.

42.     According to Popular Mechanics, "[a] rusted-through frame means the structural and crash integrity of the car is questionable, and it should be inspected and repaired by a qualified repair facility."[2]

43.     As described on AutoGuide.com, "excessive rust often signals the impending death of a vehicle. Its useful life [is] essentially over."[3] Further:

> Frame rust is a big concern, as it affects the integrity of the car. Bad enough frame rust can cause parts to snap off or crack, which will really compromise the safety of you, your passengers and other motorists. It may also significantly diminish the car's ability to protect you in a crash.[4]

44.     Excessive rust corrosion and perforation on the FJ Cruisers also causes the vehicles to fail some state safety inspections. Once a vehicle fails a state safety inspection, consumers cannot use their vehicle unless and until they spend time and money to remediate the rust and perforation to passing standards; however, during the

---

[2]   *See*   http://www.popularmechanics.com/cars/how-to/repair/how-to-fight-rust-and-win-14930616 (last visited Mar. 31, 2022).

[3]   Sami Haj-Assaad, *Should You Buy a Car with Rust?*, AutoGuide.com (Feb. 24, 2014), available at http://www.autoguide.com/auto-news/2014/02/buy-car-rust.html (last visited Marc. 31, 2022).

[4] *Id.*

9

1  time the vehicles are prohibited from use, consumers may still be required to pay for
2  and maintain insurance policy coverage(s) for such vehicles and/or pay mandatory state
3  licensing and/or taxing costs associated with ownership of the respective vehicles.

4  **C.**  **Defendants' Knowledge of the Frame Defect in the Class Vehicles**

5  45.  Toyota has long known that frames on the Class Vehicles exhibited
6  excessive rust corrosion and perforation because they did not have adequate corrosion-
7  resistant protection, and have issued numerous service campaigns and warranty
8  bulletins to address the Defect in the 2005-2010 Tacoma, 2007-2008 Tundra, and
9  2005-2008 Sequoia (the "Toyota Trucks").

10  46.  The frames on the Class Vehicles and the frames on the Toyota Trucks
11  suffer from the same Frame Defect and are materially the same for purposes of this
12  lawsuit. Upon information and belief, the Class Vehicles' frames and the Toyota
13  Trucks' frames were designed using the same defective specifications (materials) and
14  pursuant to the same defective process (coatings).

15  47.  Subject to and without waiving any applicable privileges, testing and
16  analysis conducted over a period of months for Plaintiffs' counsel by a consulting
17  expert has confirmed that the Class Vehicles' frames and the Toyota Trucks' frames
18  have the same metal composition and the same zinc phosphate epoxy coating, and thus,
19  the Frame Defect in the Class Vehicles and the defect that Toyota acknowledged in the
20  Toyota Trucks are one and the same.

21  48.  Testing and analysis have revealed that the frames were corroding under
22  the epoxy, indicating that the corrosion was a result of the zinc phosphate coating
23  Toyota used being inadequate to protect against corrosion and rust. Indeed, analysis
24  documented the discontinuous nature of the zinc phosphorus layer (pretreatment) in all
25  of the frames analyzed. A discontinuous coating allows sections of the frame to be
26  unprotected and, therefore, more likely to suffer rust damage.

27  49.  Accordingly, Toyota's knowledge of the Frame Defect in the Class
28  Vehicles and the resulting premature and excessive corrosion of the Vehicles' frames

and related components is evidenced by the service campaigns, warranty bulletins, and recalls initiated by Toyota to address the same Defect in the Toyota Trucks.

          *a.*      ***Toyota's Limited-Service Campaigns, Bulletins, and Recalls for Toyota Trucks***

50.     In or around March 2008, after receiving numerous reports that frames on approximately 813,000 model year 1995 through 2000 Toyota Tacoma trucks had exhibited excessive rust corrosion, Toyota initiated a Customer Support Program that extended the vehicles' warranty coverage for frame perforation caused by rust corrosion. Under the program, Toyota was to repair or repurchase, at its option, any vehicle exhibiting perforation of the frame due to rust corrosion.

51.     At that time, Toyota conceded that it had investigated "reports of 1995-2000 model-year Tacoma vehicles exhibiting excessive rust corrosion to the frame causing perforation of the metal" and "determined that the vehicle frame in some vehicles may not have adequate corrosion-resistant protection." In a memorandum sent to dealers, distributors, and certain owners, Toyota emphasized that "[t]his [rust corrosion] is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage."

52.     Yet, that same month, Toyota distributed a "Warranty Policy Bulletin" to its dealers, which instructed service managers and warranty administrators that "[v]ehicle inspections should only be performed if the customer has noticed excessive rust." Apparently, Toyota sought to limit the costs of this campaign by offering inspections only when a customer requested one. Toyota, knowing that many owners would not notice excessive rust corrosion in the undercarriage of their vehicle, disregarded its responsibility to correct latent defects in its products and reduce the unreasonable risk that its customers and others would be injured by the undiscovered, hidden defect.

53.     Toyota subsequently modified and expanded this Customer Support Program to include 2001-2004 Tacoma models.

11

54.    In 2012, Toyota recalled approximately 150,000 Tacoma vehicles to inspect and replace the spare-tire carrier on vehicles sold in twenty cold weather states.[5] The recall was issued to address the problem of spare-tire carriers rusting through and causing the spare tire to drop to the ground.

55.    Through the issuance of two separate Limited Service Campaigns in 2014 and 2015, however, Toyota admitted that the frames of *all* 2005-2008 model year Tacoma vehicles suffered from inadequate rust protection leading to excessive premature rust corrosion.

56.    Initially, Toyota attempted to limit its liability for the defective frames through the issuance of the 2014 Limited Service Campaign (the "2014 Campaign"), which applied only to 2005-2008 Tacoma vehicles in the twenty cold weather states and stated that Toyota had "received reports that certain 2005 through 2008 model year Tacoma vehicles operated in specific cold climate areas with high road salt usage may exhibit more-than-normal corrosion to the vehicle's frame." Toyota further stated that it had "investigated these reports and determined that the frame in some vehicles may not have corrosion-resistant protection sufficient for use in these areas."

57.    According to Toyota, lack of adequate corrosion-resident protection, "combined with prolonged exposure to road salts and other environmental factors, may contribute to the development of more-than normal rust in the frame of some vehicles." Notably, Toyota made clear that the "condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment."

58.    In April 2015, however, Toyota issued a second Limited Service Campaign (the "2015 Campaign") for model year 2005-2008 Tacoma vehicles in the

---

[5]    Connecticut, Delaware, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia.

thirty states not covered by the 2014 Campaign. Again, Toyota made clear that the "condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment." Through the 2015 Campaign, Toyota conceded that Toyota vehicles in warm weather states also suffered from excessive rust corrosion and perforation.

59.    Toyota was also forced to acknowledge excessive frame corrosion on early model year Toyota Tundra trucks through the issuance of two separate Limited Service Campaigns in 2009 and 2010 following a NHTSA investigation, which found that Tundra spare tires (mounted to the rear cross-member) were falling off due to frame rust.

60.    In the 2009 Limited Service Campaign, which recalled 110,000 first generation Tundra vehicles sold in twenty cold weather states and the District of Columbia, Toyota admitted that the excessive corrosion could cause "the spare tire stowed under the truck bed [to] become separated from the rear cross-member," or "lead to the loss of the rear brake circuits which will increase vehicle stopping distances and the risk of a crash." In the 2010 Limited Service Campaign, Toyota recalled all 2000-2003 Tundra vehicles (regardless of geographic location) for the same excessive frame rust.

61.    That same year, Toyota, "as an additional measure of confidence" to owners, issued a Corrosion Resistant Compound ("CRC") Campaign "as the extension to Safety Recall 90M - CRC application to the rear portion of the frame" for 2000-2003 model year Tundra vehicles registered in cold weather states. The CRC campaign was a combination of a safety recall that offered to apply CRCs to the rear portion of the vehicle frame, and, for a limited time, the remainder of the frame assembly. The approximately 316,000 2000-2003 Tundra vehicles sold or registered in the remaining 30 states were covered by a Limited Service Campaign issued by Toyota in 2015.

62.    In August 2013, Toyota began another Limited Service Campaign for approximately 78,000 model year 2004-2006 Tundra vehicles in 20 "cold climate

13

states" and the District of Columbia. As it had with the Tacoma, Toyota stated that it had investigated reports that the Tundra may "exhibit more-than normal corrosion to the vehicle's frame" and "determined that the frames in some vehicles may not have corrosion-resistant protection sufficient for use in these areas." And, once again, Toyota acknowledged that the "condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment."

63.     Toyota acknowledged the same condition was present in its Sequoia trucks in Limited Service Campaigns that were issued in late 2012 and early 2013, and which advised dealers that it had determined the vehicles lacked "corrosion-resistant protection" and advised dealers to inspect the vehicles for "more than normal corrosion to the vehicle's frame." As it did with the Tacoma and Tundra, Toyota made clear that the "condition" affecting the Sequoia was "unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment."

64.     In 2017, as part of a resolution to ongoing litigation pertaining to the frame corrosion in 2005-2010 Tacoma, 2007-2008 Tundra, and 2005-2008 Sequoia trucks, Toyota provided, among other benefits, free frame inspections, while also (1) applying a CRC compound or (2) replacing the frames at no cost to the owners of those vehicles.

65.     Two years later, in a November 2019 Limited Service Campaign, Toyota admitted that the frames of the 2011-2017 Tacoma similarly lacked corrosion-resistant protection and also provided free frame inspections with either (1) a CRC compound or (2) frame replacement to address the Frame Defect in the frames. Toyota has consistently issued updates to the 2019 Limited Service Campaign over the course of the past two years in response to reports of the defect in 2011-2017 Tacoma vehicles and in an effort to prevent and repair the corrosion that continues to plague those vehicles.

1

              **b.**     ***Consumer Complaints Regarding the Frame Defect***

2        66.    Class members experience the same issues with the Class Vehicles as

3 were experienced by owners of the Toyota Trucks discussed *supra*.

4        67.    One of the complaints posted on the NHTSA website (#10454963)

5 resulted from an April 12, 2012 call to the Department of Transportation's Auto Safety

6 Hotline regarding a 2011 FJ Cruiser that began exhibiting corrosion at only ***2,500***

7 ***miles***—less than ***three months after purchase***. The owner advised that Toyota was

8 made aware of the corrosion, but would neither repair or replace his vehicle.

9        68.    This complaint led to a representative from NHTSA's Office of Defects

10 Investigation ("ODI") contacting the consumer via email to obtain additional

11 information regarding the complaint.[6] In response, the consumer provided the

12 representative with photographs of his vehicle's undercarriage showing how quickly

13 the excessive corrosion had spread at only ***5,000 miles***:

14

15

16

17  

18

19

20

21

22        69.    The consumer also provided the ODI with links to several websites where

23 they could "find some similar complaints from Toyota customers experienc[ing] the

24 same issues that [he was] having" with his vehicle. The owner further explained to the

25 NHTSA representative that he was "concerned that the corrosion will spread and

26

27    [6]   The ODI notifies vehicle manufacturers about complaints when they are entered and received in the NHTSA database, particularly when it sees similarly described

28 complaints from more than a few consumers.

1   continue throughout the vehicle"[7] and "about the ascetics [sic] and the resale value" of

2   the vehicle.

3        70.    The ODI provided the above information to Toyota,[8] which, upon

4   information and belief, resolved the dispute with the owner.

5        71.    The number of complaints made by owners to Toyota, its authorized

6   dealerships, and NHTSA regarding like experiences with the Frame Defect and safety-

7   related concerns has grown substantially since 2012.

8        72.    Indeed, a review of internet forums and chat groups created specifically

9   for the discussion of issues related to the Class Vehicles, including the websites

10  referenced above, reveals thousands of posts and dozens of discussions complaining of

11  the Frame Defect, demonstrating that Plaintiffs are not alone in this matter. Those

12  complaints detail both the failures and inadequate responses of Toyota representatives

13  and Toyota in addressing the Frame Defect and the damage it caused.

14       73.    The number of complaints consumers have filed with NHTSA that

15  identify the Frame Defect and detail their experience with the corresponding excessive

16  and premature corrosion and rust it causes are numerous and continue to significantly

17  increase each year, both in number, and severity.

18       74.    Below are excerpts from some of the consumer complaints made to

19  NHTSA regarding the Frame Defect (emphasis added):

20       •   "***The chassis is so corroded and full of rust it has got to a point

21           of loosing [sic] the strength and integrity of the whole body***. This

22           is very worrisome specially if the car is involved in an accident

23

24  [7]  His concern was the reality, as described in the following NHTSA complaint

25  regarding a 2008 FJ Cruiser: "Since I purchased the vehicle brand new in 2006 it has
    been rusting and an alarming rate. Even my mechanic says he's never seen a new car

26  rust that quickly. The frame is covered [in] rust, I tried to stop it but it didn't work."

27  [8]  *See* https://static.nhtsa.gov/complaints/10454963/10454963-

28  AF0DEE515E3602CAE05375E8789808C8.pdf (last visited Mar. 31, 2022).

where the front part chassis cannot resist the impact." (09/27/2013, 2007 FJ Cruiser)

- "At 55,000 miles (6 years old) *my front gravel shield had completely rusted off and was found in my driveway*. . . I am terrified at the thought that I could've been driving and my control arms could've rusted off like my gravel shield did." (01/06/2017, 2011 FJ Cruiser)

- *"The rust on the frame is mind blowing*. . .*This is dangers [sic] and someone can be injured or dead*." (04/11/2017, 2007 FJ Cruiser)

- "Frame is rusting *to the point it is about to break."* (04/12/2017, 2007 FJ Cruiser)

- "I took my car in for an inspection at my Toyota dealership today. I was told if I'm going to sell it or trade it in that now would be the time to do it. . . . The tech said there are some very weak areas on the frame and that *it could fracture with impact or maybe will eventually by hitting a bad pothole*. . . . It seemed frightening to me that *they suggested I sell it to someone else and not disclose this potentially life threatening issue*." (04/26/2018, 2008 FJ Cruiser)

- "Frame is rusted so bad mechanic and local dealer said *vehicle is not road worthy*. If I had not taken my vehicle to a mechanic before service and general maintenance repairs, *I would have driven on a 2400 mile vacation across country without knowing the danger of a failing frame*." (09/05/2018, 2007 FJ Cruiser)

- "Took the vehicle in for oil change and check a transmission fluid leak. *Dealer found large amounts of rust on frame and suspension and noted, 'not recommended to drive.'*" (10/04/2018, 2007 FJ Cruiser)

- "While driving, my exhaust broke from hitting a pothole. When I took to the shop for repair, we noticed so much rust on the frame. I made an appointment at my local dealership to have it inspected, we found that the frame is extremely rusted[.] . . . The dealership representative became frustrated and even said *she would not put*

17

*her kids in the Fj Cruiser because its unsafe.*" (11/20/2018, 2007 FJ Cruiser)

- "*The amount of corrosion and frame flaking is alarming and poses a huge safety issue* for my family, other drivers and myself. Since purchasing the vehicle I have done everything I can to maintain and fix this issue including complaining to Toyota themselves with little to no success. . . . *Body mounts are flaking and crumbling and the frame is corroded and falling apart from the inside out.*" (03/25/2019, 2007 FJ Cruiser)

- "*Frame has completely disintegrated* where the rear upper control arm links meet the crossmember, *making the vehicle unsafe and fail the NH state inspection.*" (06/28/2019, 2007 FJ Cruiser)

- "Excessive rust on the frame. . . . This is a known issue with the FJ Cruiser on all the forms online. . . *There are thousands of us with a rotting in frames and Toyota will do nothing.*" (12/01/2012, 2008 FJ Cruiser)

- "I'm extremely concerned about my families [sic] safety. I'm worried brackets are about to rust off, and body mounts and bolts are showing severe rust, . . . *This needs to be remedied before people start getting hurt while driving with these unsafe chassis and components.*" (12/31/2019, 2008 FJ Cruiser)

- "Sever[e] rusting of frame, break and suspension components and brackets. *This 2008 Toyota FJ cruiser is quickly becoming a safety hazard on the roads.*" (02/03/2020, 2008 FJ Cruiser)

- "Vehicle was stationary in driveway *my frame, some suspension components, and my rocker panels were falling apart in my hands*" (02/22/2020, 2008 FJ Cruiser)

- "Frame, suspension, and brakes have extreme damage from rust. *Rear brakes are non-functional because of rust.*" (06/17/2020, 2008 FJ Cruiser)

- "Severe rust on all parts of the frame undercarriage, brake lines, gas tank straps. . . *I am frightened that in an accident the whole*

*body of the truck will just come off the frame*." 07/27/2020, 2008 FJ Cruiser)

- "Several *frame supports have corroded from the inside out and are flaking off. Brake components that run along the frame have corroded from the frame* to the bracket that holds them to the lines themselves. Cause[d] a slow brake leak over time that eventually *resulted in a dangerous near accident situation that was caused by complete immediate lack of brake pressure*." (07/04/2020, 2008 FJ Cruiser)

- "*The rate at which rust gestates on this vehicle . . . is unsafe and will continue to create unsafe conditions as these vehicles rapidly deteriorate*." (03/19/2021, 2011 FJ Cruiser)

- "The vehicle is a 2008 and is *scary rusty on the frame and other components. . . . Eventually one of these faulty frames are going to break in a high speed scenario and serious injury or death will occur*." (09/27/2020, 2008 FJ Cruiser)

- "This vehicle has *major rust overtaking the frame and all suspension parts and mounts* . . . I am very concerned I am going to have suspension parts break off while I'm driving, *I have already had to replace the fuel tank straps that rusted in half while driving do[w]n the highway*." (08/14/2020, 2007 FJ Cruiser)

- "My gas tank straps *completely rusted off leaving the gas tank hanging down below the frame and in extreme compromised unsafe position. Multiple areas of frame rust completely through not supported by either end*." (11/28/2019, 2007 FJ Cruiser)

- "I took my 2007 Fj Cruiser in for regular maintenance and shortly after I dropped it off, I was contacted by the dealership and asked to come back. *They wanted to show me the bottom of the vehicle because they said it was no longer safe to drive.* I went back to the dealership and the mechanic showed me that the *frame of my FJ was completely rusted through* with multiple holes in right side of the frame - some *holes measuring over 5 inches* in length. *It crumbled when touched*." (12/30/2019, 2007 FJ Cruiser)

- "During 2019-2020 state inspection of 2007 Fj Cruiser with 78000 miles by *dealer was told that frame is so rusted that it probably would not pass the next inspection*." (09/29/2019, 2007 FJ Cruiser)

19

1
2
3
4

- "Rust has ***decimated the frame*** of this vehicle resulting in the ***control arm mount to break away from the frame*** of the vehicle. . . . ***No welding/body shop will touch it because they deem it unsafe even if welded back to rest of frame****. . .* Fortunately, this broke in a parking lot instead of on the highway ***where an accident would have happened or worse***." (09/03/2019, 2008 FJ Cruiser)

5   75.   Notably, Federal law requires Toyota to monitor defects which can cause

6   a safety issue and report any findings within five (5) days. As a result, Toyota regularly

7   monitors NHTSA complaints in order to meet its reporting requirements under federal

8   law and, thus, obtained knowledge of the Defect through its ongoing monitoring of

9   these complaints. Toyota, knowing the details of production across all lines of vehicles

10   it manufactures, also had knowledge of the Defect in the Class Vehicles from

11   complaints made by owners of the Toyota Trucks containing the same Defect.

12   **D.**   **Marketing and Concealment**

13   76.   Notwithstanding its knowledge of the Frame Defect, Toyota embarked on

14   an aggressive marketing campaign when the all-new 2007 FJ Cruiser was released for

15   sale that promoted the quality and benefits of the frames and related components used

16   on the Class Vehicles, including their purported anti-corrosive properties.

17   77.   For example, in a published advertisement marketing the quality and

18   benefits of the Class Vehicles' frames, Toyota: (a) told customers that because the FJ

19   Cruiser's "frame ha[d] to be bulletproof," it had equipped the vehicle with a frame that

20   had been "proven on the toughest terrain," making the vehicle "incredibly stable when

21   climbing"; (b) promoted the "[e]xceedingly rigid design" of the frame"; and (c) touted

22
23
24
25
26
27
28

20

the frames' "Electrocoat Deposition (ED) protective coating," which it represented "seals every nook and cranny and helps the frame live long and strong":



78.   In an advertisement marketing the quality and benefits of the Class Vehicles' undercarriage, Toyota: (a) claimed that its detail in design "[k]eeps the FJ Cruiser's undercarriage smooth to slide over the rough spots"; (b) represented that the FJ Cruiser had a "[b]elly of steel" that protected the undercarriage components, including "the radiator, power steering rack, [and] engine and transfer case"; and (c)

touted the FJ Cruiser's "[t]ough [gas] tank, . . . made of its own multi-layer resin [or Zinc phosphate coating] that resists punctures and won't rust":



79.    In an advertisement marketing the quality and benefits of the Class Vehicles' body, Toyota: (a) promoted the structural integrity of the FJ Cruiser, including its "incredibly rigid body using specially placed reinforcements, and high-tensile-strength sheet steel" to prevent damage when taking the vehicle off-road; and (b) represented that "the body of the FJ uses anti-corrosion sheet steel in key areas, in addition to anti-rust wax, sealer and anti-chipping paint."

80.     Notably, Toyota even acknowledged in the above advertisement that "a truck has no greater enemy than rust," naming it a "silent killer [that] can turn a once virile and shimmering steel chariot into nothing more than a brittle, flaking ghost of itself":



81.     In the owner's manuals for the Class Vehicles, Toyota incorrectly represents that the purported anti-corrosive measures it had taken would prevent corrosion by stating: "Toyota, through its diligent research, design and use of the most

advanced technology available, helps prevent corrosion and provides you with the finest quality vehicle construction."

82.     Further, Toyota advertised the durability of Class Vehicle frames in its sales brochures distributed throughout the United States. For example, the sales brochure for the 2011 FJ Cruiser states that Toyota's "engineering standards were written in stone" and that "[s]olid body-on-frame construction keeps the FJ rigid, which helps the suspension do its work":[9]



Our engineering standards were written in stone. After five decades of off-road experience, we know a few things about making vehicles that are capable and durable. And FJ Cruiser is the latest beneficiary of this proud heritage. Its V6 engine features Dual Independent Variable Valve Timing with intelligence (VVT-i). Cranking out 260 hp and 271 lb.-ft. of torque, it has the muscle to take on mountains. Add to that an available 6-speed manual transmission with 2-speed transfer case and an electronically controlled locking rear differential, and FJ Cruiser possesses impressive off-road capability. Solid body-on-frame construction keeps the FJ rigid, which helps the suspension do its work. The independent front suspension system delivers nearly eight inches of wheel travel, while the 4-link rear suspension with lateral rod offers more than nine inches. In short: On rocks, it rocks.

83.     In the 2012-2014 FJ Cruiser sales brochures distributed throughout the United States, Toyota boasted that the FJ Cruiser could withstand "[f]rame-bending boulders," that its "rock-solid body-on-frame construction keeps the FJ rigid regardless of the terrain":

---

[9] 2011      FJ      Cruiser,      Toyota      (2011)      https://www.auto-brochures.com/makes/Toyota/FJ%20Cruiser/Toyota_US%20FJCruizer_2011.pdf (last visited Mar. 31, 2022).



FJ Cruiser shown in Quicksand with available Upgrade Package and available accessory rock rails.

**Mother Nature, who's your daddy now?**

Twenty-five-degree grades. Frame-bending boulders. Dizzying drop-offs. The sort of challenges nature presents when you tackle trails like Rubicon or Moab's Poison Spider Mesa. But five decades of off-road experience has given FJ Cruiser the capability to handle them. Its V6 engine churns out 260 hp and 271 lb.-ft. of torque, in part thanks to Dual Independent Variable Valve Timing with intelligence (VVT-i). The available 6-speed manual transmission features a 2-speed transfer case as well as an electronically controlled locking rear differential, to help ensure the power goes where it's needed. The independent front suspension system delivers nearly eight inches of wheel travel, while the 4-link rear suspension with lateral rod provides more than nine inches. And rock-solid body-on-frame construction keeps the FJ rigid regardless of the terrain.

It's no surprise a vehicle like FJ is able to reach the trail's end in one piece. But FJ Cruiser also handles pavement with equal proficiency. Its Vehicle Stability Control (VSC)[1] adjusts engine power and braking to help maintain the direction in which it's been steered, while Traction Control (TRAC) helps reduce slipping when accelerating. So enjoy the ride. You may find gloating makes the drive home shorter.

84.     Toyota also published press releases highlighting the durability of the FJ Cruiser frames. Toyota stated, for instance, that the Class Vehicles' "tough, wide stance is based on a boxed steel ladder-braced frame to which the welded steel body is mounted."[10]

---

[10]    *Toyota FJ Cruiser Uniquely Fuses Off-Road Prowess With Heritage Design and Modern Connectivity*, Toyota (Sept. 6, 2011), https://pressroom.toyota.com/toyota-2012-fj-cruiser-fuses-off-road-prowess-with-heritage-design/ (last visited Mar. 31, 2022); *2014 Toyota FJ Cruiser Continues A Long Tradition of Off-Road Capability*,

85.     Yet, nowhere in its marketing materials did Toyota acknowledge or provide consumers notice of the Frame Defect or the damage that it caused.

86.     Toyota's decision to continue using the frames, notwithstanding its knowledge of the Frame Defect, and its customers' lack of knowledge of such Defect, has caused the Defect to go unremedied to this day.

87.     Defendants possessed exclusive and superior knowledge and information regarding the Defect but concealed the Defect from Plaintiff and Class members. Indeed, Toyota has known of the Frame Defect since prior to the release of the Class Vehicles into the market, as well as the serious safety risk it causes to the Vehicles' occupants, yet Toyota failed to inform Class members of the Defect prior to their Class Vehicle purchases and, to this day, fail to adequately remedy the Defect.

**E.     Plaintiffs' Experiences**

       **a.     Elliot Nazos**

88.     On or about February 12, 2010, Plaintiff Elliot Nazos (for purposes of this section, "Plaintiff") purchased his 2010 FJ Cruiser from Planet Toyota, an authorized Toyota dealer located in Matteson, Illinois (for purposes of this section, the "Dealership").

89.     Plaintiff purchased his Class Vehicle primarily for personal, family, or household use.

90.     Passenger safety and reliability were important factors in Plaintiff's decision to purchase his Class Vehicle.  Before making his purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and

Toyota (Sept. 16, 2013), https://pressroom.toyota.com/2014-toyota-fj-cruiser/ (last visited Mar. 31, 2022).

was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its frame.

91.     None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

92.     Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

93.     Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

94.     In October 2012, Plaintiff noticed excessive rust accumulation and flaking on the frame of his Class Vehicle. Shortly thereafter, he brought his Class Vehicle to Dan Wolf Toyota of Naperville, for an inspection of the frame. The dealer confirmed that the frame on Plaintiff's vehicle exhibited rust corrosion but, pursuant to Defendant Toyota's guidance, advised Plaintiff that the rust corrosion was normal.

95.     In or about October 2019, Plaintiff returned his vehicle to Dan Wolf Toyota of Naperville to obtain a splash shield repair after the original part fell off while the vehicle was in motion due to the excessive frame rust and corrosion. Ultimately, Plaintiff paid over $300.00 for this repair.

96.     From the same event and due to the same excessive rust corrosion, the Class Vehicle's gas tank straps were lost; thus, Plaintiff also had to pay out of pocket for the replacement, labor, and installation of new gas tank straps.

97.     To date, Toyota has sent no notification to Plaintiff about any permanent repair, modification, or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

98.    Plaintiff's vehicle continues to experience excessive rust and corrosion on the frame.

99.    At all times, Plaintiff, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

100.    As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

### b.    Christine Blight

101.    On or about June 21, 2010, Plaintiff Christine Blight (for purposes of this section, "Plaintiff") purchased her 2007 FJ Cruiser from Toyota of Scranton, an authorized Toyota dealer located in Scranton, Pennsylvania (for purposes of this section, the "Dealership").

102.    Plaintiff purchased the Class Vehicle primarily for personal, family, or household use.

103.    Passenger safety and reliability were important factors in Plaintiff's decision to purchase the Class Vehicle. Before making the purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, and spoke to a representative of the authorized Toyota Dealership who assured her of the quality, safety, and reliability of the vehicle. Plaintiff selected and ultimately purchased the Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

104.    None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

105.   Had Toyota disclosed the Defect before Plaintiff purchased her vehicle, she would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

106.   Plaintiff properly maintained and serviced her Class Vehicle according to the industry and maintenance guidelines.

107.   In or about 2014, Plaintiff first noticed the vehicle was exhibiting rust and corrosion accumulation on the frame and undercarriage of the vehicle.

108.   Over time, the problem worsened, and in or about early 2018, Plaintiff noticed excessive deterioration of the frame.

109.   On or about September 28, 2018, Plaintiff's husband, Brian Blight, contacted Toyota Brand Experience Center to inquire, including to ask if there was a recall on the FJ Cruiser frame. Upon information and belief, Toyota assigned this to its National Headquarters under file #1809280682.

110.   Ultimately, a representative stated that there was no recall, and that Toyota would not be able to assist Mr. Blight.

111.   In or about January 2020, Mr. Blight was taking his children to school when, due to the rotted and rusted frame, the driver's side rear lower link bracket fell off from the frame, while the vehicle was in motion.

112.   To date, Plaintiff has received no notification from Toyota about any permanent repair or modification or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage.

113.   As a result of the Defect, Plaintiff has lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

### c. Jack Perry

114.   On or about September 13, 2010, Plaintiff Jack Perry (for purposes of this section, "Plaintiff") purchased his 2010 FJ Cruiser from Palmiero Toyota Scion, an authorized Toyota dealer located in Meadville, Pennsylvania (for purposes of this section, the "Dealership").

115.   Plaintiff purchased his Class Vehicle primarily for personal, family, or household use.

116.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his Class Vehicle.  Before making his purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

117.   None of the information provided to Plaintiff disclosed any defects with the frame.  Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

118.   Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them.  Like all members of the Class, Plaintiff would not have purchased his Class Vehicle, or he would have paid less for the vehicle, had he known of the Defect.

119.   Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

120.   In or about December 2020, Plaintiff took his Class Vehicle in for service to an authorized Toyota Dealership after noticing the excessive frame rust and excessive flaking of his Class Vehicle's frame. At this service visit he directed the technician to look at the rust on his Class Vehicle's frame. During this service visit, and

30

at each and every oil change since, he has mentioned this Frame Defect to the technicians. However, each time, the technicians returned the Class Vehicle without providing any option to repair the Frame Defect.

121. To date, Toyota has sent no notification to Plaintiff about any permanent repair, modification, or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

122. Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

123. At all times, Plaintiff, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in the manner it was intended to be used.

124. As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

**d.** **Patricia Loughney**

125. On or about April 21, 2010, Plaintiff Patricia Loughney (for purposes of this section, "Plaintiff") purchased her 2010 FJ Cruiser from Towne Toyota, an authorized Toyota dealer located in Ledgewood, New Jersey (for purposes of this section, the "Dealership").

126. Plaintiff purchased her Class Vehicle primarily for personal, family, or household use.

127. Passenger safety and reliability were important factors in Plaintiff's decision to purchase his Class Vehicle. Before making her purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a Dealership representative about the quality, safety, and reliability of the vehicle, saw T.V. commercials that touted about the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased. Plaintiff selected and ultimately purchased his Class Vehicle

because the vehicle was represented, advertised, marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

128.   None of the information provided to Plaintiff disclosed any defects with the frame.  Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

129.   Had Toyota disclosed the Defect before Plaintiff purchased her vehicle, she would have seen such disclosures and been aware of them.  Like all members of the Class, Plaintiff would not have purchased her Class Vehicle, or she would have paid less for the vehicle, had she known of the Defect.

130.   Plaintiff properly maintained and serviced her Class Vehicle according to industry and maintenance guidelines.

131.   In approximately 2014, Plaintiff noticed that the Class Vehicle had excessive rust, corrosion, and flaking on the undercarriage and the frame of her vehicle.

132.   On or about February 25, 2014, Plaintiff brought her Class Vehicle to the Dealership for a brake repair. While there, she mentioned to the Dealership concerns about the frame rust, corrosion, and flaking. She also asked about the Tundra recall. The Dealership advised her that there was no recall on the FJ Cruiser frame, thus, they could not repair her Vehicle.

133.   After the Dealership declined to do the repair, Plaintiff brought her Class Vehicle to Mr. Darren Carr where he attempted to remediate the rust and applied an undercoat, for which Plaintiff was required to pay approximately $2800.00.

134.   To date, Toyota has sent no notification about any permanent repair, modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

135.   Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

136. At all times Plaintiff, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

137. As a result of the Defect, Plaintiff has lost confidence in the ability of her Class Vehicle to provide her safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

**e.    Emily Barbour**

138. On or about July 29, 2006, Plaintiff Emily Barbour (for purposes of this section, "Plaintiff") purchased her 2007 FJ Cruiser from Muller Toyota Scion, an authorized Toyota dealer located in Clinton, New Jersey (for purposes of this section, the "Dealership").

139. Plaintiff Barbour purchased her Class Vehicle primarily for personal, family, or household use.

140. Passenger safety and reliability were important factors in Plaintiff's decision to purchase her Class vehicle. Before making her purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured her of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased. Plaintiff selected and ultimately purchased her Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, reliable transportation in all components, including its frame.

141. None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's omissions were material to Plaintiff, who was acting as a reasonable consumer.

142. Had Toyota disclosed the Defect before Plaintiff purchased her vehicle, she would have seen such disclosures and been aware of them. Like all members of the

Class, Plaintiff would not have purchased her Class Vehicle, or she would have paid less for the vehicle, had he known of the Defect.

143.   Plaintiff properly maintained and serviced her Class Vehicle according to industry and maintenance guidelines.

144.   On or about September 29, 2021, Plaintiff brought her vehicle to Fairmount Hilltop Garage for regular maintenance where the mechanic advised her that her vehicle had exhibited excessive rust and corrosion on the frame.

145.   Upon learning of the excessive rust on the frame, Plaintiff brought her vehicle to Toyota World of Clinton, an authorized Toyota Dealership in Clinton New Jersey, with concerns that her Class Vehicle had excessive rust and corrosion. While there, Robert Stulter, the Service Director of the dealership, advised that she would be required to pay $150 just for preparing an estimate. Plaintiff requested that the dealership take down her information and that they contact Toyota directly and be in touch. To date, Toyota Motors and the dealership have not contacted Plaintiff.

146.   After Toyota refused to prepare a complimentary estimate, on or about November 3, 2021, Plaintiff brought her Class vehicle to Rick Allen's Auto Repair shop, in Hampton, NJ to have the technicians look at the frame. While at the shop and while the vehicle was on a lift, Plaintiff took photos of the rust and corrosion on the frame and undercarriage. Rick Allen Auto Repair informed Plaintiff Barbour that it would not be able to make the needed repairs to or replacements of the rusted frame and undercarriage.

147.   On or about December 3, 2021, Plaintiff went back to Toyota World with the pictures and showed the photos to John Castellano, a sales and leasing consultant, and Dave Ventura, the General Sales manager, at the dealership. Mr. Ventura contacted the service department and requested that they provide a "ball-park" estimate for replacement of the frame, which the service department advised was at least $16,000 to repair.

34

148.    To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

149.    Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

150.    At all times, Plaintiff, like all other Class Members, has attempted to drive her Class Vehicle in a foreseeable manner as it was intended to be used.

151.    As a result of the Defect, Plaintiff has lost confidence in the ability of her Class Vehicle to provide her safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

**f.    Thomas Pastore**

152.    On or about August 1, 2006, Plaintiff Thomas Pastore (for purposes of this section, "Plaintiff") purchased his 2007 FJ Cruiser from Smithtown Toyota, an authorized Toyota dealer located in Smithtown, New York (for purposes of this section, the "Dealership").

153.    Plaintiff purchased his Class Vehicle primarily for personal, family, or household use.

154.    Passenger safety and reliability were important factors in Plaintiff's decision to purchase his Class Vehicle. Before making his purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, and spoke to a representative of the authorized Toyota Dealership who assured him of the quality, safety, and reliability of the vehicle. Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation is all components, including its frame.

155.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

156.   Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

157.   Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

158.   In or about 2012, Plaintiff noticed that the vehicle showed signs of rust and corrosion.

159.   In or about 2012 Plaintiff was required to replace his exhaust, due to excessive rust on his frame and undercarriage.

160.   In addition, Plaintiff contacted the Dealership and Oakdale Toyota with concerns about the excessive rust on his vehicle's frame and undercarriage. The Toyota dealerships advised they were unaware of any issues or recalls for the frame.

161.   On or about September 1, 2021, Plaintiff brought his vehicle to Garden State Undercoating to have an undercoating applied and installed on his vehicle due to the excessive rust and corrosion. Plaintiff ultimately paid $3,450.00 for the undercoating.

162.   To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

163.   Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

164.   As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements

36

1   a permanent repair or modification to the maintenance schedule that prevents the

2   Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

3         **g.    Brian Hale**

4         165.   On or about November 23, 2007, Plaintiff Brian Hale (for purposes of this

5   section, "Plaintiff") purchased his 2007 FJ Cruiser from Kern Toyota, an authorized

6   Toyota dealer located in Winchester, Virginia (for purposes of this section, the

7   "Dealership").

8         166.   Plaintiff purchased his Class Vehicle primarily for personal, family, or

9   household use.

10        167.   Passenger safety and reliability were important factors in Plaintiff's

11  decision to purchase his Class Vehicle. Before making his purchase, Plaintiff reviewed

12  brochures and the Vehicle's Monroney sticker, spoke to a representative of the

13  authorized Toyota Dealership who assured him of the quality, safety, and reliability of

14  the vehicle, and test drove the vehicle he ultimately purchased. Plaintiff selected and

15  ultimately purchased his Class Vehicle because the vehicle was represented,

16  advertised, and marketed as a high-quality vehicle capable of providing safe, quality,

17  and reliable transportation is all components, including its frame.

18        168.   None of the information provided to Plaintiff disclosed any defects with

19  the frame. Toyota's misstatements and omissions were material to Plaintiff, who was

20  acting as a reasonable consumer.

21        169.   Had Toyota disclosed the Defect before Plaintiff purchased his vehicle,

22  he would have seen such disclosures and been aware of them. Like all members of the

23  Class, Hale would not have purchased his Class Vehicle, or he would have paid less

24  for the vehicle, had he known of the Defect.

25        170.   Plaintiff properly maintained and serviced his Class Vehicle according to

26  industry and maintenance guidelines.

27

28

171. In or about 2013, Plaintiff noticed that the Class Vehicle exhibited rust on the frame and undercarriage to the point that the heat shields had corroded all the way through and had fallen off.

172. Later, in or about May 2016, Plaintiff noticed that there was excessive rust and corrosion on his vehicle's frame and auxiliary components. Shortly after, Plaintiff contacted Orisman Fairfax Toyota with his concerns about the excessive rust and corrosion, and the service department advised that undercoating the frame would likely not benefit his frame.

173. In or about September 2021, Plaintiff's vehicle was flagged at the Virginia state inspection where they mentioned that Plaintiff will need to address the excessive rust and corrosion on the frame and undercarriage.

174. To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

175. Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

176. At all times, Plaintiff. like all Class Members, has attempted to drive his vehicle in a foreseeable manner in which it was intended to be used.

177. As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

### h. **Timothy Dotson**

178. On or about August 11, 2007, Plaintiff Timothy Dotson (for purposes of this section, "Plaintiff") purchased his 2007 FJ Cruiser from Russel Motor Cars, an authorized Toyota dealer located in Baltimore, Maryland (for purposes of this section, the "Dealership").

179.   Plaintiff purchased his Class Vehicle primarily for personal, family, or household use.

180.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his Class Vehicle. Before making his purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased. Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

181.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

182.   Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would not have purchased his Class Vehicle, or he would have paid less for the vehicle, had he known of the Defect.

183.   Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

184.   On or about February 21, 2012, with approximately 69,568 miles on the odometer, Plaintiff brought his vehicle to Brown's Toyota to discuss his concerns about rust and corrosion on his vehicle. The dealership advised that the rust and corrosion his vehicle exhibited was normal. The dealership then returned the Class Vehicle to Plaintiff without providing any option to repair the Frame Defect.

185.   On or about June 18, 2020, Plaintiff noticed that his vehicle exhibited excessive rust when he was having a hitch installed at Garrett Automotive.

186.   On or about July 13, 2020, Plaintiff brought his vehicle back to Garrett Automotive due to the excessive rust and corrosion. The technician wrote, "Treat

Rusted Areas with Rust Most, Fluid Film underneath vehicle (Note…This process will help slow down rust and corrosion under your vehicle, it will not stop rust corrosion completely)."

187. On or about May 24, 2021, Plaintiff brought his vehicle to Independent Auto Center for an oil change where Plaintiff was advised by the technician that they noticed the left rear axle bracket for the control arm had rotted off.

188. The next day, Plaintiff called Toyota Brand Experience Center and spoke to a representative who said that there was no recall on the FJ Cruiser frame; however, the representative provided a case number #210525001234.

189. On or about May 25, 2021, Plaintiff called NHTSA on the phone about his concerns about the excessive corrosion the Class Vehicle.

190. On or about June 07, 2021, Plaintiff brought his vehicle to Brown's Toyota with concerns that his vehicle exhibited excessive rust and corrosion. The technician replaced rear axle housing, link arms, and necessary parts. This repair ultimately cost Plaintiff $3,719.23.

191. To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

192. Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

193. At all times, Plaintiff, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in the manner in which it was intended to be used.

194. As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

### i.   Jill Silvernale

195.   On or about February 4, 2012, Plaintiff Jill Silvernale (for purposes of this section, "Plaintiff") purchased her 2007 FJ Cruiser from Signature Automotive Group, an authorized Toyota dealer located in Benton Harbor, Michigan (for purposes of this section, the "Dealership").

196.   Plaintiff purchased her Class Vehicle primarily for personal, family, or household use.

197.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase her Class Vehicle. Before making her purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured her of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased. Plaintiff selected and ultimately purchased her Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

198.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

199.   Had Toyota disclosed the Defect before Plaintiff purchased her vehicle, she would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would not have purchased her Class Vehicle, or she would have paid less for the vehicle, had she known of the Defect.

200.   Plaintiff properly maintained and serviced her Class Vehicle according to industry and maintenance guidelines.

201.   On or about October 29, 2021, Plaintiff was having a new muffler installed on her vehicle at Peterson European when the technician advised her that the frame of her vehicle was "very rusty" with "many holes coming through." In addition,

41

1   Peterson European advised that the gas tank straps were "very rusty" and "close to
2   breaking."

3       202.   Shortly after, Plaintiff contacted Toyota and spoke to a representative that
4   stated there was no recall on the FJ frame and they would be unable to assist her.

5       203.   On or about March 16, 2022, Plaintiff noticed that the rusty fuel tanks
6   straps were hanging down to the point where she felt that her vehicle was unsafe to
7   drive to work. As a result, on March 16, 2022, Plaintiff had to pay $401.94 out of
8   pocket to replace both fuel tank straps and hardware.

9       204.   To date, Toyota has sent no notification to Plaintiff about any permanent
10  repair or modification or change to the maintenance schedule that would either repair
11  the Defect or prevent the Defect from causing additional damage.

12      205.   Plaintiff's Class Vehicle continues to experience excessive rust and
13  corrosion on the frame.

14      206.   At all times, Plaintiff, like all Class Members, has attempted to drive her
15  Class Vehicle in a foreseeable manner and in the manner in which it was intended to
16  be used.

17      207.   As a result of the Defect, Plaintiff has lost confidence in the ability of her
18  Class Vehicle to provide her safe and reliable transportation for ordinary and advertised
19  purposes. Until and unless Toyota fully discloses the Defect or implements a
20  permanent repair or modification to the maintenance schedule that prevents the Defect
21  from causing damage, Plaintiff's loss of confidence will continue unabated.

22      **j.**    **Kyle Blumin**

23      208.   On April 24, 2018, Plaintiff Kyle Blumin (for purposes of this section,
24  "Plaintiff") purchased his 2013 FJ Cruiser from Larry H. Miller Toyota, an authorized
25  Toyota dealer located in Murray, Utah (for purposes of this section, the "Dealership").

26      209.   Plaintiff purchased his Class Vehicle primarily for personal, family, or
27  household use.

28

210.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, and spoke to a representative of the authorized Toyota Dealership. Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

211.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff.

212.   Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

213.   Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

214.   In or about the latter half of 2019, Plaintiff noticed that there were rust stains on the floor of his garage where he parked his Class Vehicle. Plaintiff then discovered that the underside of his Vehicle showed signs of rust and corrosion.

215.   Approximately two months later, Plaintiff contacted the Dealership with concerns about the excessive rust on his vehicle's frame and undercarriage. A representative at the Dealership advised Plaintiff there was nothing that could be done because the Vehicle was outside of its warranty, and advised Plaintiff to call Toyota's corporate office.

216.   Plaintiff then called Toyota's customer service department, where the representative advised that Toyota would not cover the repair because the Vehicle's warranty had expired.

217.   A few days later, in an attempt to mitigate the excessive rust and corrosion, Plaintiff brought his Class Vehicle to Signature Detailing, located in Salt

Lake City, Utah, to have an undercoating applied to the class vehicle due to the excessive rust and corrosion. Plaintiff paid $350.00 for the undercoating.

218.   To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

219.   Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

220.   As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

### k.   All Plaintiffs

221.   Prior to Plaintiffs' purchase of their Class Vehicles, Defendants, in widespread marketing campaigns, touted the quality, durability, and safety of the Class Vehicles, and specifically the quality and benefits of their frames and related components.

222.   Although Toyota had the opportunity to disclose the Frame Defect through its advertising in the owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by Toyota dealerships, through vehicle brochures and other informational documents, or on Toyota's website, Toyota failed to do so prior to Plaintiffs' Vehicle purchases, and Toyota continues to conceal the Defect to this day.

223.   As such, Plaintiffs had no way of knowing or learning that such information regarding the quality, durability, and safety of the Class Vehicles, including the quality and benefits of their frames and related components, conveyed to Plaintiffs in Toyota's marketing materials when deciding to purchase their Vehicles, was false.

224. Had Plaintiffs known, or otherwise been made aware, of the Frame Defect in the Class Vehicles and Toyota's inability to repair or cure it absent replacement of the frame and other affected components, they would not have purchased their Class Vehicle or, otherwise, would have paid significantly less for them.

225. When Plaintiffs purchased their Class Vehicles, they relied on the reasonable expectation that their Class Vehicles would be equipped with a frame that was free from defects, had adequate anti-corrosion properties, and would maintain the structural integrity of the Vehicle, ensuring they were safe to operate.

226. At all relevant times, Plaintiffs have operated their Class Vehicles in a reasonable and foreseeable manner and as the Vehicles were intended to be used. However, the Vehicles no longer provide safety and reliability, due to the recurring problems caused by the Frame Defect.

227. Plaintiffs have suffered a concrete and ascertainable loss as a direct and proximate result of Toyota's omissions and misrepresentations relating to the Frame Defect in that Plaintiffs overpaid for their Class Vehicles at the time of purchase, the value of their Class Vehicles has been diminished, and they are left with vehicles that pose a safety risk to themselves and their occupants as a result of the Frame Defect and the damage it causes to the structural integrity of the Vehicle.

**F.**     **Fraudulent Concealment Allegations**

228. Absent discovery, Plaintiffs are unable through reasonable investigation to obtain the true names and identities of those individuals at Toyota responsible for disseminating false and deceptive marketing materials and information regarding the Class Vehicles. Conversely, Toyota necessarily is in possession of, or has access to, all of this information.

229. Plaintiffs' claims arise out of Toyota's false, deceptive, and fraudulent concealment of the Frame Defect and the premature and excessive rusting and corrosion it causes, and its representations about the quality, durability, and value of the Class Vehicles.

230. To the extent that Plaintiffs' claims arise from Toyota's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Class Vehicles, Toyota knew, or was reckless in not knowing, of the Frame Defect; Toyota was under a duty to disclose the Frame Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, but Toyota never disclosed the Frame Defect to Plaintiffs or the public at any time or place or in any manner.

231. Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Toyota:

a.  **Who**: Toyota actively concealed the Frame Defect from Plaintiffs and Class members while simultaneously touting the quality and durability of the Class Vehicles. Plaintiffs are unaware of, and are therefore unable to identify, the true names and identities of those specific individuals at Toyota responsible for such decisions.

b.  **What**: Toyota knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Frame Defect. Toyota concealed the Frame Defect and made contrary representations about the quality, durability, and other attributes of the Class Vehicles.

c.  **When**: Toyota concealed material information regarding the Frame Defect at all relevant times and made representations about the quality, durability, and other attributes of the Class Vehicles starting no later than 2004, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/certification for pre-owned sale, and on an ongoing basis, and continuing to this day. On information and belief, Toyota has not disclosed the truth about the Frame Defect in the Class Vehicles to anyone outside of Toyota. In addition, Toyota has never taken any action to inform consumers about the true nature of the Frame Defect in Class Vehicles. Additionally, when consumers have brought their Class

Vehicles to Toyota complaining of the excessive and premature frame corrosion and rust, Toyota has denied any knowledge of, or responsibility for, the Frame Defect, claimed that the corrosion is "normal," and required consumers to pay out-of-pocket expenses to perform inadequate repairs or replace their Class Vehicles' frames.

d.   *Where*: Toyota concealed material information regarding the true nature of the Frame Defect in the communications it had with Plaintiffs and Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which Toyota disclosed the truth about the Frame Defect in the Class Vehicles to anyone outside of Toyota. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, or owner's manuals, or on Toyota's website.

e.   *How*: Toyota concealed the Frame Defect from Plaintiffs and Class members and made representations about the quality, durability, and other attributes of the Class Vehicles. Toyota actively concealed the truth about the existence and nature of the Frame Defect from Plaintiffs and Class members, at all times, even though it knew about the Frame Defect and knew that information about the Frame Defect would be important to a reasonable consumer. Toyota also promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

f.   *Why*: Toyota actively concealed material information about the Frame Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase the Vehicles instead of competitors' vehicles, and to save money on production and materials, and it made representations about the quality and durability of the Vehicles. Had Toyota disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers, including Class members) would have been aware of the Frame Defect, and they would not have bought the Class Vehicles or would have paid less for them.

## V.      TOLLING OF THE STATUTE OF LIMITATIONS

### A.      Fraudulent Concealment Tolling

232.    Toyota has known of the Frame Defect in the Class Vehicles since at least 2006, and has concealed from, or failed to notify, Plaintiffs, Class members, and the public of the full and complete nature of the Frame Defect, even when directly asked about it by Plaintiffs and Class members during communications with Toyota, as well as its customer service representatives, authorized dealerships, and service centers. Toyota continues to conceal the Frame Defect to this day.

233.    Any applicable statute of limitation has, thus, been tolled by Toyota's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B.      Estoppel

234.    Toyota was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. Toyota actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class members reasonably relied upon Toyota's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, Toyota is estopped from relying on any statutes of limitation in defense of this action.

### C.      Discovery Rule

235.    Certain causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Frame Defect.

236.    However, Plaintiffs and Class members had no reasonable ability to discern on their own that the Class Vehicles were defective until—at the earliest—after the Frame Defect caused their Vehicles' frame and related components to fail. Indeed, the premature and excessive corrosion affecting the Class Vehicles' frames does not spread to the Vehicles' exterior panels and cannot be observed at eye-level. In fact,

most Class members become aware of the extreme and premature corrosion only after being in an accident or when a wholly-unrelated part was being repaired and a mechanic or Toyota service representative is able to observe the corrosion when the Vehicle is placed on a hydraulic lift. Plaintiffs and Class members, obviously, do not have this capability and, in any event, it is not reasonable to expect that Plaintiffs and Class members would continuously monitor the undercarriage of their Vehicles.

237. Even then, Plaintiffs and Class members had no reasonable reason to know about the corrosion and rust caused by a defect in the Class Vehicles because of Toyota's active concealment of the Frame Defect. Not only did Toyota fail to notify Plaintiffs or Class members about the Frame Defect, Toyota, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it, and, in many instances, actually blamed the owner/lessee for causing the problem.

238. Thus, Plaintiffs and Class members were not reasonably able to discover the Frame Defect until after they had purchased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing premature and excessive corrosion on their Vehicles.

## VI.   CLASS ALLEGATIONS

239. Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the following Nationwide Class (under the laws of the state of California) and State Classes defined as:

> **Nationwide Class:**
>
> All persons or entities in the United States (including its territories and the District of Columbia) that purchased a Class Vehicle. Class Vehicles consist of the Toyota FJ Cruiser, model years 2007-2014.

49

**Illinois Class:**

All persons or entities in Illinois that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Illinois.

**Maryland Class:**

All persons or entities in Maryland that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Maryland.

**Michigan Class:**

All persons or entities in Michigan that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Michigan.

**New York Class:**

All persons or entities in New York that purchased a Class Vehicle or that purchased a Class Vehicle and reside in New York.

**New Jersey Class:**

All persons or entities in New Jersey that purchased a Class Vehicle or that purchased a Class Vehicle and reside in New Jersey.

**Pennsylvania Class:**

All persons or entities in Utah that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Pennsylvania.

**Virginia Class:**

All persons or entities in Virginia that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Virginia.

**Utah Class:**

All persons or entities in Utah that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Utah.

240. Excluded from the Class are Defendants; their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Toyota; Toyota's dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated

50

court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

241.   Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

242.   This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

243.   **Numerosity**. Rule 23(a)(1) of the Federal Rules of Civil Procedure: The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are at least thousands of Class members, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Toyota's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

244.   **Commonality and Predominance**. Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

a.     whether Toyota engaged in the conduct alleged herein;

b.     whether Toyota designed, manufactured, advertised, marketed, distributed, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.     whether Toyota designed, manufactured, marketed, and distributed Class Vehicles with a Frame Defect;

d.     whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of their bargains;

e.     whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

f.     whether Toyota's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraudulent concealment, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

g.     whether Toyota has violated its express warranties to Plaintiffs and Class members;

h.     whether Toyota has been unjustly enriched so that its receipt and retention of the profits derived from Plaintiffs and Class members is inequitable;

i.     whether Toyota actively concealed the Frame Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

j.     such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

245.  **Typicality**. Rule 23(a)(3) of the Federal Rules of Civil Procedure: Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Toyota's wrongful conduct as described above. All claims seek recovery on the same legal theories and are based upon Toyota's common course of conduct.

246.  **Adequacy**. Rule 23(a)(4) of the Federal Rules of Civil Procedure: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

247.  **Declaratory Relief**. Rule 23(b)(2) of the Federal Rules of Civil Procedure: Toyota has acted or refused to act on grounds generally applicable to

Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

248. **Superiority**. Rule 23(b)(3) of the Federal Rules of Civil Procedure: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Toyota, so it would be impracticable for Class members to individually seek redress for Toyota's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII. CLAIMS

**A.** **Claims Brought on Behalf of the Nationwide Class**

### COUNT I

### FRAUDULENT CONCEALMENT

249. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

250. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform in all states. In the alternative, Plaintiffs bring this claim on behalf of themselves and their respective state classes under the laws of each state.

251. Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.

53

252.   Despite advertising the Class Vehicles and their frames as durable and being of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

253.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles and Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

254.   Plaintiffs and Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

255.   Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

     a.   Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

     b.   the facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

     c.   Toyota knew that Plaintiffs and Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

d.      Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

256.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and Class members.

257.   Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

258.   Plaintiffs and Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs' and Class members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Class members.

259.   As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

260.   Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

261.   Accordingly, Toyota is liable to the Nationwide Class and/or State Classes for their damages in an amount to be proven at trial.

262.   Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.   Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II

### UNJUST ENRICHMENT

263.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

264.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants.

265.   As a direct and proximate result of Toyota's misrepresentations regarding the Class Vehicles and failure to disclose the Frame Defect, Defendants have profited through the sale of the Class Vehicles. Although the Class Vehicles were purchased through the Defendants' agents, the money from the Class Vehicle sales flows directly back to Defendants.

266.   Additionally, as a direct and proximate result of Defendants' failure to disclose known Defects in the Class Vehicles, Plaintiff and Class members have vehicles that require repeated, high-cost repairs.

267.   Plaintiffs and Class Members conferred a benefit on Toyota by paying money for repeated, high-cost repairs to the defective frame that earned interest or otherwise added to the Defendants' profits when said money should have remained with Plaintiffs and Class Members.

268.   The Defendants had knowledge of the benefit conferred on them by Plaintiffs and Class members. Specifically, Defendants knew or should have known that Plaintiffs and Class members were paying them for repeated, high-cost repairs to

the frame in connection with the Frame Defect, which should have been repaired by Toyota at no cost.

269. Defendants voluntarily accepted and retained the benefit conferred on them by Plaintiffs and Class members by accepting payment for repeated, high-cost repairs to the defective frames on the Class Vehicles.

270. The circumstances are such that it would be inequitable for Defendants to retain the benefit without paying the value thereof to Plaintiffs and Class Members.

## COUNT III
### DECLARATORY RELIEF

271. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

272. Plaintiffs brings this claim on behalf of themselves and the Class against Defendants.

273. Pursuant to 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

274. Defendants marketed, distributed, and sold the Class Vehicles equipped with frames prone to exhibiting excessive rust corrosion and perforation on account of Defendants' failure to treat the frames on such vehicles with adequate rust corrosion protection.

275. Accordingly, Plaintiffs and Class Members seek entry of the following declarations: (1) the Class Vehicles lack adequate rust corrosion protection and are defective; (2) all persons who purchased the Class Vehicles are to be provided the best practicable notice of the Defect, which cost shall be borne by Defendants; and (3) Defendants must establish an inspection, repair, and replacement program and protocol and notify Class members of such program, pursuant to which Defendants, including its authorized representatives, and at no cost to Class members, will inspect, upon request, Class members' Class Vehicles for frame rust corrosion, treat the Class

Vehicles that have not exhibited rust corrosion with adequate rust corrosion protection, and repair or replace the frames on the Class Vehicles that have experienced frame rust corrosion.

**B.    Claims Brought on Behalf of the State Classes**

**COUNT IV**

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND**

**DECEPTIVE BUSINESS PRACTICES ACT**

**(815 ILCS 505/1, *et seq.* and 510/2)**

276.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

277.   Plaintiff Elliot Nazos (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Illinois Class against Toyota.

278.   Toyota, Plaintiff, and the Illinois Class members are "persons" within the meaning 815 ILCS 505/1(c) and 510/1(5). Plaintiffs and the Illinois State Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

279.   The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILCS 510/2.

280.   In the course of its business, Toyota, through their agents, employees, and/or subsidiaries, violated the Illinois CFA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles, the

quality and benefits of the frames used on the Class Vehicles, the existence of the Frame Defect, and Toyota's ability to render a repair to cure the Defect.

281. Specifically, in marketing, offering for sale, and selling/leasing the defective Class Vehicles, Toyota engaged in one or more of the following unfair or deceptive acts or practices prohibited by 815 ILCS 505/2 and 510/2:

a. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

b. Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

c. Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

d. Advertising the Class Vehicles with the intent not to sell them as advertised;

e. Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f. Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

282. Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Illinois Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Illinois Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Illinois Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

283.   Plaintiff and the Illinois Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

284.   Toyota had an ongoing duty to Plaintiff and the Illinois Class members to refrain from unfair and deceptive practices under the Illinois CFA in the course of its business. Specifically, Toyota owed Plaintiff and the Illinois Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Illinois Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

285.   Plaintiff and the Illinois Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

286.   Toyota's violations present a continuing risk to Plaintiff and the Illinois Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

287.   Pursuant to 815 ILCS 505/10a(a) and 510/3, Plaintiff and the Illinois Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA.

## COUNT V

### VIOLATION OF THE MARYLAND
### UNFAIR TRADE PRACTICES ACT
### (Md. Code Com. Law § 13-101, *et seq.*)

288.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

289.   Plaintiff Timothy Dotson (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Maryland Class against Toyota.

290. Toyota, Plaintiff, and the Maryland Class members are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

291. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. Md. Code Com. Law § 13-303.

292. In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Md. Code Com. Law § 13-303:

    a.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    b.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    c.    Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

    d.    Advertising the Class Vehicles with the intent not to sell them as advertised;

    e.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    f.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

293. Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Maryland Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Maryland Class members would rely on the misrepresentations, concealments,

1   and omissions. Had he known the truth, Plaintiff and the Maryland Class members
2   would not have purchased the Class Vehicles, or would have paid significantly less for
3   them.

4       294.   Plaintiff and the Maryland Class members had no way of discerning that
5   Toyota's representations were false and misleading, or otherwise learning the facts that
6   Toyota had concealed and/or failed to disclose.

7       295.   Toyota had an ongoing duty to Plaintiff and the Maryland Class members
8   to refrain from unfair and deceptive practices under the Maryland CPA in the course
9   of its business. Specifically, Toyota owed Plaintiff and the Maryland Class members a
10  duty to disclose all the material facts concerning the Class Vehicles because it
11  possessed exclusive knowledge, it intentionally concealed such material facts from
12  Plaintiff and the Maryland Class members, and/or it made misrepresentations that were
13  rendered misleading because they were contradicted by withheld facts.

14      296.   Plaintiff and Maryland Class members suffered ascertainable loss and
15  actual damages as a direct and proximate result of Toyota's concealment,
16  misrepresentations, and/or failure to disclose material information.

17      297.   Toyota's violations present a continuing risk to Plaintiff and the Maryland
18  Class, as well as to the general public. As such, Toyota's unlawful acts and practices
19  complained of herein affect the public interest.

20      298.   Pursuant to Md. Code Com. Law § 13-408, Plaintiff and the Maryland
21  Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices,
22  and awarding damages, punitive damages, and any other just and proper relief available
23  under the Maryland CPA.

24
25
26
27
28

## COUNT VI

**VIOLATION OF THE MICHIGAN**

**CONSUMER PROTECTION ACT**

**(MICH. COMP. LAWS §445.903, *et seq.*)**

299.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

300.   Plaintiff Jill Silvernale (for the purposes of this section, "Plaintiff") brings this claim on behalf of herself and the Michigan Class.

301.   Toyota, Plaintiff, and the Michigan State Class members are "persons" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

302.   Toyota engaged in "trade" or "commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(g).

303.   The Michigan Consumer Protection Act ("Michigan CPA") makes unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …."  Mich. Comp. Laws § 445.903(1).

304.   In the course of their business, Toyota, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair, unconscionable and/or deceptive acts or practices as prohibited by the Michigan CPA:

   a.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

   b.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

   c.   Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

   d.   Advertising the Class Vehicles with the intent not to sell them as advertised;

   e.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

63

f.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

305.   Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Michigan Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Michigan Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Michigan Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

306.   Plaintiff and the Michigan Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

307.   Toyota had an ongoing duty to Plaintiff and the Michigan Class members to refrain from unfair and deceptive practices under the Michigan CPA in the course of its business. Specifically, Toyota owed Plaintiffs and the Michigan Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Michigan Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

308.   Plaintiff and Michigan Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

309.   Toyota's violations present a continuing risk to Plaintiff and the Michigan Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

310.   Pursuant to Mich. Comp. Laws § 445.911, Plaintiff and the Michigan Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Michigan CPA.

**COUNT VII**

**VIOLATIONS OF THE NEW JERSEY**

**CONSUMER FRAUD ACT**

**(N.J. Stat. Ann. § 56:8-1, *et seq*.)**

311.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

312.   Plaintiffs Emily Barbour and Patricia Loughney (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the New Jersey Class against Toyota.

313.   Toyota, Plaintiffs, and the New Jersey Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

314.   Toyota is engaged in "sales" of "merchandise" within the meaning of N.J. Stat.  Ann. § 56:8-1(c), (e).

315.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…"  N.J. Stat. Ann. § 56:8-2.

316. In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in the following unfair or deceptive acts or practices as prohibited by N.J. Stat. Ann. § 56:8-2: using or employing "deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale" of the Class Vehicles, as detailed above.

317. Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the New Jersey Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the New Jersey Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the New Jersey Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

318. Plaintiffs and the New Jersey Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

319. Toyota had an ongoing duty to Plaintiffs and the New Jersey Class members to refrain from unfair and deceptive practices under the New Jersey CFA in the course of its business. Specifically, Toyota owed Plaintiffs and the New Jersey Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the New Jersey Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

320. Plaintiffs and the New Jersey Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

321. Toyota's violations present a continuing risk to Plaintiffs and the New Jersey Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

322. Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the New Jersey Class seek an order enjoining Toyota' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New Jersey CFA.

<u>COUNT VIII</u>

**VIOLATION OF THE NEW YORK**

**DECEPTIVE ACTS AND PRACTICES ACT**

**(N.Y. Gen. Bus. Law § 349)**

323. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

324. Plaintiff Thomas Pastore (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the New York Class against Toyota.

325. Toyota, Plaintiff, and the New York Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

326. The New York Deceptive Acts and Practices Act ("NY DAPA") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

327. In the course of their business, Toyota engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.Y. Gen. Bus. Law § 349:

      a. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

      b. Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

67

c.    Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

d.    Advertising the Class Vehicles with the intent not to sell them as advertised;

e.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

328.   Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and New York Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the New York Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the New York Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

329.   Plaintiff and the New York Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

330.   Toyota had an ongoing duty to Plaintiff and the New York Class members to refrain from unfair and deceptive practices under the New York DAPA in the course of its business. Specifically, Toyota owed Plaintiff and the New York Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from

1 Plaintiff and the New York Class members, and/or it made misrepresentations that
2 were rendered misleading because they were contradicted by withheld facts.

3 331.   Plaintiff and the New York Class members suffered ascertainable loss and
4 actual damages as a direct and proximate result of Toyota's concealment,
5 misrepresentations, and/or failure to disclose material information.

6 332.   Toyota's violations present a continuing risk to Plaintiff and the New
7 York Class, as well as to the general public. As such, Toyota's unlawful acts and
8 practices complained of herein affect the public interest.

9 333.   Plaintiff and the New York Class seek an order enjoining Toyota's unfair
10 and/or deceptive acts or practices, and awarding damages, punitive damages, and any
11 other just and proper relief available under the NY DAPA.

12 ## COUNT IX
13 **VIOLATION OF THE PENNSYLVANIA**
14 **UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
15 **(73 Pa. Stat. Ann. § 201-1, *et seq.*)**

16 334.   Plaintiffs incorporate by reference each preceding paragraph as though
17 fully set forth herein.

18 335.   Plaintiffs Christine Blight and Jack Perry (for the purposes of this section,
19 "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania Class
20 against Toyota.

21 336.   Toyota, Plaintiffs, and the Pennsylvania Class members are "persons"
22 within the meaning of 73 Pa. Stat. Ann. § 201-2.(2).

23 337.   Defendants are engaged in "trade" or "commerce" within the meaning of
24 73 Pa. Stat. Ann. § 201-2(3).

25 338.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA")
26 prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce
27 …." 73 Pa. Stat. Ann. § 201 3.

28

339. In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices in violation of 73 Pa. Stat. Ann. § 201-3:

      a.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

      b.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      c.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

      d.    Advertising the Class Vehicles with the intent not to sell them as advertised;

      e.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

      f.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

340. Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the Pennsylvania Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Pennsylvania Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the Pennsylvania Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

341.   Plaintiffs and the Pennsylvania Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

342.   Toyota's violations present a continuing risk to Plaintiffs and the Pennsylvania Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

343.   Toyota had an ongoing duty to Plaintiffs and the Pennsylvania Class members to refrain from unfair and deceptive practices under the Pennsylvania UTPA in the course of its business. Specifically, Toyota owed Plaintiffs and the Pennsylvania Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the Pennsylvania Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

344.   Plaintiffs and Pennsylvania Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

345.   Pursuant to 73 Pa. Stat. Ann. § 201-9.2(a), Plaintiffs and the Pennsylvania Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive and/or treble damages, and any other just and proper relief available under the Pennsylvania UTPA.

## COUNT X

### VIOLATION OF UTAH

### CONSUMER SALES PRACTICES ACT

### (Utah Code Ann. § 13-11-1, *et seq.*)

346.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

71

347. Plaintiff Kyle Blumin (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Utah Class against Toyota.

348. The Defendants are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

349. Plaintiff and the Utah State Class members are "persons" under Utah Code § 13-11-3(5).

350. The sales of the Class Vehicles to Plaintiff and the Utah Class members were "consumer transactions" within the meaning of Utah Code § 13-11-3(2).

351. The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction." Utah Code § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code § 13-11-5.

352. In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Utah Code § 13-11-4:

    a.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    b.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

    c.    Representing that the Class Vehicles were supplied in accordance with Defendants' prior representations, although they were not as represented.

353. Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Utah Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Utah Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Utah Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

354.   Plaintiff and the Utah Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

355.   Toyota's violations present a continuing risk to Plaintiff and the Utah Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

356.   Toyota had an ongoing duty to Plaintiff and the Utah Class members to refrain from unfair and deceptive practices under the Utah CSPA in the course of its business. Specifically, Toyota owed Plaintiff and the Utah Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Utah Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

357.   Plaintiff and the Utah Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

358.   Plaintiff and the Utah Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Utah CSPA.

## COUNT XI

### VIOLATION OF UTAH

### TRUTH IN ADVERTISING LAW

### (Utah Code Ann. § 13-11a-1, *et seq.*)

359.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

360.   Plaintiff Kyle Blumin (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Utah Class against Toyota.

361. Plaintiff, the Utah Class, and the Defendants are "person[s]" within the meaning of Utah Code § 13-11a-1(7).

362. Utah's Truth In Advertising law makes unlawful any deceptive practice undertaken in the course of a person's business. Utah Code § 13-11a-3.

363. In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices as defined in Utah Code § 13-11a-3:

a. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

b. Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

c. representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

d. Advertising the Class Vehicles with the intent not to sell them as advertised;

e. Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f. Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

364. Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Utah Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Utah Class members would rely on the misrepresentations, concealments, and

omissions. Had they known the truth, Plaintiff and the Utah Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

365. Plaintiff and the Utah Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

366. Toyota's violations present a continuing risk to Plaintiff and the Utah Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

367. Toyota had an ongoing duty to Plaintiff and the Utah Class members to refrain from unfair and deceptive practices under the Utah Truth In Advertising law in the course of its business. Specifically, Toyota owed Plaintiff and the Utah Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Utah Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

368. Plaintiff and the Utah Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

369. Pursuant to Utah Code Ann. § 13-11a-4, Plaintiff and the Utah Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Utah Truth In Advertising law.

## COUNT XII

### VIOLATION OF THE VIRGINIA

### CONSUMER PROTECTION ACT

### (VA. CODE ANN. § 59.1-196, *et seq.*)

370. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

75

371. Plaintiff Brian Hale (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Virginia Class against Toyota.

372. The Defendants, Plaintiff, and the Virginia Class members are "persons" within the meaning of VA. CODE ANN. § 59.1-198. The Defendants are also "supplier[s]" as defined by VA. CODE ANN. § 59.1-198.

373. The Class Vehicles were at all relevant times "goods" within the meaning of VA. CODE ANN. § 59.1-198.

374. The Defendants were and are engaged in "consumer transactions" within the meaning of VA. CODE ANN. § 59.1-198.

375. The Virginia Consumer Protection Act ("Virginia CPA") prohibits "fraudulent acts or practices committed by a supplier in connection with a consumer transaction[,]" VA. CODE ANN. § 59.1-200(A), and makes the following specific acts unlawful:

    a.   "Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits[.]"

    b.   "Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model[.]"

    c.   "Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised."

    d.   "Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" §§ 59.1-200(A)(5)-(6), (8), and (14).

376. In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices as prohibited by VA. CODE ANN. § 59.1-200(A):

    a.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

76

b.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

c.   Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

d.   Advertising the Class Vehicles with the intent not to sell them as advertised;

e.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

377. Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Virginia Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Virginia Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Virginia Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

378. Plaintiff and the Virginia Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

379. Toyota's violations present a continuing risk to Plaintiff and the Virginia Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

380.   Toyota had an ongoing duty to Plaintiff and the Virginia Class members to refrain from unfair and deceptive practices under the Virginia CPA in the course of its business. Specifically, Toyota owed Plaintiff and the Virginia Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Virginia Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

381.   The Virginia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

382.   Plaintiff and the Virginia Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Virginia CPA.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide and Classes, respectfully request that the Court certify the proposed Classes, including designating the named Plaintiffs as representatives of the Nationwide Class and respective State Classes, appointing the undersigned as Class Counsel, and designating any appropriate issue classes, under the applicable provisions of Federal Rule of Civil Procedure 23, and that the Court enter judgment in Plaintiffs' favor and against Toyota including the following relief:

(i)   A declaration that any applicable statutes of limitations are tolled due to Toyota's fraudulent concealment and that Toyota is estopped from relying on any statutes of limitations in defense;

(ii)   A declaration that (1) the Class Vehicles lack adequate rust corrosion protection and are defective; (2) all persons who purchased the Class Vehicles are to be provided the best practicable notice of the Defect; and (3) Defendants must establish an inspection, repair, and replacement program and protocol and notify Class members

of such program, pursuant to which Defendants, including its authorized representatives, and at no cost to Class members, will inspect, upon request, Class members' Class Vehicles for frame rust corrosion, treat the Class Vehicles that have not exhibited rust corrosion with adequate rust corrosion protection, and repair or replace the frames on the Class Vehicles that have experienced frame rust corrosion;

(iii)    Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

(iv)    Punitive and exemplary damages under applicable law;

(v)    Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by a Plaintiff or Class member to remedy the Frame Defect;

(vi)    A determination that Toyota is financially responsible for all Class notices and the administration of Class relief;

(vii)   Any applicable statutory or civil penalties;

(viii)  An order requiring Toyota to pay both pre-judgment and post-judgment interest on any amounts awarded;

(ix)    An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

(x)    Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

(xi)    Any such other and further relief the Court deems just and equitable.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs and Class members hereby demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated: April 4, 2022.                    Respectfully submitted,

**EDELSBERG LAW, P.A.**

**By:** ___*/s/ Scott Edelsberg*___
      Scott Edelsberg (SBN 330990)
      scott@edelsberglaw.com
      1925 Century Park E #1700
      Los Angeles, California 90067
      Telephone: (310) 438-5355

**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
Jason H. Alperstein (*pro hac vice to be filed*)
alperstein@kolawyers.com
Jeff Ostrow (*pro hac vice to be filed*)
ostrow@kolawyers.com
Kristen Lake Cardoso (SBN 338762)
cardoso@kolawyers.com
One West Las Olas, Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300

**BLEICHMAR FONTI AND AULD LLP**
Lesley E. Weaver (SBN 191305)
lweaver@bfalaw.com
Joshua D. Samra (SBN 313050)
jsamra@bfalaw.com
555 12th Street, Suite 1600
Oakland, CA 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

**GORDON & PARTNERS, P.A.**
Steven G. Calamusa (*pro hac vice to be filed*)
scalamusa@fortheinjured.com
Geoff S. Stahl (*pro hac vice to be filed*)
gstahl@fortheinjured.com
Rachel A. Bentley (*pro hac vice to be filed*)
rbentley@fortheinjured.com
4114 Northlake Boulevard

Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050

**LAW OFFICE OF DENNIS O. COHEN, PLLC**
Dennis O. Cohen (*pro hac vice to be filed*)
dennis@denniscohenlaw.com
157 13th Street
Brooklyn, NY 11215
Telephone: (646) 859-8855