1  EDELSBERG LAW, P.A.
2  Scott Edelsberg (SBN 330990)
   scott@edelsberglaw.com
3  1925 Century Park E #1700
4  Los Angeles, California 90067
   Telephone: (310) 438-5355
5
6  Attorneys for Plaintiffs and the Proposed Classes

7  *(Additional Attorneys Listed on Signature Page)*

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**
10

11 | ELLIOT NAZOS, CHRISTINE
12 | BLIGHT, JACK PERRY, PATRICIA          Case No. 2:22-cv-02214-PA(Ex)
   | LOUGHNEY, THOMAS PASTORE,
13 | BRIAN HALE, TIMOTHY DOTSON,          SECOND AMENDED CLASS
   | EMILY BARBOUR, JILL                  ACTION COMPLAINT
14 | SILVERNALE and KYLE BLUMIN,
15 | individually and on behalf of all others   DEMAND FOR JURY TRIAL
   | similarly situated,
16
17                    Plaintiffs,

18 | v.
19
20 | TOYOTA MOTOR CORPORATION
   | and TOYOTA MOTOR SALES,
21 | U.S.A., INC.,
22
23                    Defendants.

24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.   JURISDICTION AND VENUE .............................................................. 4

III.  PARTIES ................................................................................................ 5

      A.    Plaintiffs ...................................................................................... 5

      B.    Defendants ................................................................................... 6

IV.   FACTUAL ALLEGATIONS .................................................................. 7

      A.    The Class Vehicles and the Frame Defect ................................. 7

      B.    The Frame Defect Renders the Class Vehicles Unsafe ............. 8

      C.    Defendants' Knowledge of the Frame Defect in the Class
            Vehicles ..................................................................................... 10

            a.    Toyota's Limited-Service Campaigns, Bulletins, and
                  Recalls for Toyota Trucks ............................................... 11

            b.    Customer Complaints Regarding the Frame Defect ........ 15

      D.    Marketing and Concealment ...................................................... 22

      E.    Plaintiffs' Experiences .............................................................. 29

            a.    Elliot Nazos .................................................................... 29

            b.    Christine Blight .............................................................. 32

            c.    Jeffrey Cochran .............................................................. 34

            d.    Jack Perry ....................................................................... 36

            e.    Brian and Barbara Saunders .......................................... 38

            f.    Patricia Loughney ........................................................... 40

            g.    Emily Barbour ................................................................ 42

            h.    Thomas Pastore .............................................................. 44

            i.    Timothy and Dawn Dotson ............................................ 46

            j.    Jill Silvernale ................................................................. 49

            k.    Kyle Blumin .................................................................... 51

            l.    All Plaintiffs ................................................................... 52

i

F.     The Agency Relationship Between Toyota and Its Network of Authorized Dealerships ........................................................54

G.     Fraudulent Concealment Allegations ....................................55

V.     TOLLING OF THE STATUTE OF LIMITATIONS ....................58

A.     Fraudulent Concealment Tolling ..........................................58

B.     Estoppel ...................................................................................59

C.     Discovery Rule .......................................................................59

VI.     CLASS ALLEGATIONS ...........................................................60

VII.     CLAIMS ....................................................................................64

A.     Claims Brought on Behalf of The State Classes .................64

      1.     Illinois Class

Count 1     Violation of Illinois Consumer Fraud and Deceptive Business Practices Act ............................................64

Count 2     Breach of Implied Warranty ....................................67

Count 3     Fraud by Omission and Concealment .....................69

      2.     Indiana Class

Count 4     Violation of the Indiana Deceptive Consumer Sales Act.........72

Count 5     Breach of Implied Warranty ....................................74

Count 6     Fraud by Omission and Concealment .....................76

      3.     Maryland Class

Count 7     Violation of Maryland Unfair Trade Practices Act................79

Count 8     Breach of Implied Warranty ....................................82

Count 9     Fraud by Omission and Concealment .....................84

      4.     Massachusetts Class

Count 10     Violation of Massachusetts Consumer Protection Act ..........87

Count 11     Breach of Implied Warranty ....................................89

Count 12     Fraud by Omission and Concealment .....................91

5.    <u>Michigan Class</u>

Count 13    Violation of Michigan Consumer Protection Act .................94

Count 14    Breach of Implied Warranty....................................................96

Count 15    Fraud by Omission and Concealment ....................................98

6.    <u>New Jersey Class</u>

Count 16    Violations Of New Jersey Consumer Fraud Act.................101

Count 17    Breach of Implied Warranty..................................................103

Count 18    Fraud by Omission and Concealment ..................................105

7.    <u>New York Class</u>

Count 19    Violation of New York Consumer Protection Act...............109

Count 20    Breach of Implied Warranty..................................................111

Count 21    Fraud by Omission and Concealment ..................................113

8.    <u>Pennsylvania Class</u>

Count 22    Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law.......................................................116

Count 23    Breach of Implied Warranty..................................................118

Count 24    Fraud by Omission and Concealment ..................................120

9.    <u>Utah Class</u>

Count 25    Violation of Utah Consumer Sales Practices Act ...............123

Count 26    Violation of Utah Truth In Advertising Law .......................125

Count 27    Breach of Implied Warranty..................................................127

Count 28    Fraud by Omission and Concealment ..................................129

VIII.   PRAYER FOR RELIEF ........................................................132

IX.    DEMAND FOR JURY TRIAL ..............................................133

Plaintiffs Elliot Nazos, Christine Blight, Jeffrey Cochran, Brian and Barbara Saunders, Jack Perry, Thomas Pastore, Timothy and Dawn Dotson, Emily Barbour, Patricia Loughney, Jill Silvernale, and Kyle Blumin ("Plaintiffs"), on behalf of themselves and all other similarly situated members of the below-defined State Classes (collectively, the "Class"), bring this action against Defendants Toyota Motor Corporation ("TMC") and Toyota Motor Sales, U.S.A., Inc. ("TMS") (collectively, "Toyota" or "Defendants"), upon personal knowledge as to the factual allegations pertaining to themselves and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.   **INTRODUCTION**

1.   This action arises from Toyota's failure to disclose a dangerous defect in the frames of its model year 2007-2014 FJ Cruiser vehicles (the "Class Vehicles" or "Vehicles"), as well as its contemporaneous misrepresentations regarding the true nature of those frames, which Toyota prominently featured in the marketing and advertising campaigns it designed to increase their sales. The excessive corrosion caused by the defect in the Class Vehicles poses a safety threat to both drivers and occupants of the Vehicles. In fact, as a result of the defect, some Vehicles are no longer drivable, having failed to pass safety check(s). Further, Plaintiffs' extensive expert analysis, conducted over a period of months, confirms that Toyota was aware of these defects but has done nothing to cure them.

2.   As detailed below, Toyota's nationwide advertising campaigns made affirmative representations to Plaintiffs and Class members regarding the quality and rugged nature of the Class Vehicles.  In reality, however, the frames of the Vehicles are defective, as they lack adequate rust corrosion protection, causing them to excessively and prematurely rust and corrode (the "Frame Defect" or "Defect"), as seen in the photographs below:[1]

---

[1] Sample photographs of the severe rust and corrosion on each of Plaintiff's Class Vehicles are attached hereto as composite **Exhibit A.**

1



3.      The Defect not only reduces the value (including market value) of the Class Vehicle, but it subjects the Vehicles' occupants to a significant safety risk. A vehicle's frame forms the basis of a vehicle's crashworthiness, including its ability to withstand or minimize damage to the occupant compartment in the event of an accident. Thus, the Defect compromises the strength of the frames and the overall structural integrity of the Class Vehicles.

4.      Plaintiffs, all of whom own Class Vehicles with frames that have manifested excessive and premature corrosion and rust as a result of the Defect, had no way of discerning or otherwise learning facts to reveal that Toyota's representations pertaining to the Class Vehicles were false and misleading, as Toyota failed to disclose and knowingly concealed the Frame Defect from Plaintiffs (and Class members) in its marketing materials. It was only after Plaintiffs had purchased their Class Vehicles that Toyota's incomplete marketing, which omitted reference to the Frame Defect, was revealed.

5.     Toyota has long been aware of the Frame Defect in the Class Vehicles' frames, as well as the safety hazard caused by the excessively corroded frames. Similar frames on other Toyota vehicles, including the frames on 1995-2010 model year Tacomas, 2007-2008 Tundras, and 2005-2008 Sequoias (the "Toyota Trucks"), exhibited the same excessive rust corrosion and perforation exhibited by the Class Vehicles. TMS has issued numerous Limited Service Campaigns to address the same Frame Defect at issue here in the Toyota Trucks. The Class Vehicles, like the Toyota Trucks are prone to excessive, premature rust corrosion because the frames were not properly prepared and treated against rust corrosion when they were manufactured.

6.     Despite this knowledge, Toyota failed to disclose the existence of the Defect to Plaintiffs, other Class members, and the public. Further, Toyota has not issued a recall to inspect and repair the Class Vehicles or offered to reimburse owners of the Class Vehicles for costs incurred to identify and repair the Defect. Toyota, despite actual knowledge of the Defect and the potential dangers of the Defect, has withheld from the Toyota owners and the public this important safety information.

7.     Instead, TMS initiated non-publicized Limited Service Campaigns that provided inadequate relief for only some of the affected Toyota Trucks models in limited geographic areas and no relief for Plaintiffs and Class members.[2]

8.     By failing to disclose the existence of the Defect to Plaintiffs, other Class members, and the public, Toyota has misled the public with its promotional and technical materials and written guarantees regarding the rust prevention measures taken by Toyota.

9.     Plaintiffs and Class members have suffered ascertainable losses and actual damages as a direct and proximate result of Toyota's misrepresentations and omission

---

[2] Upon information and belief, discovery will show through non-publicized Limited Service Campaigns and other documents not privy to Plaintiffs and Class members at this stage of the case, that Toyota had knowledge of the Frame Defect prior to 2007. Plaintiff will be requesting these non- publicized Limited Service Campaigns and other documents which Plaintiffs and Class members anticipate will evidence Toyota's knowledge of the Frame Defect prior to 2007 in discovery.

3

of the Frame Defect in that they: (1) overpaid for the Class Vehicles because the Defect significantly diminished the value of the Vehicles at the point of purchase and reduced their market value; (2) have Vehicles that suffer premature and excessive corrosion; (3) must expend significant money to have their Vehicles' frames and related components (inadequately) repaired and/or replaced; and (4) must pay for replacement vehicles while their Class Vehicles are being repaired or are not drivable for failure to pass safety standards.

10.    Plaintiffs and Class members have purchased Class Vehicles that they would not otherwise have purchased, or would have paid less for, had they known of the Frame Defect at the point of sale.

11.    Accordingly, Plaintiffs bring claims for (1) fraudulent concealment; and (2) breach of implied warranty; and (3) violations of the consumer protection laws under the laws of the states of Illinois, Indiana, Maryland, Massachusetts, Michigan, New York, New Jersey, Pennsylvania, and Utah.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1332(d), because: (a) this action is brought as a proposed class action under Federal Rule of Civil Procedure 23; (b) the proposed Class includes more than 100 members; (c) many of the proposed Class members are citizens of states that are diverse from Defendants' citizenship; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13.    This Court also has supplemental jurisdiction over Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367.

14.    This Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting business activities in the state of California, because Defendant TMS is incorporated in the state of California, and because Defendant TMS's principal place of business was located in California until at least 2017. As such, a substantial portion of the relevant, unlawful conduct at issue in

4

this case as to all Class members occurred primarily in California, in this District. Accordingly, Defendants have sufficient contacts with this District to subject Defendants to personal jurisdiction.

15.    Venue is proper in this judicial District under 28 U.S.C. §1391(b) because a substantial part of the challenged conduct or omissions giving rise to the claims occurred and/or emanated from this District, because Defendants have caused harm to Class members residing in this District, because Defendants regularly conduct business in this District, because Defendants are residents of this District under 28 U.S.C. §1391(c)(2), because they are subject to personal jurisdiction in this District, and because Defendants have marketed, advertised, distributed, and sold Class Vehicles within this District.

## III.   PARTIES

### A.   Plaintiffs

16.    Plaintiff Elliot Nazos is a citizen of Florida and resides in Sarasota, Florida. Plaintiff owns a 2010 FJ Cruiser, which he purchased new in Matteson, Illinois, on or about February 10, 2010.

17.    Plaintiff Christine Blight is a citizen of Pennsylvania and resides in Bear Creek Township, Pennsylvania. Plaintiff owns a 2007 FJ Cruiser, which she purchased certified pre-owned in Scranton, Pennsylvania, on or about June 21, 2010.

18.    Plaintiff Jeffrey Cochran is a citizen of Indiana and resides in Indianapolis, Indiana. Plaintiff owns a 2007 FJ Cruiser, which he purchased new in Indianapolis, Indiana on or about April 13, 2006.

19.    Plaintiffs Brian and Barbara Saunders are citizens of Massachusetts and reside in West Dennis, Massachusetts. Plaintiffs own a 2007 FJ Cruiser, which they purchased new in Hyannis, Massachusetts on or about October 27, 2006.

20.    Plaintiff Jack Perry is a citizen of Ohio and resides in Canton, Ohio. Plaintiff owns a 2010 FJ Cruiser, which he purchased new in Meadville, Pennsylvania, on or about September 13, 2010.

21.     Plaintiff Patricia Loughney is a citizen of Colorado and resides in Loveland, Colorado. Plaintiff owns a 2010 FJ Cruiser, which she purchased new in Ledgewood, New Jersey, on or about April 21, 2010.

22.     Plaintiff Emily Barbour is a citizen of New Jersey and resides in Lebanon, New Jersey. Plaintiff owns a 2007 FJ Cruiser, which she purchased new, on or about July 29, 2006.

23.     Plaintiff Thomas Pastore is a citizen of New York and resides in West Islip, New York. Plaintiff owns a 2007 FJ Cruiser, which he bought new in Smithtown, New York, on or about August 1, 2006.

24.     Plaintiffs Timothy and Dawn Dotson are citizens of Maryland and reside in Pasadena, Maryland. Plaintiffs own a 2007 FJ Cruiser, which they purchased new in Baltimore, Maryland, on or about August 11, 2007.

25.     Plaintiff Jill Silvernale is a citizen of Michigan and resides in Dowagiac, Michigan. Plaintiff owns a 2007 FJ Cruiser, which she purchased used in Benton Harbor, Michigan, on or about February 4, 2012.

26.     Plaintiff Kyle Blumin is a citizen of Utah and resides in Hideout, Utah. Plaintiff owns a 2013 FJ Cruiser, which he purchased used in Murray, Utah, on or about April 24, 2018.

**B.     Defendants**

27.     TMC is the world's largest automaker and largest seller of automobiles in the United States. TMC is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

28.     TMC sells, markets, distributes, and/or services vehicles throughout the United States, including the Class Vehicles. At all times relevant hereto, TMC transacted or conducted business in the state of California and derived substantial revenue from interstate commerce.

29.     TMS is a California corporation and at all material times relevant to this lawsuit maintained its corporate headquarters in Torrance, California. In 2017, after all

the Class Vehicles had been manufactured and sold to Class members, TMS moved its corporate headquarters to Plano, Texas.

30.   TMS is the authorized importer and distributor of Toyota motor vehicles in the United States. TMS is responsible for advertising, marketing, and selling the Class Vehicles. TMS also manages and supports a network of Toyota dealerships located throughout the United States.

31.   Defendants jointly developed and disseminated to their exclusive distributors and authorized dealers the owner's manuals, warranty booklets, maintenance schedules, advertisements, and other promotional and technical materials relating to the Class Vehicles.

32.   At all relevant times, and with the approval and at the direction of TMC, TMS acted through its authorized employees, agents, and distributor and dealer networks in performing activities, including but not limited to advertising, marketing, and selling Class Vehicles, providing warranties, disseminating technical information and mechanic training materials to dealers, and monitoring the performance of Class Vehicles in the United States.

## IV.   FACTUAL ALLEGATIONS

### A.   The Class Vehicles and the Frame Defect

33.   The FJ Cruiser was released in 2006 as a modern remake of the classic off-roading vehicles Toyota had produced in the late 1950s in the United States.

34.   The FJ Cruiser's design harkens back to the design of the original Land Cruiser, the FJ40, with which it shares many structural underpinnings. The FJ Cruiser remained practically unchanged from its release through when it was discontinued in 2014.

35.   Toyota called the FJ Cruiser "the most capable 4X4" in its lineup at the time, noting that it had "engineered the FJ Cruiser for serious trail driving capability."

36.   Toyota's December 26, 2005 press release stated that the 2007 FJ Cruiser "provides **optimized** off-road capabilities, value and styling clues reminiscent of

Toyota's famed FJ40 4x4 utility vehicle" and "will deliver true off-road ruggedness, image and performance[.]"

37.    Unknown to consumers, however, the FJ Cruiser was manufactured with frames that lacked adequate rust corrosion protection and are prone to excessive and premature rust corrosion. The Frame Defect affects the structural integrity of the Class Vehicles and compromises the quality, durability, and safety of the Vehicles, requiring Class members to pay out-of-pocket to have their Vehicles' frames replaced or "repaired" in a manner that does not remedy the Defect or otherwise prevent the recurrence of the problem caused as a result thereof.

38.    TMC equipped all model year FJ Cruisers with the same defective frames and, as a result, all Class Vehicles suffer from the same Frame Defect. In addition, TMS marketed, distributed, and warranted the Class Vehicles in the United States in a uniform manner.

39.    The Frame Defect is a systemic problem associated with the materials and production processes used in connection with the Class Vehicles' frames and is not associated with normal geography or typical environmental factors. The premature and excessive corrosion and rust caused by the Frame Defect is found in the frames of Class Vehicles located throughout the United States.

**B.    The Frame Defect Renders the Class Vehicles Unsafe**

40.    A vehicle frame is the main supporting structure to which all other components are attached on a motor vehicle with a "body on frame" design. The function of frames includes handling static and dynamic loads with unintended deflection and distortion, preventing undesirable forces and twisting from driving over uneven surfaces, engine torque, vehicle handling and accelerating and decelerating. A vehicle's frame is also the primary component that guards against sudden impacts and collisions.

41.    The Class Vehicles were manufactured with frames lacking adequate rust corrosion protection. As a result, the Class Vehicle frames are prone to experiencing

8

severe premature rust corrosion, which affects the structural integrity of the vehicles, rendering them unsafe to drive and a hazard on the roadways.

42.     Rust corrosion has a significant deleterious effect on metal items. It makes them weaker by replacing the strong iron or steel with flaky powder, ultimately leading to perforations. Rust corrosion is a progressive process. Once corrosion begins, it will not stop until adequately repaired.

43.     Because the damage is typically on the undercarriage of the Class Vehicles, it goes undetected unless purposefully inspected (for example, through a mandatory state safety inspection or otherwise).

44.     Corrosion of the Class Vehicles is unrelated to and separate from normal surface rust experienced after years of usage and/or exposure to typical environmental conditions. The excessive rust corrosion on the Class Vehicles compromises the vehicles' safety, stability, and crash-worthiness because important suspension components, engine mounts, transmission mounts, and body mounts anchor to the vehicles' frames.

45.     According to Popular Mechanics, "[a] rusted-through frame means the structural and crash integrity of the car is questionable, and it should be inspected and repaired by a qualified repair facility."[3]

46.     As described on AutoGuide.com, "excessive rust often signals the impending death of a vehicle. Its useful life [is] essentially over."[4] Further:

> Frame rust is a big concern, as it affects the integrity of the
> car. Bad enough frame rust can cause parts to snap off or
> crack, which will really compromise the safety of you, your

---

[3]   *See* http://www.popularmechanics.com/cars/how-to/repair/how-to-fight-rust-and-win-14930616 (last visited Nov. 16, 2022).

[4]   Sami Haj-Assaad, *Should You Buy a Car with Rust?*, AutoGuide.com (Feb. 24, 2014), available at http://www.autoguide.com/auto-news/2014/02/buy-car-rust.html (last visited Nov. 16, 2022).

passengers and other motorists. It may also significantly diminish the car's ability to protect you in a crash.[5]

47.     Excessive rust corrosion and perforation on the FJ Cruisers also causes the vehicles to fail some state safety inspections. Once a vehicle fails a state safety inspection, consumers cannot use their vehicle unless and until they spend time and money to remediate the rust and perforation to passing standards; however, during the time the vehicles are prohibited from use, consumers may still be required to pay for and maintain insurance policy coverage(s) for such vehicles and/or pay mandatory state licensing and/or taxing costs associated with ownership of the respective vehicles.

**C.     Defendants' Knowledge of the Frame Defect in the Class Vehicles**

48.     Toyota has long known that frames on the Class Vehicles exhibited excessive rust corrosion and perforation because they did not have adequate corrosion-resistant protection, and TMS, at the direction of TMC, issued numerous service campaigns and warranty bulletins to address the Defect in the Toyota Trucks.

49.     Although the Class Vehicles were manufactured in Japan, and the Toyota Trucks were manufactured in the U.S., the frames on the Class Vehicles and the frames on the Toyota Trucks suffer from the same Frame Defect. Upon information and belief, the Class Vehicles' frames and the Toyota Trucks' frames were designed using the same defective specifications (materials) and pursuant to the same defective process (coatings). Thus, the frames on the Class Vehicles and the frames on the Toyota Trucks are materially the same for purposes of this lawsuit.[6]

50.     Subject to and without waiving any applicable privileges, testing and analysis conducted over a period of months for Plaintiffs' counsel by a consulting expert has confirmed that the Class Vehicles' frames and the Toyota Trucks' frames have the same metal composition and the same subpar zinc phosphate epoxy coating

---

[5] *Id.*

[6] *See Weinreich v. Toyota Motor Sales USA, Inc.*, No. 2:18-3294-RMG, 2019 WL 5684376 (D.S.C. Oct. 31, 2019) (denying, in part, TMS's motion to dismiss based on similar allegations regarding the Toyota 4Runner).

that is discontinuous, thin and missing in certain areas, and thus, the Frame Defect in the Class Vehicles and the defect that Toyota acknowledged in the Toyota Trucks are one and the same.

51.     Discovery will show the significant similarities between the improper frame coatings of the frames of the Class Vehicles and the improper frame coatings of the Toyota Trucks (collectively "Toyota Frames").

52.     Testing and analysis have revealed that the frames were corroding under the epoxy, indicating that the corrosion was a result of the zinc phosphate coating TMC used being inadequate to protect against corrosion and rust. Indeed, analysis documented the discontinuous nature of the zinc phosphorus layer (pretreatment) in all of the frames analyzed. A discontinuous coating allows sections of the frame to be unprotected and, therefore, more likely to suffer rust damage.

53.     Discovery will show that TMC gave the directive for the blueprint to produce Toyota Frames, including what materials and coatings were to be used to make the defective frames.

54.     Accordingly, Toyota's knowledge of the Frame Defect in the Class Vehicles and the resulting premature and excessive corrosion of the Vehicles' frames and related components is evidenced by the service campaigns, warranty bulletins, and recalls initiated by TMS to address the same Defect in the Toyota Trucks.

   a.     **_Toyota's Limited-Service Campaigns, Bulletins, and_**
          **_Recalls for Toyota Trucks_**

55.     In or around March 2008, after receiving numerous reports that frames on approximately 813,000 model year 1995 through 2000 Toyota Tacoma trucks had exhibited excessive rust corrosion, TMS initiated a Customer Support Program that extended the vehicles' warranty coverage for frame perforation caused by rust corrosion. Under the program, TMS was to repair or repurchase, at its option, any vehicle exhibiting perforation of the frame due to rust corrosion.

56.     At that time, TMS conceded that it had investigated "reports of 1995-2000 model-year Tacoma vehicles exhibiting excessive rust corrosion to the frame causing perforation of the metal" and "determined that the vehicle frame in some vehicles may not have adequate corrosion-resistant protection." In a memorandum sent to dealers, distributors, and certain owners, TMS emphasized that "[t]his [rust corrosion] is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage."

57.     Yet, that same month, TMS distributed a "Warranty Policy Bulletin" to its dealers, which instructed service managers and warranty administrators that "[v]ehicle inspections should only be performed if the customer has noticed excessive rust." Apparently, TMS sought to limit the costs of this campaign by offering inspections only when a customer requested one. TMS, knowing that many owners would not notice excessive rust corrosion in the undercarriage of their vehicle, disregarded its responsibility to correct latent defects in its products and reduce the unreasonable risk that its customers and others would be injured by the undiscovered, hidden defect.

58.     TMS subsequently modified and expanded this Customer Support Program to include 2001-2004 Tacoma models.

59.     In 2012, TMS recalled approximately 150,000 Tacoma vehicles to inspect and replace the spare-tire carrier on vehicles sold in twenty cold weather states.[7] The recall was issued to address the problem of spare-tire carriers rusting through and causing the spare tire to drop to the ground.

60.     Through the issuance of two separate Limited Service Campaigns in 2014 and 2015, however, TMS admitted that the frames of *all* 2005-2008 model year

_____
[7] Connecticut, Delaware, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, and Wisconsin, as well as the District of Columbia.

Tacoma vehicles suffered from inadequate rust protection leading to excessive premature rust corrosion.

61.     Initially, TMS attempted to limit its liability for the defective frames through the issuance of the 2014 Limited Service Campaign (the "2014 Campaign"), which applied only to 2005-2008 Tacoma vehicles in the twenty cold weather states and stated that TMS had "received reports that certain 2005 through 2008 model year Tacoma vehicles operated in specific cold climate areas with high road salt usage may exhibit more-than-normal corrosion to the vehicle's frame." TMS further stated that it had "investigated these reports and determined that the frame in some vehicles may not have corrosion-resistant protection sufficient for use in these areas."

62.     According to TMS, lack of adequate corrosion-resident protection, "combined with prolonged exposure to road salts and other environmental factors, may contribute to the development of more-than normal rust in the frame of some vehicles." Notably, TMS made clear that the "condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment."

63.     In April 2015, however, TMS issued a second Limited Service Campaign (the "2015 Campaign") for model year 2005-2008 Tacoma vehicles in the thirty states not covered by the 2014 Campaign. Again, TMS made clear that the "condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment." Through the 2015 Campaign, TMS conceded that Toyota vehicles in warm weather states also suffered from excessive rust corrosion and perforation.

64.     TMS was also forced to acknowledge excessive frame corrosion on early model year Toyota Tundra trucks through the issuance of two separate Limited Service Campaigns in 2009 and 2010 following a NHTSA investigation, which found that Tundra spare tires (mounted to the rear cross-member) were falling off due to frame rust.

65.    In the 2009 Limited Service Campaign, which recalled 110,000 first generation Tundra vehicles sold in twenty cold weather states and the District of Columbia, TMS admitted that the excessive corrosion could cause "the spare tire stowed under the truck bed [to] become separated from the rear cross-member," or "lead to the loss of the rear brake circuits which will increase vehicle stopping distances and the risk of a crash." In the 2010 Limited Service Campaign, TMS recalled all 2000-2003 Tundra vehicles (regardless of geographic location) for the same excessive frame rust.

66.    That same year, TMS, "as an additional measure of confidence" to owners, issued a Corrosion Resistant Compound ("CRC") Campaign "as the extension to Safety Recall 90M - CRC application to the rear portion of the frame" for 2000-2003 model year Tundra vehicles registered in cold weather states. The CRC campaign was a combination of a safety recall that offered to apply CRCs to the rear portion of the vehicle frame, and, for a limited time, the remainder of the frame assembly. The approximately 316,000 2000-2003 Tundra vehicles sold or registered in the remaining 30 states were covered by a Limited Service Campaign issued by Toyota in 2015.

67.    In August 2013, TMS began another Limited Service Campaign for approximately 78,000 model year 2004-2006 Tundra vehicles in 20 "cold climate states" and the District of Columbia. As it had with the Tacoma, TMS stated that it had investigated reports that the Tundra may "exhibit more-than normal corrosion to the vehicle's frame" and "determined that the frames in some vehicles may not have corrosion-resistant protection sufficient for use in these areas." And, once again, TMS acknowledged that the "condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment."

68.    TMS acknowledged the same condition was present in its Sequoia trucks in Limited Service Campaigns that were issued in late 2012 and early 2013, and which advised dealers that it had determined the vehicles lacked "corrosion-resistant

14

protection" and advised dealers to inspect the vehicles for "more than normal corrosion to the vehicle's frame." As it did with the Tacoma and Tundra, TMS made clear that the "condition" affecting the Sequoia was "unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment."

69.    In 2017, as part of a resolution to ongoing litigation pertaining to the frame corrosion in 2005-2010 Tacoma, 2007-2008 Tundra, and 2005-2008 Sequoia trucks, TMS provided, among other benefits, free frame inspections, while also (1) applying a CRC compound or (2) replacing the frames at no cost to the owners of those vehicles.

70.    Two years later, in a November 2019 Limited Service Campaign, TMS admitted that the frames of the 2011-2017 Tacoma similarly lacked corrosion-resistant protection and also provided free frame inspections with either (1) a CRC compound or (2) frame replacement to address the Frame Defect in the frames. TMS, at the direction of TMC, has consistently issued updates to the 2019 Limited Service Campaign over the course of the past two years in response to reports of the defect in 2011-2017 Tacoma vehicles and in an effort to prevent and repair the corrosion that continues to plague those vehicles.

### b.    *Consumer Complaints Regarding the Frame Defect*

71.    Class members experience the same issues with the Class Vehicles as were experienced by owners of the Toyota Trucks discussed *supra*.

72.    One of the complaints posted on the NHTSA website (#10454963) resulted from an April 12, 2012 call to the Department of Transportation's Auto Safety Hotline regarding a 2011 FJ Cruiser that began exhibiting corrosion at only **2,500 miles**—less than **three months after purchase**. The owner advised that Toyota was made aware of the corrosion, but would neither repair or replace his vehicle.

73.    This complaint led to a representative from NHTSA's Office of Defects Investigation ("ODI") contacting the consumer via email to obtain additional

information regarding the complaint.[8] In response, the consumer provided the representative with photographs of his vehicle's undercarriage showing how quickly the excessive corrosion had spread at only *5,000 miles*:

 

74.     The consumer also provided the ODI with links to several websites where they could "find some similar complaints from Toyota customers experienc[ing] the same issues that [he was] having" with his vehicle. The owner further explained to the NHTSA representative that he was "concerned that the corrosion will spread and continue throughout the vehicle"[9] and "about the ascetics [sic] and the resale value" of the vehicle.

75.     The ODI provided the above information to TMS,[10] which, upon information and belief, resolved the dispute with the owner.

76.     The number of complaints made by owners to TMS, its authorized dealerships, and NHTSA regarding like experiences with the Frame Defect and safety-related concerns has grown substantially since 2012.

---

[8]   The ODI notifies vehicle manufacturers about complaints when they are entered and received in the NHTSA database, particularly when it sees similarly described complaints from more than a few consumers.

[9]   His concern was the reality, as described in the following NHTSA complaint regarding a 2008 FJ Cruiser: "Since I purchased the vehicle brand new in 2006 it has been rusting and an alarming rate. Even my mechanic says he's never seen a new car rust that quickly. The frame is covered [in] rust, I tried to stop it but it didn't work."

[10]   *See* https://static.nhtsa.gov/complaints/10454963/10454963-AF0DEE515E3602CAE05375E8789808C8.pdf (last visited Nov. 16, 2022).

77.     Indeed, a review of internet forums and chat groups created specifically for the discussion of issues related to the Class Vehicles, including the websites referenced above, reveals thousands of posts and dozens of discussions complaining of the Frame Defect, demonstrating that Plaintiffs are not alone in this matter. Those complaints detail both the failures and inadequate responses of Toyota representatives and Toyota in addressing the Frame Defect and the damage it caused.

78.     The number of complaints consumers have filed with NHTSA that identify the Frame Defect and detail their experience with the corresponding excessive and premature corrosion and rust it causes are numerous and continue to significantly increase each year, both in number, and severity.

79.     From at least 2011 to present, over 100 complaints have been filed with NHTSA over related the related issue of excessive rust to the frame of FJ Cruiser vehicles. In one example, a consumer filed a complaint to NHTSA on November 15, 2011 over "[e]xcessive corrosion on frame, wheel and throughout the base of the vehicle" for the consumer's 2011 FJ Cruiser and contacted Toyota over this issue. On April 2, 2012, Defendant TMS responded to the consumer's complaint with a letter acknowledging the complaint, stating "We were sorry to learn of your dissatisfaction with . . . surface rust on the muffler area . . . and wish to assure you that your opinion and concerns are important to us."[11] According to publicly available records from NHTSA, Toyota engaged in arbitration with this consumer over the purported rust issues. At the very least, this consumer's complaint made in 2011 and Toyota's response should have alerted Toyota of wider issues.

80.     Below are excerpts from a non-exhaustive set of the consumer complaints made to NHTSA regarding the Frame Defect (emphasis added):

- "Excessive rust on the frame. . . . This is a known issue with the FJ Cruiser on all the forms online. . . **There are thousands of us**

---

[11] *See* https://static.nhtsa.gov/complaints/10454963/10454963-AF0DEE515E3602CAE05375E8789808C8.pdf at 6 (last visited Nov. 22, 2022).

*with a rotting in frames and Toyota will do nothing*." (12/01/2012, 2008 FJ Cruiser)

- "*The chassis is so corroded and full of rust it has got to a point of loosing [sic] the strength and integrity of the whole body*. This is very worrisome specially if the car is involved in an accident where the front part chassis cannot resist the impact." (09/27/2013, 2007 FJ Cruiser)

- "At 55,000 miles (6 years old) *my front gravel shield had completely rusted off and was found in my driveway*. . . I am terrified at the thought that I could've been driving and my control arms could've rusted off like my gravel shield did." (01/06/2017, 2011 FJ Cruiser)

- "*The rust on the frame is mind blowing*. . .*This is dangers [sic] and someone can be injured or dead*." (04/11/2017, 2007 FJ Cruiser)

- "Frame is rusting *to the point it is about to break.*" (04/12/2017, 2007 FJ Cruiser)

- "I took my car in for an inspection at my Toyota dealership today. I was told if I'm going to sell it or trade it in that now would be the time to do it. . . . The tech said there are some very weak areas on the frame and that *it could fracture with impact or maybe will eventually by hitting a bad pothole*. . . . It seemed frightening to me that *they suggested I sell it to someone else and not disclose this potentially life threatening issue*." (04/26/2018, 2008 FJ Cruiser)

- "Lower control arms rusted. Need replaced couldn't adjust them for alignment. Frame rusting front and rear diff rusting. Stock skid plate replaced rusted through completely. *I thoroughly wash salt off my vehicle, yet it still has rusted just like the original frame recall Toyota hasn't gotten it right.* Need another recall. I've lived with mine, but others have it much worse." (05/10/2018, 2011 FJ Cruiser)

- "A few weeks ago I was working on my vehicle and I had to remove the rear bumper then I found the chassis damaged by so much deep rust, that for a moment I just thought to brush and put

18

an anti corrosive but the damage is not fixed with brushing and painting. I call[ed] Toyota for a frame recall and they don't have any yet. **My vehicle it's not safe to pull anything. I also feel that one of these days the body can be detached from the chassis**." (5/20/2018, 2007 fj cruiser)

- "Frame is rusted so bad mechanic and local dealer said ***vehicle is not road worthy***. If I had not taken my vehicle to a mechanic before service and general maintenance repairs, ***I would have driven on a 2400 mile vacation across country without knowing the danger of a failing frame***." (09/05/2018, 2007 FJ Cruiser)

- "Took the vehicle in for oil change and check a transmission fluid leak. ***Dealer found large amounts of rust on frame and suspension and noted, 'not recommended to drive***.'" (10/04/2018, 2007 FJ Cruiser)

- "While driving, my exhaust broke from hitting a pothole. When I took to the shop for repair, we noticed so much rust on the frame. I made an appointment at my local dealership to have it inspected, we found that the frame is extremely rusted[.] . . . The dealership representative became frustrated and even said ***she would not put her kids in the FJ Cruiser because its unsafe***." (11/20/2018, 2007 FJ Cruiser)

- "***The amount of corrosion and frame flaking is alarming and poses a huge safety issue*** for my family, other drivers and myself. Since purchasing the vehicle I have done everything I can to maintain and fix this issue including complaining to Toyota themselves with little to no success. . . . ***Body mounts are flaking and crumbling and the frame is corroded and falling apart from the inside out***." (03/25/2019, 2007 FJ Cruiser)

- "***Frame has completely disintegrated*** where the rear upper control arm links meet the crossmember, ***making the vehicle unsafe and fail the NH state inspection***." (06/28/2019, 2007 FJ Cruiser)

- "The frame on my fj cruiser it literately rotting to nothing. As are most produced from 2007 - 2012 ***I have begged Toyota for help and a resolution like with the Tundra and Tacoma frame rotting issues. This is a major safety issue and someone is going to get hurt or killed.*** My

19

control are in rotting away from the frame." (07/11/2019, 2008 FJ Cruiser)

- "***The vehicle has heavy rust all along the undercarriage and frame***. I have friends and acquaintances that have the same problem and to remove as much of this rust as possible Toyota will charge somewhere between $800 and $1,000." (8/6/2019, 2011 FJ Cruiser)

- "Rust has ***decimated the frame*** of this vehicle resulting in the ***control arm mount to break away from the frame*** of the vehicle. . . . ***No welding/body shop will touch it because they deem it unsafe even if welded back to rest of frame*** . . . Fortunately, this broke in a parking lot instead of on the highway ***where an accident would have happened or worse***." (09/03/2019, 2008 FJ Cruiser)

- "During 2019-2020 state inspection of 2007 Fj Cruiser with 78000 miles by ***dealer was told that frame is so rusted that it probably would not pass the next inspection***."  (09/29/2019, 2007 FJ Cruiser)

- "My gas tank straps ***completely rusted off leaving the gas tank hanging down below the frame and in extreme compromised unsafe position***. ***Multiple areas of frame rust completely through not supported by either end***." (11/28/2019, 2007 FJ Cruiser)

- "I took my 2007 Fj Cruiser in for regular maintenance and shortly after I dropped it off, I was contacted by the dealership and asked to come back. ***They wanted to show me the bottom of the vehicle because they said it was no longer safe to drive.*** I went back to the dealership and the mechanic showed me that the ***frame of my FJ was completely rusted through*** with multiple holes in right side of the frame - some ***holes measuring over 5 inches*** in length. ***It crumbled when touched***."  (12/30/2019, 2007 FJ Cruiser)

- "I'm extremely concerned about my families [sic] safety. I'm worried brackets are about to rust off, and body mounts and bolts are showing severe rust, . . . ***This needs to be remedied before people start getting hurt while driving with these unsafe chassis and components.***" (12/31/2019, 2008 FJ Cruiser)

- "Sever[e] rusting of frame, break and suspension components and brackets. ***This 2008 Toyota FJ cruiser is quickly becoming a safety hazard on the roads***." (02/03/2020, 2008 FJ Cruiser)

- "Vehicle was stationary in driveway ***my frame, some suspension components, and my rocker panels were falling apart in my hands***" (02/22/2020, 2008 FJ Cruiser)

- "Frame, suspension, and brakes have extreme damage from rust. ***Rear brakes are non-functional because of rust***." (06/17/2020, 2008 FJ Cruiser)

- "The frame and suspension pieces on my FJ have rusted due to poor coatings and materials used by Toyota. *TR" (6/17/2020, 2008 FJ Cruiser)

- "Several ***frame supports have corroded from the inside out and are flaking off***. ***Brake components that run along the frame have corroded from the frame*** to the bracket that holds them to the lines themselves. Cause[d] a slow brake leak over time that eventually ***resulted in a dangerous near accident situation that was caused by complete immediate lack of brake pressure***." (07/04/2020, 2008 FJ Cruiser)

- "Severe rust on all parts of the frame undercarriage, brake lines, gas tank straps. . . .***I am frightened that in an accident the whole body of the truck will just come off the frame***." 07/27/2020, 2008 FJ Cruiser)

- "The vehicle is a 2008 and is ***scary rusty on the frame and other components. . . . Eventually one of these faulty frames are going to break in a high speed scenario and serious injury or death will occur***." (09/27/2020, 2008 FJ Cruiser)

- "This vehicle has ***major rust overtaking the frame and all suspension parts and mounts*** . . . I am very concerned I am going to have suspension parts break off while I'm driving, ***I have already had to replace the fuel tank straps that rusted in half while driving do[w]n the highway***." (08/14/2020, 2007 FJ Cruiser)

21

- "***The rate at which rust gestates on this vehicle . . . [i]s unsafe and will continue to create unsafe conditions as these vehicles rapidly deteriorate***." (03/19/2021, 2011 FJ Cruiser)

- "After buying my vehicle ***I have began to notice a growing rust problem that is not due to salt water or other environmental conditions, but clearly a defect in manufacturing***. After joining a few Facebook groups with other FJ owners I've found countless other people have had the same problem and that without massive trust removal my vehicle is expected to have failures in the frame and suspension at some point." (5/17/2022, 2008 FJ Cruiser)

81.    Notably, Federal law requires Toyota to monitor defects which can cause a safety issue and report any findings within five (5) days. As a result, Toyota regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and, thus, obtained knowledge of the Defect through its ongoing monitoring of these complaints. Toyota, knowing the details of production across all lines of vehicles it manufactures, also had knowledge of the Defect in the Class Vehicles from complaints made by owners of the Toyota Trucks containing the same Defect.

**D.    Marketing and Concealment**

82.    Notwithstanding its knowledge of the Frame Defect, Toyota did not disclose the Frame Defect to consumers in its advertisements, press releases, sales brochures, or other marketing material. Instead, Toyota marketed Vehicles' frames to consumers as "tough", "rock solid," and designed to prevent corrosion. When the all-new 2007 FJ Cruiser was released for sale Toyota embarked on an aggressive marketing campaign that promoted the quality and benefits of the frames and related components used on the Class Vehicles, including their purported anti-corrosive properties.

83.    For example, in a published advertisement marketing the quality and benefits of the Class Vehicles' frames, Toyota: (a) told customers that because the FJ Cruiser's "frame ha[d] to be bulletproof," it had equipped the vehicle with a frame that had been "proven on the toughest terrain," making the vehicle "incredibly stable when

22

climbing"; (b) promoted the "[e]xceedingly rigid design" of the frame"; and (c) touted

the frames' "Electrocoat Deposition (ED) protective coating," which it represented



"seals every nook and cranny and helps the frame live long and strong":

84.    In an advertisement marketing the quality and benefits of the Class

Vehicles' undercarriage, Toyota: (a) claimed that its detail in design "[k]eeps the FJ

Cruiser's undercarriage smooth to slide over the rough spots"; (b) represented that the

FJ Cruiser had a "[b]elly of steel" that protected the undercarriage components,

including "the radiator, power steering rack, [and] engine and transfer case"; and (c)

touted the FJ Cruiser's "[t]ough [gas] tank, . . . made of its own multi-layer resin [or Zinc phosphate coating] that resists punctures and won't rust":



85.   In an advertisement marketing the quality and benefits of the Class Vehicles' body, Toyota: (a) promoted the structural integrity of the FJ Cruiser, including its "incredibly rigid body using specially placed reinforcements, and high-tensile-strength sheet steel" to prevent damage when taking the vehicle off-road; and (b) represented that "the body of the FJ uses anti-corrosion sheet steel in key areas, in addition to anti-rust wax, sealer and anti-chipping paint."

86.     Notably, Toyota acknowledged in the above advertisement that "a truck has no greater enemy than rust," naming it a "silent killer [that] can turn a once virile and shimmering steel chariot into nothing more than a brittle, flaking ghost of itself":



87.     Notably, these advertisements were made by Toyota and signed by Akio Nishimura, the Chief Engineer of FJ Cruisers for Toyota.

88.     In a related press release published on Defendant TMS's website, Nishimura states that the FJ Cruiser "has been developed as a rugged sports utility vehicle."[12]

89.     In the owner's manuals for the Class Vehicles issued by TMS, TMS incorrectly represents that the purported anti-corrosive measures it had taken would prevent corrosion by stating: "Toyota, through its diligent research, design and use of the most advanced technology available, helps prevent corrosion and provides you with the finest quality vehicle construction."

90.     Further, TMS advertised the durability of Class Vehicle frames in its sales brochures distributed throughout the United States and available on TMS's website. For instance, in the sales brochure for the 2007 FJ Cruiser, Toyota stated that the "FJ Cruiser is not only engineered to conquer anything Mother Nature has to offer, but keep coming back for more."[13]

91.     Similarly, the sales brochure for the 2010 FJ Cruiser states the Vehicle has a "tough-as-nails body" and has been built with "typical Toyota attention to quality and durability."[14]

---

[12]  *FJ CRUISER: A RUGGED SUV FOR YOUNGER BUYERS*, Toyota, https://toyota.pressroom.com.au/press_kit_detail.asp?clientID=2&navSectionID=6&categoryID=1000&kitID=299#3316 (last visited Nov. 22, 2022).

[13]  2007 FJ Cruiser Sales Brochure, Toyota (2007), http://www.toyota120.com/GenDocs/2007FJCbrochure.pdf (last visited Nov. 16, 2022).

[14]  2010 FJ Cruiser Sales Brochure, Toyota (2010), https://pictures.dealer.com/suntoyotatc/50f8dea340463872007b7b118d340c8d.pdf (last visited Nov. 16, 2022).

92.    Also, the sales brochure for the 2011 FJ Cruiser states that Toyota's "engineering standards were written in stone" and that "[s]olid body-on-frame construction keeps the FJ rigid, which helps the suspension do its work":[15]

Our engineering standards were written in stone. After five decades of off-road experience, we know a few things about making vehicles that are capable and durable. And FJ Cruiser is the latest beneficiary of this proud heritage. Its V6 engine features Dual Independent Variable Valve Timing with intelligence (VVT-i). Cranking out 260 hp and 271 lb.-ft. of torque, it has the muscle to take on mountains. Add to that an available 6-speed manual transmission with 2-speed transfer case and an electronically controlled locking rear differential, and FJ Cruiser possesses impressive off-road capability. Solid body-on-frame construction keeps the FJ rigid, which helps the suspension do its work. The independent front suspension system delivers nearly eight inches of wheel travel, while the 4-link rear suspension with lateral rod offers more than nine inches. In short: On rocks, it rocks.

---

[15] 2011      FJ      Cruiser,      Toyota      (2011)      https://www.auto-brochures.com/makes/Toyota/FJ%20Cruiser/Toyota_US%20FJCruizer_2011.pdf (last visited Nov. 16, 2022).

27

93.     In the 2012-2014 FJ Cruiser sales brochures distributed throughout the United States, Toyota boasted that the FJ Cruiser could withstand "[f]rame-bending boulders," that its "rock-solid body-on-frame construction keeps the FJ rigid regardless of the terrain":



94.     TMS also published press releases highlighting the durability of the FJ Cruiser frames. TMS stated, for instance, that the Class Vehicles' "tough, wide stance

is based on a boxed steel ladder-braced frame to which the welded steel body is mounted."[16]

95.    Toyota's press releases, sales brochures, and other marketing material touted the durability of the Class Vehicles. Yet, Toyota failed to disclose, acknowledge, or provide consumers notice in its marketing materials of the Frame Defect and the damage that it caused. Reasonable consumers had no way to know of the Frame Defect prior to the purchase of Class Vehicles.

96.    Toyota's decision to continue using the frames, notwithstanding its knowledge of the Frame Defect, and its customers' lack of knowledge of such Defect, has caused the Defect to go unremedied to this day.

97.    Defendants possessed exclusive and superior knowledge and information regarding the Defect but concealed the Defect from Plaintiff and Class members. Indeed, Toyota has known of the Frame Defect since prior to the release of the Class Vehicles into the market, as well as the serious safety risk it causes to the Vehicles' occupants, yet Toyota failed to inform Class members of the Defect prior to their Class Vehicle purchases and, to this day, fail to adequately remedy the Defect.

**E.    Plaintiffs' Experiences**

       **a.    Elliot Nazos**

98.    On or about February 12, 2010, Plaintiff Elliot Nazos (for purposes of this section, "Plaintiff") purchased his 2010 FJ Cruiser from Planet Toyota, an authorized Toyota dealer located in Matteson, Illinois (for purposes of this section, the "Dealership").

99.    Plaintiff purchased his Class Vehicle primarily for personal, family, or household use.

---

[16] *Toyota FJ Cruiser Uniquely Fuses Off-Road Prowess With Heritage Design and Modern Connectivity*, Toyota (Sept. 6, 2011), https://pressroom.toyota.com/toyota-2012-fj-cruiser-fuses-off-road-prowess-with-heritage-design/ (last visited Nov. 16, 2022); *2014 Toyota FJ Cruiser Continues A Long Tradition of Off-Road Capability*, Toyota (Sept. 16, 2013), https://pressroom.toyota.com/2014-toyota-fj-cruiser/ (last visited Nov. 16, 2022).

100.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his Class Vehicle.  Before making his purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its frame.

101.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

102.   Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

103.   Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

104.   In October 2012, Plaintiff noticed excessive rust accumulation and flaking on the frame of his Class Vehicle. Shortly thereafter, he brought his Class Vehicle to Dan Wolf Toyota of Naperville, for an inspection of the frame. The dealer confirmed that the frame on Plaintiff's Class Vehicle exhibited rust corrosion, but that the corrosion was normal and there was nothing wrong with frame, which was operating as intended. Plaintiff's Class Vehicle was covered by warranty at this time, yet Toyota failed to recommend repairs to the frame.

105.   In or about July 2018, while Plaintiff was operating his Class Vehicle, the engine's original splash shield, which is generally unobservable to the consumer due to its location underneath the engine, fell off of his Class Vehicle.

106.   Plaintiff then brought his Class Vehicle to Dan Wolf Toyota of Naperville ("Dan Wolf") to repair his splash shield at an out-of-pocket expense of over $300.00.

107.   In or about October 2019, Plaintiff returned his Class Vehicle to Dan Wolf after parts fell off from underneath his Class Vehicle and Plaintiff observed that the corrosion on his Class Vehicle's frame had worsened significantly and caused the Class Vehicle's gas tank straps—which he was unable to locate—to disintegrate and become completely detached from the Class Vehicle. A salesperson at Dan Wolf represented to Plaintiff, however, that the rust corrosion on his frame was normal.

108.   Given the dealership's prior representation that nothing was wrong with Class Vehicle's frame, together with the fact that the defect is latent and the frame is neither observable nor reasonably accessible, Plaintiff had no way to know of the existence of the defect in his Class Vehicle until, at the earliest, October 2019, when Plaintiff took his Class Vehicle to Dan Wolf to repair its splash shield.

109.   To date, Toyota has sent no notification to Plaintiff about any permanent repair, modification, or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

110.   Plaintiff's vehicle continues to experience excessive rust and corrosion on the frame.

111.   At all times, Plaintiff, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

112.   As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

**b.   Christine Blight**

113.   On or about June 21, 2010, Plaintiff Christine Blight (for purposes of this section, "Plaintiff") purchased her 2007 FJ Cruiser from Toyota of Scranton, an authorized Toyota dealer located in Scranton, Pennsylvania (for purposes of this section, the "Dealership").

114.   Plaintiff purchased the Class Vehicle primarily for personal, family, or household use.

115.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase the Class Vehicle. Before making the purchase, Plaintiff conducted internet research, reviewed brochures and the Vehicle's Monroney sticker, and spoke to representatives of the Dealership and MotorWorld Toyota, another authorized Toyota dealership, who assured her of the quality, safety, and reliability of the vehicle. In fact, one of the dealership's sales representatives repeatedly represented to Plaintiff and her and her husband that there was a warranty on the body, but the frame will outlast the life of the Class Vehicle because it was coated from the factory. Plaintiff selected and ultimately purchased the Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

116.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

117.   Plaintiff, in purchasing the Class Vehicle, relied upon Toyota's representations—made online and in brochures and by representatives of its authorized dealerships—regarding the quality, safety, and reliability of the Class Vehicle. Had Toyota disclosed the Defect before Plaintiff purchased her vehicle, she would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

118.   Plaintiff properly maintained and serviced her Class Vehicle according to the industry and maintenance guidelines.

119.   In or about 2014, Plaintiff first noticed the vehicle was exhibiting what appeared to be surface rust and corrosion on the frame and undercarriage of the vehicle.

120.   In or about early 2018, Plaintiff noticed, for the first time, that the corrosion on the Class Vehicle's frame had worsened.

121.   Accordingly, on or about September 28, 2018, Plaintiff's husband, Brian Blight, contacted Toyota Brand Experience Center to inquire about the corrosion on the Class Vehicle's frame, including to ask if a recall had been issued to address the corrosion. Upon information and belief, Toyota assigned this to its National Headquarters under file #1809280682. Ultimately, a representative stated that there was no recall, and that Toyota would not be able to assist Mr. Blight.

122.   In or about January 2020, while Mr. Blight was taking his children to school and while operating the Class Vehicle on the road, the driver's side rear lower link bracket, which is generally unobservable to the consumer due to its location underneath the vehicle, fell off of the Class Vehicle.

123.   This was the first time that Plaintiff was able to observe the extent of the corrosion on the Class Vehicle's frame and became aware that the frame had corroded beyond the surface.  Indeed, given the defect is latent and the Class Vehicle's frame is neither observable nor reasonable accessible, Plaintiff had no way to know of the existence of the defect in his Class Vehicle prior to this time.

124.   To date, Toyota has sent no notification to Plaintiff about any permanent repair, modification, or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

125.   Plaintiff's vehicle continues to experience excessive rust and corrosion on the frame.

126.   At all times, Plaintiff, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

127.   As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

   **c.**   <u>**Jeffrey Cochran**</u>

128.   On or about April 13, 2006, Plaintiff Jeffrey Cochran (for purposes of this section, "Plaintiff") purchased his 2007 FJ Cruiser from O'Brien Toyota, an authorized Toyota dealer located in Indianapolis, Indiana (for purposes of this section, the "Dealership").

129.   Plaintiff purchased his Class Vehicle primarily for personal, family, or household use.

130.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle.  Before making his purchase, Plaintiff Cochran researched the vehicle online including viewing advertisements that touted the quality, safety, and reliability of the vehicle, and spoke to a representative of the Dealership named Dale Schmaltz who assured him of the quality, safety, and reliability of the vehicle. Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented, advertised and marketed as a high-quality vehicle capable of providing safe, quality and reliable transportation in all components, including its frame.

131.   None of the information provided to Plaintiff disclosed any defects with the Frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

132.   Plaintiff, in purchasing the Class Vehicle, relied upon Toyota's representations—made online and in brochures and by representatives of the Dealership—regarding the quality, safety, and reliability of the Class Vehicle. Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them.  Like all members of the Class, Plaintiff would not have purchased his Class Vehicle, or he would have paid less for the vehicle, had he known of the Defect.

133.   Plaintiff properly maintained and serviced her Class Vehicle according to the industry and maintenance guidelines.

134.   In or about June of 2021, Plaintiff brought his Class Vehicle to Ziebart in Indianapolis, Indiana, for under coating and rust proofing of his vehicle when Ziebart brought it to Plaintiff's attention that his vehicle has excessive rust and corrosion on the frame and component parts. Ziebart would not perform any service on Plaintiff's vehicle and suggested that he bring his vehicle to Hobbs Automotive.

135.   On or about June 8, 2021 Plaintiff brought his Class Vehicle to Hobbs Automotive Inc., located in Indianapolis, Indiana to have his vehicle inspected for rust corrosion and new fuel tank straps installed since the factory installed straps have fallen off due to the excessive rust and corrosion on his vehicle's frame; however, Hobbs Automotive refused to perform any repairs and the technician wrote, "frame is severely rusted in several spots. Do not recommend fixing anything without frame replacement." As such, no repairs were made at the service visit.

136.   After being denied repairs due to excessive rust and corrosion on the frame, on or about June 10, 2021, Plaintiff wrote to NHTSA about his concerns about the excessive corrosion the Class Vehicle. The NHTSA ODI report ID number is 11420434 and states as follows:

> The contact owns a 2007 Toyota FJ Cruiser. The contact stated
> that the vehicle was taken to an independent mechanic to replace
> the gas tank trunk strap. The mechanic informed him that the

1
2
3
4

> undercarriage of the vehicle was extremely corroded and that the vehicle was not safe to drive. The local dealer was contacted about the failure and he was informed over the phone that the entire sub-frame of the vehicle needed to be replaced out of pocket. The vehicle was not yet repaired. The manufacturer was not made aware of the failure. The failure mileage was 81,875.

5    137.   In addition, on or about December 14, 2021, Plaintiff sent an email to

6  NHTSA requesting to amend his ODI submission to: vsh@dot.gov because since his

7  initial complaint the gasoline tank straps had fallen off due to the excessive corrosion

8  on the Class Vehicle's Frame.

9    138.   To date, Toyota has sent no notification to Plaintiff about any permanent

10  repair, modification or change to the maintenance schedule that would either repair the

11  Defect or prevent the Defect from causing additional damage.

12    139.   Plaintiff's vehicle continues to experience excessive rust and corrosion on

13  the frame.

14    140.   At all times, Plaintiff, like all Class Members, has attempted to drive his

15  Class Vehicle in a foreseeable manner and in a manner in which it was intended to be

16  used.

17    141.   As a result of the Defect, Plaintiff has lost confidence in the ability of his

18  Class Vehicle to provide him safe and reliable transportation for ordinary and

19  advertised purposes. Until and unless Toyota fully discloses the Defect or implements

20  a permanent repair or modification to the maintenance schedule that prevents the

21  Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

22    **d.   <u>Jack Perry</u>**

23    142.   On or about September 13, 2010, Plaintiff Jack Perry (for purposes of this

24  section, "Plaintiff") purchased his 2010 FJ Cruiser from Palmiero Toyota Scion, an

25  authorized Toyota dealer located in Meadville, Pennsylvania (for purposes of this

26  section, the "Dealership").

27    143.   Plaintiff purchased his Class Vehicle primarily for personal, family, or

28  household use.

144.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff conducted online research, which included viewing Toyota's and the Dealership's websites; reviewed brochures, sales promotional materials, and the Class Vehicle's window sticker (the "Monroney" sticker); and spoke to a representative of the authorized Toyota dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased. Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented, advertised and marketed as a high-quality vehicle capable of providing safe, quality and reliable transportation in all components, including its Frame.

145.   None of the information provided to Plaintiff's disclosed any defects with the Frame.  Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

146.   Plaintiff, in purchasing the Class Vehicle, relied upon Toyota's representations—made online and in brochures and by representatives of the Dealership—regarding the quality, safety, and reliability of the Class Vehicle. Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them.  Like all members of the Class, Plaintiff would not have purchased his Class Vehicle, or he would have paid less for the vehicle, had he known of the Defect

147.   Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

148.   In or about December 2020, Plaintiff took his Class Vehicle in for service to an authorized Toyota Dealership after noticing the excessive frame rust and excessive flaking of his Class Vehicle's frame. At this service visit he directed the technician to look at the rust on his Class Vehicle's frame. During this service visit, and at each and every oil change since, he has mentioned this Frame Defect to the

1   technicians. However, each time, the technicians returned the Class Vehicle without

2   providing any option to repair the Frame Defect.

3       149.   To date, Toyota has sent no notification to Plaintiff about any permanent

4   repair, modification, or change to the maintenance schedule that would either repair

5   the Defect or prevent the Defect from causing additional damage.

6       150.   Plaintiff's vehicle continues to experience excessive rust and corrosion on

7   the frame.

8       151.   At all times, Plaintiff, like all Class Members, has attempted to drive his

9   Class Vehicle in a foreseeable manner and in a manner in which it was intended to be

10  used.

11      152.   As a result of the Defect, Plaintiff has lost confidence in the ability of his

12  Class Vehicle to provide him safe and reliable transportation for ordinary and

13  advertised purposes. Until and unless Toyota fully discloses the Defect or implements

14  a permanent repair or modification to the maintenance schedule that prevents the

15  Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

16      **e.**    **Brian and Barbara Saunders**

17      153.   On or about October 27, 2006, Plaintiffs Brian and Barbara Saunders (for

18  purposes of this section, "Plaintiffs") purchased their 2007 FJ Cruiser from Hyannis

19  Toyota Scion, an authorized Toyota dealer located in Hyannis, Massachusetts (for

20  purposes of this section, the "Dealership").

21      154.   Plaintiff Brian and Barbara Saunders purchased their Class Vehicle

22  primarily for personal, family, or household use.

23      155.   Passenger safety and reliability were important factors in Plaintiffs'

24  decision to purchase their Class Vehicle. Before making their purchase, Plaintiffs

25  reviewed the window sticker (the "Monroney" sticker), spoke to a representative of the

26  authorized Toyota dealership who assured them of the quality, safety, and reliability of

27  the vehicle, and test drove the vehicle they ultimately purchased. Plaintiffs selected and

28  ultimately purchased the Class Vehicle because the vehicle was represented, advertised

and marketed as a high-quality vehicle capable of providing safe, quality and reliable transportation in all components, including its Frame.

156.   None of the information provided to Plaintiffs disclosed any defects with the Frame. Toyota's misstatements and omissions were material to Plaintiffs.

157.   Had Toyota disclosed the Defect before Plaintiffs purchased their vehicle, they would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiffs would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Defect.

158.   Plaintiffs properly maintained and serviced their class vehicle according to Toyota's recommended maintenance guidelines.

159.   In March of 2021 Mrs. Saunders went to All Out Performance, located in Harwich, Massachusetts, for a diagnosis of the frame. The technician wrote, "found vehicle to have severe structural rot at left front lower, control arm mount, left and right rear upper control arm mounts and frame, (right upper arm has severed at frame) and rear lateral track bar at rear axle.  In addition to frame rust I discovered the rear axle housing has rusted to the point of weeping oil. At this point I do not advise driving the vehicle." Mrs. Saunders paid $500.00 for the diagnosis.

160.   On or about April 27, 2021, Plaintiff Barbara Saunders spoke with a representative named Chris from Toyota Brand Experience Center about her concerns with the Class Vehicle exhibiting excessive rust and corrosion of the frame and associated components. He advised that the car was out of warranty; however, the Toyota Brand experience center representative Chris emailed her the Case # 210427000800.

161.   On or about May 07, 2021, Plaintiffs had their vehicle towed to Toyota of Hyannis to have the vehicle's frame inspected for rust. The technician wrote, "Rear cross member of frame has holes. Brackets for rear arms rotted off and not attached to frame." The technician also mentioned that there were no frames available. The Saunders were charged $96.05 for the diagnosis and no repairs were completed.

162.   To date, Toyota has sent no notification to Plaintiff about any permanent repair, modification, or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

163.   Plaintiffs' vehicle continues to experience excessive rust and corrosion on the frame.

164.   At all times, Plaintiffs, like all Class Members, have attempted to drive their Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

165.   As a result of the Defect, Plaintiffs have lost confidence in the ability of their Class Vehicle to provide them safe and reliable transportation for ordinary and advertised purposes. Due to safety concerns, Plaintiffs have not driven the vehicle since in or about March 2021. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiffs' loss of confidence will continue unabated.

### f.   **Patricia Loughney**

166.   On or about April 21, 2010, Plaintiff Patricia Loughney (for purposes of this section, "Plaintiff") purchased her 2010 FJ Cruiser from Towne Toyota, an authorized Toyota dealer located in Ledgewood, New Jersey (for purposes of this section, the "Dealership").

167.   Plaintiff purchased her Class Vehicle primarily for personal, family, or household use.

168.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his Class Vehicle.  Before making her purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a Dealership representative about the quality, safety, and reliability of the vehicle, saw T.V. commercials that touted about the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff selected and ultimately purchased his Class Vehicle

because the vehicle was represented, advertised, marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

169.   None of the information provided to Plaintiff disclosed any defects with the frame.  Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

170.   Had Toyota disclosed the Defect before Plaintiff purchased her vehicle, she would have seen such disclosures and been aware of them.  Like all members of the Class, Plaintiff would not have purchased her Class Vehicle, or she would have paid less for the vehicle, had she known of the Defect.

171.   Plaintiff properly maintained and serviced her Class Vehicle according to industry and maintenance guidelines.

172.   In approximately 2014, Plaintiff observed rust, corrosion, and flaking on the undercarriage and the frame of her Class Vehicle.

173.   On or about February 25, 2014, Plaintiff brought her Class Vehicle to the Dealership for a brake repair. While there, she inquired as to the corrosion she had observed and the prior recall of the Toyota Tundra concerning frame corrosion. The Dealership advised her that there was no recall on the FJ Cruiser frame. The dealership further advised that the corrosion was normal and there was nothing wrong with the Class Vehicle's frame, which was operating as intended. Plaintiff's Class Vehicle was covered by an extended warranty at this time; yet the Dealership would not perform any repairs. After the Dealership declined to repair the frame, Plaintiff brought her Class Vehicle to an auto body shop to have an undercoat applied to the frame of her Class Vehicle at a $2,800.00 out-of-pocket expense, but, in reliance on the dealership's assurances that there was nothing wrong with the Class Vehicle's frame, took no further action.

174.   It was until 2017 or 2018 that Plaintiff first observe the extent of the corrosion on the Class Vehicle's frame and became aware that the frame had corroded

beyond the surface.  Indeed, given the defect is latent and the Class Vehicle's frame is neither observable nor reasonable accessible, Plaintiff had no way to know of the existence of the defect in his Class Vehicle prior to this time.

175.   To date, Toyota has sent no notification about any permanent repair, modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

176.   Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

177.   At all times Plaintiff, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

178.   As a result of the Defect, Plaintiff has lost confidence in the ability of her Class Vehicle to provide her safe and reliable transportation for ordinary and advertised purposes.  Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

### g.   Emily Barbour

179.   On or about July 29, 2006, Plaintiff Emily Barbour (for purposes of this section, "Plaintiff") purchased her 2007 FJ Cruiser from Muller Toyota Scion, an authorized Toyota dealer located in Clinton, New Jersey (for purposes of this section, the "Dealership").

180.   Plaintiff Barbour purchased her Class Vehicle primarily for personal, family, or household use.

181.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase her Class vehicle. Before making her purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured her of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased. Plaintiff selected and

ultimately purchased her Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, reliable transportation in all components, including its frame.

182. None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's omissions were material to Plaintiff, who was acting as a reasonable consumer.

183. Had Toyota disclosed the Defect before Plaintiff purchased her vehicle, she would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would not have purchased her Class Vehicle, or she would have paid less for the vehicle, had he known of the Defect.

184. Plaintiff properly maintained and serviced her Class Vehicle according to industry and maintenance guidelines.

185. On or about September 29, 2021, Plaintiff brought her vehicle to Fairmount Hilltop Garage for regular maintenance where the mechanic advised her that her vehicle had exhibited excessive rust and corrosion on the frame.

186. Upon learning of the excessive rust on the frame, Plaintiff brought her vehicle to Toyota World of Clinton, an authorized Toyota Dealership in Clinton New Jersey, with concerns that her Class Vehicle had excessive rust and corrosion. While there, Robert Stulter, the Service Director of the dealership, advised that she would be required to pay $150 just for preparing an estimate. Plaintiff requested that the dealership take down her information and that they contact Toyota directly and be in touch. To date, Toyota Motors and the dealership have not contacted Plaintiff.

187. After Toyota refused to prepare a complimentary estimate, on or about November 3, 2021, Plaintiff brought her Class vehicle to Rick Allen's Auto Repair shop, in Hampton, NJ to have the technicians look at the frame. While at the shop and while the vehicle was on a lift, Plaintiff took photos of the rust and corrosion on the frame and undercarriage. Rick Allen Auto Repair informed Plaintiff Barbour that it

would not be able to make the needed repairs to or replacements of the rusted frame and undercarriage.

188.   On or about December 3, 2021, Plaintiff went back to Toyota World with the pictures and showed the photos to John Castellano, a sales and leasing consultant, and Dave Ventura, the General Sales manager, at the dealership. Mr. Ventura contacted the service department and requested that they provide a "ball-park" estimate for replacement of the frame, which the service department advised was at least $16,000 to repair.

189.   To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

190.   Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

191.   At all times, Plaintiff, like all other Class Members, has attempted to drive her Class Vehicle in a foreseeable manner as it was intended to be used.

192.   As a result of the Defect, Plaintiff has lost confidence in the ability of her Class Vehicle to provide her safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

### h.   **Thomas Pastore**

193.   On or about August 1, 2006, Plaintiff Thomas Pastore (for purposes of this section, "Plaintiff") purchased his 2007 FJ Cruiser from Smithtown Toyota, an authorized Toyota dealer located in Smithtown, New York (for purposes of this section, the "Dealership").

194.   Plaintiff purchased his Class Vehicle primarily for personal, family, or household use.

195.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his Class Vehicle. Before making his purchase, Plaintiff reviewed brochures, Toyota's website, and the Vehicle's Monroney sticker, and spoke to a representative of the authorized Toyota Dealership who assured him of the quality, safety, and reliability of the vehicle. Plaintiff also test drove a 2007 FJ Cruiser. Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation is all components, including its frame.

196.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

197.   Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

198.   Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

199.   In or about 2012, in connection with the replacement of his Class Vehicle's exhaust, Plaintiff noticed signs of rust and corrosion on the Class Vehicle's frame.

200.   Plaintiff then contacted the Dealership, as well as another of Toyota's authorized dealerships, Oakdale Toyota, to inquire about the corrosion he had observed on his vehicle's frame and undercarriage. The Toyota dealerships advised they were unaware of any issues or recalls for the frame and that corrosion of the frame is normal.

201.   The corrosion on the Class Vehicle's frame worsened over time, and on or about September 1, 2021, Plaintiff brought his vehicle to Garden State Undercoating to have an undercoating applied to his Class Vehicle's frame at an out-of-pocket expense of $3,450.00.

202.   It was then that Plaintiff first observed the extent of the corrosion on the Class Vehicle's frame and became aware that the frame had corroded beyond the surface. Indeed, given the defect is latent and the Class Vehicle's frame is neither observable nor reasonable accessible, Plaintiff had no way to know of the existence of the defect in his Class Vehicle prior to this time.

203.   To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

204.   Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

205.   As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

### i.   Timothy and Dawn Dotson

206.   On or about August 11, 2007, Plaintiffs Timothy and Dawn Dotson (for purposes of this section, "Plaintiffs") purchased their 2007 FJ Cruiser from Russel Motor Cars, an authorized Toyota dealer located in Baltimore, Maryland (for purposes of this section, the "Dealership").

207.   Plaintiffs purchased their Class Vehicle primarily for personal, family, or household use.

208.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase their Class Vehicle. Before making his purchase, Plaintiffs reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured them of the quality, safety, and reliability of the vehicle, and test drove the vehicle they ultimately purchased. Plaintiffs selected and ultimately purchased their Class Vehicle because the vehicle was

1  represented, advertised, and marketed as a high-quality vehicle capable of providing
2  safe, quality, and reliable transportation in all components, including its frame.

3      209.   None of the information provided to Plaintiffs disclosed any defects with
4  the frame. Toyota's misstatements and omissions were material to Plaintiffs, who was
5  acting as reasonable consumers.

6      210.   Plaintiffs, in purchasing their Class Vehicle, relied upon Toyota's
7  representations—made in brochures and by representatives of the Dealership—
8  regarding the quality, safety, and reliability of the Class Vehicle. Had Toyota disclosed
9  the Defect before Plaintiffs purchased their Class Vehicle, they would have seen such
10 disclosures and been aware of them. Like all members of the Class, Plaintiffs would
11 not have purchased their Class Vehicle, or they would have paid less for the vehicle,
12 had they known of the Defect.

13     211.   Plaintiffs properly maintained and serviced his Class Vehicle according
14 to industry and maintenance guidelines.

15     212.   On or about February 21, 2012, with approximately 69,568 miles on the
16 odometer, Mr. Dotson brought the Class Vehicle to Brown's Toyota to discuss
17 Plaintiffs' concerns about rust and corrosion on their Class Vehicle. The dealership
18 advised that the corrosion on their Class Vehicle's frame was normal and that there
19 was nothing wrong with the frame, which was operating as intended. Plaintiffs' Class
20 Vehicle was covered by extended warranty at this time; yet the Dealership returned the
21 Class Vehicle to Plaintiffs without providing any option for repairs.

22     213.   The corrosion worsened over time, however, it was not until on or about
23 June 18, 2020, when Mr. Dotson was at Garrett Automotive having a hitch installed on
24 the Class Vehicle, that Mr. Dotson observed the extent the frame had corroded.

25     214.   Since Plaintiffs were now aware of a possible defect in the Class Vehicle's
26 frame, on or about July 13, 2020, Mr. Dotson brought their Class Vehicle back to
27 Garrett Automotive for further inspection. At the conclusion of the inspection, the
28 technician provided a report to Plaintiff that stated: "Treat Rusted Areas with Rust

47

Most, Fluid Film underneath vehicle (Note…This process will help slow down rust and corrosion under your vehicle, it will not stop rust corrosion completely)."

215.   On or about May 24, 2021, Mr. Dotson brought their vehicle to Independent Auto Center for an oil change where Mr. Dotson was advised by the technician that they noticed the left rear axle bracket for the control arm had rotted off.

216.   The next day, Mr. Dotson called Toyota Brand Experience Center and spoke to a representative who said that there was no recall on the FJ Cruiser frame; however, the representative provided a case number #210525001234.

217.   On or about May 25, 2021, Mr. Dotson called NHTSA on the phone about his concerns about the excessive corrosion the Class Vehicle.

218.   On or about June 07, 2021, Mr. Dotson brought their vehicle to Brown's Toyota with concerns that the vehicle exhibited excessive rust and corrosion. The technician replaced rear axle housing, link arms, and necessary parts. This repair ultimately cost Plaintiff $3,719.23.

219.   Given the defect is latent and the Class Vehicle's frame is neither observable nor reasonable accessible, Plaintiffs had no way to know of the existence of the defect in their Class Vehicle until, at the earliest, June 18, 2020, when Mr. Dotson was able to observe the extent of the corrosion while having a hitch installed on the Class Vehicle.

220.   To date, Toyota has sent no notification to Plaintiffs about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

221.   Plaintiffs' Class Vehicle continues to experience excessive rust and corrosion on the frame.

222.   At all times, Plaintiffs, like all Class Members, have attempted to drive their Class Vehicle in a foreseeable manner and in the manner in which it was intended to be used.

48

223.   As a result of the Defect, Plaintiff has lost confidence in the ability of their Class Vehicle to provide them safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's' loss of confidence will continue unabated.

**j.**   **Jill Silvernale**

224.   On or about February 4, 2012, Plaintiff Jill Silvernale (for purposes of this section, "Plaintiff") purchased her 2007 FJ Cruiser from Signature Automotive Group, an authorized Toyota dealer located in Benton Harbor, Michigan (for purposes of this section, the "Dealership").

225.   Plaintiff purchased her Class Vehicle primarily for personal, family, or household use.

226.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase her Class Vehicle. Before making her purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, spoke to a representative of the authorized Toyota Dealership who assured her of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased. Plaintiff selected and ultimately purchased her Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

227.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff, who was acting as a reasonable consumer.

228.   Had Toyota disclosed the Defect before Plaintiff purchased her vehicle, she would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would not have purchased her Class Vehicle, or she would have paid less for the vehicle, had she known of the Defect.

229.   Plaintiff properly maintained and serviced her Class Vehicle according to industry and maintenance guidelines.

230.   On or about October 29, 2021, Plaintiff was having a new muffler installed on her vehicle at Peterson European when the technician advised her that the frame of her vehicle was "very rusty" with "many holes coming through." In addition, Peterson European advised that the gas tank straps were "very rusty" and "close to breaking."

231.   Shortly after, Plaintiff contacted Toyota and spoke to a representative that stated there was no recall on the FJ frame and they would be unable to assist her.

232.   On or about March 16, 2022, Plaintiff noticed that the rusty fuel tanks straps were hanging down to the point where she felt that her vehicle was unsafe to drive to work. As a result, on March 16, 2022, Plaintiff had to pay $401.94 out of pocket to replace both fuel tank straps and hardware.

233.   To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

234.   Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

235.   At all times, Plaintiff, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in the manner in which it was intended to be used.

236.   As a result of the Defect, Plaintiff has lost confidence in the ability of her Class Vehicle to provide her safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

**k.  Kyle Blumin**

237.   On April 24, 2018, Plaintiff Kyle Blumin (for purposes of this section, "Plaintiff") purchased his 2013 FJ Cruiser from Larry H. Miller Toyota, an authorized Toyota dealer located in Murray, Utah (for purposes of this section, the "Dealership").

238.   Plaintiff purchased his Class Vehicle primarily for personal, family, or household use.

239.   Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff reviewed brochures and the Vehicle's Monroney sticker, and spoke to a representative of the authorized Toyota Dealership. Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented, advertised, and marketed as a high-quality vehicle capable of providing safe, quality, and reliable transportation in all components, including its frame.

240.   None of the information provided to Plaintiff disclosed any defects with the frame. Toyota's misstatements and omissions were material to Plaintiff.

241.   Had Toyota disclosed the Defect before Plaintiff purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

242.   Plaintiff properly maintained and serviced his Class Vehicle according to industry and maintenance guidelines.

243.   In or about the latter half of 2019, Plaintiff noticed that there were rust stains on the floor of his garage where he parked his Class Vehicle. Plaintiff then discovered that the underside of his Vehicle showed signs of rust and corrosion.

244.   Approximately two months later, Plaintiff contacted the Dealership with concerns about the excessive rust on his vehicle's frame and undercarriage. A representative at the Dealership advised Plaintiff there was nothing that could be done

because the Vehicle was outside of its warranty, and advised Plaintiff to call Toyota's corporate office.

245.   Plaintiff then called Toyota's customer service department, where the representative advised that Toyota would not cover the repair because the Vehicle's warranty had expired.

246.   A few days later, in an attempt to mitigate the excessive rust and corrosion, Plaintiff brought his Class Vehicle to Signature Detailing, located in Salt Lake City, Utah, to have an undercoating applied to the class vehicle due to the excessive rust and corrosion. Plaintiff paid $350.00 for the undercoating.

247.   To date, Toyota has sent no notification to Plaintiff about any permanent repair or modification or change to the maintenance schedule that would either repair the Defect or prevent the Defect from causing additional damage.

248.   Plaintiff's Class Vehicle continues to experience excessive rust and corrosion on the frame.

249.   As a result of the Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide him safe and reliable transportation for ordinary and advertised purposes. Until and unless Toyota fully discloses the Defect or implements a permanent repair or modification to the maintenance schedule that prevents the Defect from causing damage, Plaintiff's loss of confidence will continue unabated.

**l.    All Plaintiffs**

250.   Prior to Plaintiffs' purchase of their Class Vehicles, Defendants, in widespread marketing campaigns, touted the quality, durability, and safety of the Class Vehicles, and specifically the quality and benefits of their frames and related components.

251.   Although Toyota had the opportunity to disclose the Frame Defect through its advertising in the owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by Toyota dealerships, through vehicle brochures and other informational documents, or on Toyota's website, Toyota failed

to do so prior to Plaintiffs' Vehicle purchases, and Toyota continues to conceal the Defect to this day.

252.   As such, Plaintiffs had no way of knowing or learning that such information regarding the quality, durability, and safety of the Class Vehicles, including the quality and benefits of their frames and related components, conveyed to Plaintiffs in Toyota's marketing materials when deciding to purchase their Vehicles, was false.

253.   Had Plaintiffs known, or otherwise been made aware, of the Frame Defect in the Class Vehicles and Toyota's inability to repair or cure it absent replacement of the frame and other affected components, they would not have purchased their Class Vehicle or, otherwise, would have paid significantly less for them.

254.   When Plaintiffs purchased their Class Vehicles, they relied on the reasonable expectation that their Class Vehicles would be equipped with a frame that was free from defects, had adequate anti-corrosion properties, and would maintain the structural integrity of the Vehicle, ensuring they were safe to operate.

255.   At all relevant times, Plaintiffs have operated their Class Vehicles in a reasonable and foreseeable manner and as the Vehicles were intended to be used. However, the Vehicles no longer provide safety and reliability, due to the recurring problems caused by the Frame Defect.

256.   Plaintiffs have suffered a concrete and ascertainable loss as a direct and proximate result of Toyota's omissions and misrepresentations relating to the Frame Defect in that Plaintiffs overpaid for their Class Vehicles at the time of purchase, the value of their Class Vehicles has been diminished, and they are left with vehicles that pose a safety risk to themselves and their occupants as a result of the Frame Defect and the damage it causes to the structural integrity of the Vehicle.

257.   Toyota was provided notice of the issues raised in this Complaint, as set forth in the above paragraphs pertaining to each Plaintiff, and via letter on April 14,

1  2022. However, Toyota has failed to remedy its unlawful conduct and otherwise cure
2  its breaches of warranty.

3  **F.     The Agency Relationship Between Toyota and Its Network of Authorized**
4  **Dealerships**

5      258.   In order to sell vehicles to the general public, upon information and belief,
6  Toyota enters into agreements with its nationwide network of authorized dealerships
7  to engage in retail sales with consumers such as Plaintiffs.[17] In return for the exclusive
8  right to sell new, Toyota vehicles, including the Class Vehicles at issue here, the
9  authorized dealerships are also permitted to service and repair these vehicles under the
10  warranties Toyota provides directly to consumers who purchased new vehicles from
11  the authorized dealerships.

12      259.   Accordingly, Toyota's authorized dealerships are Toyota's agents, and
13  the consumers who purchased the Class Vehicles are the third-party beneficiaries of
14  these dealership agreements, which allow the consumers to purchase and service their
15  Class Vehicles locally.

16      260.   Further, Plaintiffs and Class members are the intended beneficiaries of
17  Toyota's implied warranties to its dealers. The dealers were not intended to be the
18  ultimate consumers of the Class Vehicles, and they have no rights under Toyota's
19  implied agreements, which were designed for and intended to benefit the consumers
20  only. Consumers, such as Plaintiffs and Class members, are the true intended
21  beneficiaries of Toyota's implied warranties and may, therefore, avail themselves of
22  those warranties.

23      261.   In promoting, selling, and repairing its defective vehicles, Toyota acts
24  through numerous authorized dealers who act, and represent themselves to the public,
25  as exclusive Toyota representatives and agents. That the dealers act as Toyota's agents
26  is demonstrated by the following facts:

27  ─────────────
[17] Plaintiff will be requesting the agreements between Toyota and its nationwide
28  network of authorized dealerships in discovery.

a.    The authorized Toyota dealerships complete all services and repairs according to Toyota's instructions, which Toyota issues to its authorized dealerships through service manuals, TSBs, technical tips, and other documents;

b.    The warranties provided by Toyota for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

c.    Toyota dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

d.    Toyota controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Toyota's authorization; and

e.    Toyota has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers' interaction with the public; and

262.   Toyota gives its authorized dealerships actual or apparent authority to act on its behalf; thus, the authorized dealerships are agents of Toyota. Plaintiffs and each of the Class members have had sufficient direct dealings with either Toyota or its agent dealerships to establish privity of contract between Toyota, on the one hand, and Plaintiffs and each Class member, on the other hand. This establishes privity with respect to the implied warranties between Plaintiff and Toyota.

**G.**    **Fraudulent Concealment Allegations**

263.   Absent discovery, Plaintiffs are unable through reasonable investigation to obtain the true names and identities of those individuals at Toyota responsible for disseminating false and deceptive marketing materials and information regarding the

1  Class Vehicles. Conversely, Toyota necessarily is in possession of, or has access to, all
2  of this information.

3      264.   Plaintiffs' claims arise out of Toyota's false, deceptive, and fraudulent
4  concealment of the Frame Defect and the premature and excessive rusting and
5  corrosion it causes, and its representations about the quality, durability, and value of
6  the Class Vehicles.

7      265.   To the extent that Plaintiffs' claims arise from Toyota's fraudulent
8  concealment, there is no one document or communication, and no one interaction, upon
9  which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including
10 specifically at the time they purchased their Class Vehicles, Toyota knew, or was
11 reckless in not knowing, of the Frame Defect; Toyota was under a duty to disclose the
12 Frame Defect based upon its exclusive knowledge of it, its affirmative representations
13 about it, and its concealment of it, but Toyota never disclosed the Frame Defect to
14 Plaintiffs or the public at any time or place or in any manner. Instead, Toyota touted in
15 its press releases, sales brochures, and other marketing material the durability of the
16 Class Vehicles. Had Toyota disclosed the existence of the Frame Defect in Class
17 Vehicles, Plaintiffs and Class Members would not have purchased or leased the Class
18 Vehicles, or they would have paid less for them. Had Toyota disclosed the existence
19 of the Frame Defect in Class Vehicles the market price of the Class Vehicles would
20 have been lower. Accordingly, Plaintiffs and Class Members paid a premium reflecting
21 the market's assumption that the Class Vehicles did not have a Frame Defect.

22     266.   Plaintiffs make the following specific fraud allegations with as much
23 specificity as possible, although they do not have access to information necessarily
24 available only to Toyota:

25         a.    *Who*: Toyota actively concealed the Frame Defect from Plaintiffs
26 and Class members while simultaneously touting the quality and durability of the Class
27 Vehicles. Plaintiffs are unaware of, and are therefore unable to identify, the true names
28 and identities of those specific individuals at Toyota responsible for such decisions.

b.      ***What***: Toyota knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Frame Defect. Toyota concealed the Frame Defect and made contrary representations about the quality, durability, and other attributes of the Class Vehicles in its advertisements, sales brochures, marketing materials, and other communications.

c.      ***When***: Toyota concealed material information regarding the Frame Defect at all relevant times and made representations about the quality, durability, and other attributes of the Class Vehicles starting no later than 2004, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/certification for pre-owned sale, and on an ongoing basis, and continuing to this day. On information and belief, Toyota has not disclosed the truth about the Frame Defect in the Class Vehicles to anyone outside of Toyota. In addition, Toyota has never taken any action to inform consumers about the true nature of the Frame Defect in Class Vehicles. Additionally, when consumers have brought their Class Vehicles to Toyota complaining of the excessive and premature frame corrosion and rust, Toyota has denied any knowledge of, or responsibility for, the Frame Defect, claimed that the corrosion is "normal," and required consumers to pay out-of-pocket expenses to perform inadequate repairs or replace their Class Vehicles' frames.

d.      ***Where***: Toyota concealed material information regarding the true nature of the Frame Defect in the advertisements, press releases, sales brochures, marketing materials, and other communications it had with Plaintiffs and Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which Toyota disclosed the truth about the Frame Defect in the Class Vehicles to anyone outside of Toyota. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, or owner's manuals, or on Toyota's website.

e.   ***How***: Toyota concealed the Frame Defect from Plaintiffs and Class members and made representations about the quality, durability, and other attributes of the Class Vehicles. Toyota actively concealed the truth about the existence and nature of the Frame Defect from Plaintiffs and Class members, at all times, even though it knew about the Frame Defect and knew that information about the Frame Defect would be important to a reasonable consumer. Toyota also promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

f.   ***Why***: Toyota actively concealed material information about the Frame Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase the Vehicles instead of competitors' vehicles, and to save money on production and materials, and it made representations about the quality and durability of the Vehicles. Had Toyota disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers, including Class members) would have been aware of the Frame Defect, and they would not have bought the Class Vehicles or would have paid less for them.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Fraudulent Concealment Tolling

267.   Toyota has known of the Frame Defect in the Class Vehicles since at least 2006, and has concealed from, or failed to notify, Plaintiffs, Class members, and the public of the full and complete nature of the Frame Defect, even when directly asked about it by Plaintiffs and Class members during communications with Toyota, as well as its customer service representatives, authorized dealerships, and service centers. Toyota continues to conceal the Frame Defect to this day.

268.   Indeed, when consumers have brought their Class Vehicles to Toyota complaining of the excessive and premature frame corrosion and rust, Toyota has denied any knowledge of, or responsibility for, the Frame Defect, claimed that the corrosion is "normal," did not offer repairs, even when Class Vehicles were under

58

warranty, and ultimately required consumers to pay out-of-pocket expenses to perform repairs that did not cure the Frame Defect or replace their Class Vehicles' frames.

269.   Any applicable statute of limitation has, thus, been tolled by Toyota's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**B.   Estoppel**

270.   Toyota was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. Toyota actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class members reasonably relied upon Toyota's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, Toyota is estopped from relying on any statutes of limitation in defense of this action.

**C.   Discovery Rule**

271.   Certain causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Frame Defect.

272.   However, Plaintiffs and Class members had no reasonable ability to discern on their own that the Class Vehicles were defective until—at the earliest—after the Frame Defect caused their Vehicles' frame and related components to fail. Indeed, the premature and excessive corrosion affecting the Class Vehicles' frames often does not spread to the Vehicles' exterior panels and cannot be observed at eye-level and, when it can be observed, the corrosion appears to reasonable consumers as surface corrosion. In fact, most Class members become aware of the extreme and premature corrosion only after being in an accident or when a wholly-unrelated part was being repaired and a mechanic or Toyota service representative is able to observe the corrosion when the Vehicle is placed on a hydraulic lift. Plaintiffs and Class members, obviously, do not have this capability and, in any event, it is not reasonable to expect

that Plaintiffs and Class members would continuously monitor the undercarriage of their Vehicles.

273.   Even then, Plaintiffs and Class members had no reasonable reason to know about the corrosion and rust caused by a defect in the Class Vehicles because of Toyota's active concealment of the Frame Defect. Not only did Toyota fail to notify Plaintiffs or Class members about the Frame Defect, Toyota, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it, and claimed that the corrosion observed on the Class Vehicle's was "normal" and the frame was operating as intended and, thus, did not require repair.

274.   Thus, Plaintiffs and Class members were not reasonably able to discover the Frame Defect until after they had purchased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing premature and excessive corrosion on their Vehicles.

## VI.   CLASS ALLEGATIONS

275.   Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the following State Classes defined as:

**Illinois Class:**

All persons or entities in Illinois that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Illinois.

**Indiana Class:**

All persons or entities in Indiana that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Indiana.

**Maryland Class:**

All persons or entities in Maryland that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Maryland.

**Massachusetts Class:**

All persons or entities in Massachusetts that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Massachusetts.

**Michigan Class:**

All persons or entities in Michigan that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Michigan.

**New York Class:**

All persons or entities in New York that purchased a Class Vehicle or that purchased a Class Vehicle and reside in New York.

**New Jersey Class:**

All persons or entities in New Jersey that purchased a Class Vehicle or that purchased a Class Vehicle and reside in New Jersey.

**Pennsylvania Class:**

All persons or entities in Pennsylvania that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Pennsylvania.

**Utah Class:**

All persons or entities in Utah that purchased a Class Vehicle or that purchased a Class Vehicle and reside in Utah.

276.    Excluded from the Class are Defendants; their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Toyota; Toyota's dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

277.    Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using

the same evidence as would be used to prove those elements in individual actions alleging the same claim.

278. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

279. **Numerosity**. Rule 23(a)(1) of the Federal Rules of Civil Procedure: The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are at least thousands of Class members, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Toyota's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

280. **Commonality and Predominance**. Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

        a.    whether Toyota engaged in the conduct alleged herein;

        b.    whether Toyota designed, manufactured, advertised, marketed, distributed, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

        c.    whether Toyota designed, manufactured, marketed, and distributed Class Vehicles with a Frame Defect;

        d.    whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of their bargains;

        e.    whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

        f.    whether Toyota's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraudulent

concealment, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

   g.   whether Toyota has violated its express warranties to Plaintiffs and Class members;

   h.   whether Toyota has been unjustly enriched so that its receipt and retention of the profits derived from Plaintiffs and Class members is inequitable;

   i.   whether Toyota actively concealed the Frame Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

   j.   such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

281.   **Typicality**. Rule 23(a)(3) of the Federal Rules of Civil Procedure: Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Toyota's wrongful conduct as described above. All claims seek recovery on the same legal theories and are based upon Toyota's common course of conduct.

282.   **Adequacy**. Rule 23(a)(4) of the Federal Rules of Civil Procedure: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

283.   **Declaratory Relief**. Rule 23(b)(2) of the Federal Rules of Civil Procedure: Toyota has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

284.   **Superiority**. Rule 23(b)(3) of the Federal Rules of Civil Procedure: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Toyota, so it would be impracticable for Class members to individually seek redress for Toyota's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS

**A.      Claims Brought on Behalf of the State Classes**

       **1.      Illinois Class**

## COUNT 1

## VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

**(815 ILCS 505/1, *et seq.* and 510/2)**

285.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

286.   Plaintiff Elliot Nazos (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Illinois Class against Toyota.

287.   Toyota, Plaintiff, and the Illinois Class members are "persons" within the meaning 815 ILCS 505/1(c) and 510/1(5). Plaintiffs and the Illinois State Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

288.   The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact,

64

with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILCS 510/2.

289.   In the course of its business, Toyota, through their agents, employees, and/or subsidiaries, violated the Illinois CFA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles, the quality and benefits of the frames used on the Class Vehicles, the existence of the Frame Defect, and Toyota's ability to render a repair to cure the Defect.

290.   Specifically, in marketing, offering for sale, and selling/leasing the defective Class Vehicles, Toyota engaged in one or more of the following unfair or deceptive acts or practices prohibited by 815 ILCS 505/2 and 510/2:

a.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

b.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

c.   Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

d.   Advertising the Class Vehicles with the intent not to sell them as advertised;

e.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the

1    advertisement and sale of the Class Vehicles, whether or not any

2    person has in fact been misled, deceived or damaged thereby.

3    291.   Toyota's scheme and concealment of the true characteristics of the Class

4   Vehicles were material to Plaintiff and the Illinois Class members, and Toyota

5   misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff

6   and the Illinois Class members would rely on the misrepresentations, concealments,

7   and omissions. Had they known the truth, Plaintiff and the Illinois Class members

8   would not have purchased the Class Vehicles, or would have paid significantly less for

9   them.

10    292.   Plaintiff and the Illinois Class members had no way of discerning that

11   Toyota's representations were false and misleading, or otherwise learning the facts that

12   Toyota had concealed and/or failed to disclose.

13    293.   Toyota had an ongoing duty to Plaintiff and the Illinois Class members to

14   refrain from unfair and deceptive practices under the Illinois CFA in the course of its

15   business. Specifically, Toyota owed Plaintiff and the Illinois Class members a duty to

16   disclose all the material facts concerning the Class Vehicles because it possessed

17   exclusive knowledge, it intentionally concealed such material facts from Plaintiff and

18   the Illinois Class members, and/or it made misrepresentations that were rendered

19   misleading because they were contradicted by withheld facts.

20    294.   Plaintiff and the Illinois Class members suffered ascertainable loss and

21   actual damages as a direct and proximate result of Toyota's concealment,

22   misrepresentations, and/or failure to disclose material information.

23    295.   Toyota's violations present a continuing risk to Plaintiff and the Illinois

24   Class, as well as to the general public. As such, Toyota's unlawful acts and practices

25   complained of herein affect the public interest.

26    296.  Pursuant to 815 ILCS 505/10a(a) and 510/3, Plaintiff and the Illinois

27   Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and

28

awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA.

## COUNT 2

## BREACH OF IMPLIED WARRANTY

## (810 ILL. COMP. STAT. 5/2-314, 5/2-315)

297.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

298.   Plaintiff Elliot Nazos (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Illinois Class against Toyota.

299.   Plaintiff and the Illinois Class members are "buyers" within the meaning of 810 ILCS 5/2-103(1)(a).

300.   The Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles, 810 ILCS 5/2-104(1), and "sellers" of motor vehicles under 5/2-103(1)(d).

301.   The Class Vehicles were at all relevant times "goods" within the meaning of 810 ILCS §§ 5/2-105(1).

302.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 810 ILCS 5/2-314 and 5/2-315.

303.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

304.   Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be

67

unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

305.   Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiff and the Illinois Class members' claims.

306.   As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiff and the Illinois Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

307.   Plaintiff and Illinois members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiff and the Illinois Class members.

308.   Notwithstanding this, privity is not required in this case because Plaintiff and the Illinois Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiff's and Illinois Class members' Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

**COUNT 3**

**FRAUDULENT OMISSION AND CONCEALEMENT**

309.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

310.   Plaintiff Elliot Nazos (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Illinois Class against Toyota.

311.   Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

312.   Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

313.   Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

314.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty

69

replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

315.   Plaintiffs and Illinois State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

316.   Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

a.   Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

b.   The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

c.   Toyota knew that Plaintiffs and Illinois State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

d.   Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

317.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and Illinois State Class members. Further, the Frame Defect is material because it poses a safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

318.   Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

319.   Plaintiffs and Illinois State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs' and Illinois State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Illinois State Class members.

320.   As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Illinois State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

321.   Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and Illinois State Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

322.   Accordingly, Toyota is liable to Plaintiff and the other Illinois Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

323.   Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.  Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**2.** **Indiana Class**

## COUNT 4

## VIOLATION OF THE INDIANA

## DECEPTIVE CONSUMER SALES ACT

## (Ind. Code § 24-5-0.5-3)

324.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

325.   Plaintiff Jeffrey Cochran (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Indiana Class against Toyota.

326.   Toyota, Plaintiff, and the Indiana Class members are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

327.   Plaintiff's and Indiana Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

328.   The Indiana Deceptive Consumer Sales Act ("Indiana DCSA prohibits a person from engaging in a "deceptive act," which includes representing:  "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have[;] (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not[;] … (7) That the supplier has a sponsorship, approval, or affiliation in such consumer transaction the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have[;] … (c) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such representation thereon or therein, or who authored such materials, and such other suppliers who shall state orally or in writing that such representation is true if such

72

1  other supplier shall know or have reason to know that such representation was false."

2  Ind. Code § 24-5-0.5-3.

3  329.   In the course of their business, the Toyota Defendants, through their

4  agents, employees, and/or subsidiaries, engaged in one or more of the following unfair

5  or deceptive acts or practices as defined in Ind. Code § 24-5-0.5-3:

6          a.   Causing likelihood of confusion or of misunderstanding as to the

7              approval or certification of the Class Vehicles;

8          b.   Representing that the Class Vehicles have approval,

9              characteristics, uses, or benefits that they do not have;

10          c.   Representing that the Class Vehicles are of a particular standard,

11              quality and grade when they are not;

12          d.   Advertising the Class Vehicles with the intent not to sell them as

13              advertised;

14          e.   Engaging in other conduct which created a likelihood of

15              confusion or of misunderstanding; and/or

16          f.   Using or employing deception, fraud, false pretense, false promise

17              or misrepresentation, or the concealment, suppression or omission

18              of a material fact with intent that others rely upon such

19              concealment, suppression or omission, in connection with the

20              advertisement and sale of the Class Vehicles, whether or not any

21              person has in fact been misled, deceived or damaged thereby.

22  330.   Toyota's scheme and concealment of the true characteristics of the Class

23  Vehicles were material to Plaintiff and the Indiana Class members, and Toyota

24  misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff

25  and the Indiana Class members would rely on the misrepresentations, concealments,

26  and omissions. Had they known the truth, Plaintiff and the Indiana Class members

27  would not have purchased the Class Vehicles, or would have paid significantly less for

28  them.

331.   Plaintiff and the Indiana Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

332.   Toyota had an ongoing duty to Plaintiff and the Indiana Class members to refrain from unfair and deceptive practices under the Indiana DCSA in the course of its business. Specifically, Toyota owed Plaintiff and the Indiana Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Indiana Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

333.   Plaintiff and the Indiana Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

334.   Toyota's violations present a continuing risk to Plaintiff and the Indiana Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

335.   Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff and the Indiana Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Indiana DCSA.

336.   On March 25, 2022, a notice letter was sent to Toyota complying with Ind. Code § 24-5-0.5-5(a). Plaintiff seeks all damages and relief to which Plaintiff and the Indiana Class are entitled.

## COUNT 5
### BREACH OF IMPLIED WARRANTY
### (IND. CODE §§ 26-1-2-314 and 26-1-2-315)

337.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

338.   Plaintiff Jeffrey Cochran (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Indiana Class against Toyota.

339.   Plaintiff and the Indiana Class members are "buyers" within the meaning of Ind. Code § 26-1-2-103(1)(a).

340.   The Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

341.   The Class Vehicles were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2.1-103(1)(h) and 26-1-2-105(1).

342.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Ind. Code §§ 26-1-2-314, 26-1-2-315.

343.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

344.   Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

75

345.   Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiff and the Indiana Class members' claims.

346.   As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiff and Indiana Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

347.   Plaintiff and Indiana Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiffs and the Class members.

348.   Notwithstanding this, privity is not required in this case because Plaintiff and Indiana Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiff's and Indiana Class members' Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

## COUNT 6

### FRAUDULENT OMISSION AND CONCEALMENT

349.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

350.   Plaintiff Jeffrey Cochran (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Indiana Class against Toyota.

76

351.   Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

352.   Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

353.   Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

354.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

355.   Plaintiffs and Indiana State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

356.   Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

        a.   Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

        b.   The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

        c.   Toyota knew that Plaintiffs and Indiana State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

        d.   Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

357.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and Indiana State Class members. Further, the Frame Defect is material because it poses a safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

358.   Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

359.   Plaintiffs and Indiana State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts.

Plaintiffs' and Indiana State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Indiana State Class members.

360.   As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Indiana State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

361.   Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and Indiana State Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

362.   Accordingly, Toyota is liable to Plaintiff and the other Indiana Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

363.   Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.  Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**3.**     **Maryland Class**

**COUNT 7**

**VIOLATION OF THE MARYLAND**

**UNFAIR TRADE PRACTICES ACT**

**(Md. Code Com. Law § 13-101, *et seq.*)**

364.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

365.   Plaintiff Timothy Dotson (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Maryland Class against Toyota.

366.   Toyota, Plaintiff, and the Maryland Class members are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

367.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good.  Md. Code Com. Law § 13-303.

368.   In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Md. Code Com. Law § 13-303:

    a.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    b.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    c.   Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

    d.   Advertising the Class Vehicles with the intent not to sell them as advertised;

    e.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    f.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

369.   Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Maryland Class members, and Toyota

80

1  misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff

2  and the Maryland Class members would rely on the misrepresentations, concealments,

3  and omissions. Had he known the truth, Plaintiff and the Maryland Class members

4  would not have purchased the Class Vehicles, or would have paid significantly less for

5  them.

6      370.   Plaintiff and the Maryland Class members had no way of discerning that

7  Toyota's representations were false and misleading, or otherwise learning the facts that

8  Toyota had concealed and/or failed to disclose.

9      371.   Toyota had an ongoing duty to Plaintiff and the Maryland Class members

10  to refrain from unfair and deceptive practices under the Maryland CPA in the course

11  of its business. Specifically, Toyota owed Plaintiff and the Maryland Class members a

12  duty to disclose all the material facts concerning the Class Vehicles because it

13  possessed exclusive knowledge, it intentionally concealed such material facts from

14  Plaintiff and the Maryland Class members, and/or it made misrepresentations that were

15  rendered misleading because they were contradicted by withheld facts.

16      372.   Plaintiff and Maryland Class members suffered ascertainable loss and

17  actual damages as a direct and proximate result of Toyota's concealment,

18  misrepresentations, and/or failure to disclose material information.

19      373.   Toyota's violations present a continuing risk to Plaintiff and the Maryland

20  Class, as well as to the general public. As such, Toyota's unlawful acts and practices

21  complained of herein affect the public interest.

22      374.   Pursuant to Md. Code Com. Law § 13-408, Plaintiff and the Maryland

23  Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices,

24  and awarding damages, punitive damages, and any other just and proper relief available

25  under the Maryland CPA.

26

27

28

**COUNT 8**

**BREACH OF IMPLIED WARRANTY**

**(MD. CODE COM. LAW §§ 2-314, 2-315)**

375.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

376.   Plaintiffs Timothy Dotson and Dawn Dotson (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Maryland Class against Toyota.

377.   Plaintiffs and the Maryland Class members are "buyers" within the meaning of Md. Code Com. Law § 2-103(1)(a).

378.   The Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles Md. Code Com. Law §§ 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

379.   The Class Vehicles were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1).

380.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, 2-315.

381.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

382.   Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect.

Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

383. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiffs' and the Maryland Class members' claims.

384. As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiffs and the Maryland Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

385. Plaintiffs and Maryland Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiffs and Maryland Class members.

386. Notwithstanding this, privity is not required in this case because Plaintiffs and Maryland Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs' and Maryland Class members' Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

**COUNT 9**

**FRAUDULENT OMISSION AND CONCEALEMENT**

387.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

388.   Plaintiff Timothy Dotson and Dawn Dotson (for the purposes of this section, "Plaintiffs") brings this action on behalf of themselves and the Maryland Class against Toyota.

389.   Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

390.   Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

391.   Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

392.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it

manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

393. Plaintiffs and Maryland State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

394. Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

  a. Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

  b. The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

  c. Toyota knew that Plaintiffs and Maryland State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

  d. Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

395. These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and Maryland State Class members. Further, the Frame Defect is material because it poses a safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

396.   Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

397.   Plaintiffs and Maryland State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs' and Maryland State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Maryland State Class members.

398.   As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Maryland State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

399.   Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and Maryland State Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

400.   Accordingly, Toyota is liable to Plaintiff and the other Maryland Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

401.   Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.  Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**4.    Massachusetts Class**

**COUNT 10**

**DECEPTIVE ACTS OR PRACTICES**

**PROHIBITED BY MASSACHUSETTS LAW**

**(Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)**

402.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

403.    Plaintiffs Brian and Barbara Saunders (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Massachusetts Class against Toyota.

404.    Toyota, Plaintiffs, and the Massachusetts Class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

405.    Toyota is engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

406.    The Massachusetts consumer protection law ("Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.

407.    In the course of their business, the Toyota Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Mass. Gen. Laws ch. 93A, § 2:

      a.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

      b.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      c.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

      d.    Advertising the Class Vehicles with the intent not to sell them as advertised;

87

    e.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    f.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

408.   Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the Massachusetts Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Massachusetts Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the Massachusetts Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

409.   Plaintiffs and the Massachusetts Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

410.   Toyota had an ongoing duty to Plaintiffs and the Massachusetts Class members to refrain from unfair and deceptive practices under the Massachusetts Act in the course of its business. Specifically, Toyota owed Plaintiffs and the Massachusetts Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the Massachusetts Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

411.   Plaintiffs and the Massachusetts Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

412.   Toyota's violations present a continuing risk to Plaintiffs and the Massachusetts Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

413.   Plaintiff sand the Massachusetts State Class seek an order pursuant to Mass. Gen. Laws ch. 93A § 9 enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Massachusetts Act.

414.   On March 25, 2022, a notice letter was sent to Toyota complying with Mass. Gen. Laws ch. 93A, § 9(3). Plaintiff seeks all damages and relief to which Plaintiff and the Massachusetts Class are entitled.

**COUNT 11**

**BREACH OF IMPLIED WARRANTY**

**(MASS. GEN. LAWS ch. 106, §§ 2-314, 2-315)**

415.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

416.   Plaintiffs Brian and Barbara Saunders (for the purposes of this section, "Plaintiff") bring this action on behalf of themselves and the Massachusetts Class against Toyota.

417.   Plaintiff sand the Massachusetts Class members are "buyers" within the meaning of Mass. Gen. Laws ch. 106, § 2-103(1)(a).

418.   The Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mass. Gen. Laws ch. 106, § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

419.   The Class Vehicles were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106, §§ 2-105(1).

420.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mass. Gen. Laws ch. 106, §§ 2-314, 2-315.

421.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

422.   Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

423.   Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiffs' and Massachusetts Class members' claims.

424.   As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiffs and Massachusetts Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining

alternative means of transportation, and other incidental and consequential damages recoverable under the law.

425.   Plaintiffs and Massachusetts Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiffs and Massachusetts Class members.

426.   Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs' and Massachusetts Class members' Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

## COUNT 12

### FRAUDULENT OMISSION AND CONCEALMENT

427.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

428.   Plaintiff Brian and Barbara Saunders (for the purposes of this section, "Plaintiff") brings this action on behalf of themselves and the Massachusetts Class against Toyota.

429.   Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

430.   Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

431.   Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high

91

quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

432. Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit. Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

433. Plaintiffs and Massachusetts State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

434. Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

    a.   Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

    b.   The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

    c.   Toyota knew that Plaintiffs and Massachusetts State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

92

d.   Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

435.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and Massachusetts State Class members. Further, the Frame Defect is material because it poses a safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

436.   Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

437.   Plaintiffs and Massachusetts State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs' and Massachusetts State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Massachusetts State Class members.

438.   As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Massachusetts State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

439.    Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and Massachusetts State Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

440.    Accordingly, Toyota is liable to Plaintiff and the other Massachusetts Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

441.    Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.   Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**5.    Michigan Class**

**COUNT 13**

**VIOLATION OF THE MICHIGAN**

**CONSUMER PROTECTION ACT**

**(MICH. COMP. LAWS §445.903, _et seq._)**

442.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

443.    Plaintiff Jill Silvernale (for the purposes of this section, "Plaintiff") brings this claim on behalf of herself and the Michigan Class.

444.    Toyota, Plaintiff, and the Michigan State Class members are "persons" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

445.    Toyota engaged in "trade" or "commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(g).

446.   The Michigan Consumer Protection Act ("Michigan CPA") makes unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …."  Mich. Comp. Laws § 445.903(1).

447.   In the course of their business, Toyota, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair, unconscionable and/or deceptive acts or practices as prohibited by the Michigan CPA:

a.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

b.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

c.   Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

d.   Advertising the Class Vehicles with the intent not to sell them as advertised;

e.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

448.   Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Michigan Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Michigan Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Michigan

95

Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

449.   Plaintiff and the Michigan Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

450.   Toyota had an ongoing duty to Plaintiff and the Michigan Class members to refrain from unfair and deceptive practices under the Michigan CPA in the course of its business. Specifically, Toyota owed Plaintiffs and the Michigan Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Michigan Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

451.   Plaintiff and Michigan Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

452.   Toyota's violations present a continuing risk to Plaintiff and the Michigan Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

453.   Pursuant to Mich. Comp. Laws § 445.911, Plaintiff and the Michigan Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Michigan CPA.

## COUNT 14

## BREACH OF IMPLIED WARRANTY

### (Mich. Comp. Laws §§ 440.2314 and 440.2860)

454.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

455. Plaintiff Jill Silvernale (for the purposes of this section, "Plaintiff") brings this claim on behalf of herself and the Michigan Class.

456. Defendants were at all relevant times "merchants" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(c).

457. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

458. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

459. Toyota sold Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.

460. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

461. Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

462.   Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiff's and the Connecticut Class members' claims.

463.   As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiff and the Michigan Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

464.   Plaintiff and the Michigan Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiff and the Michigan Class members.

465.   Notwithstanding this, privity is not required in this case because Plaintiff and the Michigan Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because the Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

## COUNT 15

### FRAUDULENT OMISSION AND CONCEALMENT

466.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

467.   Plaintiff Jill Silvernale (for the purposes of this section, "Plaintiff") brings this action on behalf of themselves and the Michigan Class against Toyota.

98

468.   Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

469.   Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

470.   Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

471.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

472.   Plaintiffs and Michigan State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

473.    Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

        a.    Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

        b.    The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

        c.    Toyota knew that Plaintiffs and Michigan State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

        d.    Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

474.    These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and Michigan State Class members. Further, the Frame Defect is material because it poses a safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

475.    Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

476.    Plaintiffs and Michigan State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts.

Plaintiffs' and Michigan State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Michigan State Class members.

477. As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Michigan State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

478. Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and Michigan State Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

479. Accordingly, Toyota is liable to Plaintiff and the other Michigan Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

480. Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights. Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**6.    New Jersey Class**

**COUNT 16**

**VIOLATIONS OF THE NEW JERSEY**

**CONSUMER FRAUD ACT**

**(N.J. Stat. Ann. § 56:8-1, *et seq*.)**

481. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

482.    Plaintiffs Emily Barbour and Patricia Loughney (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the New Jersey Class against Toyota.

483.    Toyota, Plaintiffs, and the New Jersey Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

484.    Toyota is engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (e).

485.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.

486.    In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in the following unfair or deceptive acts or practices as prohibited by N.J. Stat. Ann. § 56:8-2: using or employing "deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale" of the Class Vehicles, as detailed above.

487.    Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the New Jersey Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the New Jersey Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the New Jersey

Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

488.   Plaintiffs and the New Jersey Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

489.   Toyota had an ongoing duty to Plaintiffs and the New Jersey Class members to refrain from unfair and deceptive practices under the New Jersey CFA in the course of its business. Specifically, Toyota owed Plaintiffs and the New Jersey Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the New Jersey Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

490.   Plaintiffs and the New Jersey Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

491.   Toyota's violations present a continuing risk to Plaintiffs and the New Jersey Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

492.   Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the New Jersey Class seek an order enjoining Toyota' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New Jersey CFA.

## COUNT 17
### BREACH OF IMPLIED WARRANTY
### (N.J. STAT. ANN. §§ 12A:2-314, 12A:2-315)

493.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

494.   Plaintiffs Emily Barbour and Patricia Loughney (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the New Jersey Class against Toyota.

495.   Plaintiffs and the New Jersey Class members are "buyers" within the meaning of N.J. STAT. ANN. § 12A:2-103(1)(a).

496.   The Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.J. STAT. ANN. §§ 12A:2-104(1) and "sellers" of motor vehicles under § 12A:2-103(1)(d).

497.   The Class Vehicles were at all relevant times "goods" within the meaning of N.J. STAT. ANN. §§ 12A:2-105(1).

498.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. STAT. ANN. §§ 12A:2-314, 12A:2-315.

499.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

500.   Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the

public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

501.   Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiff and the New Jersey Class members' claims.

502.   As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiffs and the New Jersey Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

503.   Plaintiffs and the New Jersey Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiffs and the New Jersey Class member.

504.   Notwithstanding this, privity is not required in this case because Plaintiffs and New Jersey Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs and New Jersey Class members' Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

## COUNT 18

### FRAUDULENT OMISSION AND CONCEALMENT

505.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

506.   Plaintiff Emily Barbour and Patricia Loughney (for the purposes of this section, "Plaintiff") brings this action on behalf of themselves and the New Jersey Class against Toyota.

507.   Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

508.   Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

509.   Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

510.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

511.   Plaintiffs and New Jersey State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

512.   Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

     a.   Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

     b.   The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

     c.   Toyota knew that Plaintiffs and New Jersey State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

     d.   Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

513.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and New Jersey State Class members. Further, the Frame Defect is material because it poses a safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

514.   Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

107

515.   Plaintiffs and New Jersey State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs' and New Jersey State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or New Jersey State Class members.

516.   As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and New Jersey State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

517.   Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and New Jersey State Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

518.   Accordingly, Toyota is liable to Plaintiff and the other New Jersey Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

519.   Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.  Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**7.  New York Class**

**COUNT 19**

**VIOLATION OF THE NEW YORK**

**DECEPTIVE ACTS AND PRACTICES ACT**

**(N.Y. Gen. Bus. Law § 349)**

520.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

521.  Plaintiff Thomas Pastore (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the New York Class against Toyota.

522.  Toyota, Plaintiff, and the New York Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

523.  The New York Deceptive Acts and Practices Act ("NY DAPA") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

524.  In the course of their business, Toyota engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.Y. Gen. Bus. Law § 349:

        a.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

        b.  Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        c.  Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

        d.  Advertising the Class Vehicles with the intent not to sell them as advertised;

        e.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

525.   Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and New York Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the New York Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the New York Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

526.   Plaintiff and the New York Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

527.   Toyota had an ongoing duty to Plaintiff and the New York Class members to refrain from unfair and deceptive practices under the New York DAPA in the course of its business. Specifically, Toyota owed Plaintiff and the New York Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the New York Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

528.   Plaintiff and the New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

529.   Toyota's violations present a continuing risk to Plaintiff and the New York Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

530.   Plaintiff and the New York Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the NY DAPA.

## COUNT 20
## BREACH OF IMPLIED WARRANTY
## (N.Y. U.C.C. LAW §§ 2-314, 2-315)

531.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

532.   Plaintiff Thomas Pastore (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the New York Class against Toyota.

533.   Plaintiff and the New York Class members are "buyers" within the meaning of N.Y. U.C.C. LAW § 2-103(1)(a),

534.   The Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. U.C.C. LAW § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

535.   The Class Vehicles were at all relevant times "goods" within the meaning of N.Y. U.C.C. LAW §§ 2-105(1).

536.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.Y. U.C.C. LAW §§ 2-314, 2-315.

537.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust

corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

538.   Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

539.   Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiff's and the other New York Class members' claims.

540.   As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiff and the New York Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

541.   Plaintiff and the New York Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiffs and the New York Class members.

542.   Notwithstanding this, privity is not required in this case because Plaintiff and the New York Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate

consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiff's and the New York Class members' Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

## COUNT 21

### FRAUDULENT OMISSION AND CONCEALMENT

543.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

544.   Plaintiff Thomas Pastore (for the purposes of this section, "Plaintiff") brings this action on behalf of themselves and the New York Class against Toyota.

545.   Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

546.   Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

547.   Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

548.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts,

113

Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

549.   Plaintiffs and New York State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

550.   Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

a.   Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

b.   The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

c.   Toyota knew that Plaintiffs and New York State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

d.   Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

551.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and New York State Class members. Further, the Frame Defect is material because it poses a

safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

552. Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

553. Plaintiffs and New York State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs' and New York State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or New York State Class members.

554. As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and New York State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

555. Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and New York State Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

556. Accordingly, Toyota is liable to Plaintiff and the other New York Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

557. Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights. Toyota's conduct

1  warrants an assessment of punitive damages in an amount sufficient to deter such
2  conduct in the future, which amount is to be determined according to proof.

3      **8.**   **<u>Pennsylvania Class</u>**

4  **<u>COUNT 22</u>**

5  **VIOLATION OF THE PENNSYLVANIA**

6  **UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**

7  **(73 Pa. Stat. Ann. § 201-1, *et seq.*)**

8      558.   Plaintiffs incorporate by reference each preceding paragraph as though
9  fully set forth herein.

10      559.   Plaintiffs Christine Blight and Jack Perry (for the purposes of this section,
11  "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania Class
12  against Toyota.

13      560.   Toyota, Plaintiffs, and the Pennsylvania Class members are "persons"
14  within the meaning of 73 Pa. Stat. Ann. § 201-2.(2).

15      561.   Defendants are engaged in "trade" or "commerce" within the meaning of
16  73 Pa. Stat. Ann. § 201-2(3).

17      562.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA")
18  prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce
19  ...." 73 Pa. Stat. Ann. § 201 3.

20      563.   In the course of their business, Defendants, through their agents,
21  employees, and/or subsidiaries, engaged in one or more of the following unfair or
22  deceptive acts or practices in violation of 73 Pa. Stat. Ann. § 201-3:

23          a.   Causing likelihood of confusion or of misunderstanding as to the
24                approval or certification of the Class Vehicles;

25          b.   Representing that the Class Vehicles have approval, characteristics,
26                uses, or benefits that they do not have;

27          c.   Representing that the Class Vehicles are of a particular standard,
28                quality and grade when they are not;

116

d.   Advertising the Class Vehicles with the intent not to sell them as advertised;

e.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

564.   Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the Pennsylvania Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Pennsylvania Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the Pennsylvania Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

565.   Plaintiffs and the Pennsylvania Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

566.   Toyota's violations present a continuing risk to Plaintiffs and the Pennsylvania Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

567.   Toyota had an ongoing duty to Plaintiffs and the Pennsylvania Class members to refrain from unfair and deceptive practices under the Pennsylvania UTPA in the course of its business. Specifically, Toyota owed Plaintiffs and the Pennsylvania Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material

117

facts from Plaintiffs and the Pennsylvania Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

568. Plaintiffs and Pennsylvania Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

569. Pursuant to 73 Pa. Stat. Ann. § 201-9.2(a), Plaintiffs and the Pennsylvania Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive and/or treble damages, and any other just and proper relief available under the Pennsylvania UTPA.

**COUNT 23**

**BREACH OF IMPLIED WARRANTY**

**(13 PA. CONS. STAT. §§ 2314, 2315)**

570. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

571. Plaintiff Brian Blights, Christina Blights, and Michael Turner (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania Class against Toyota.

572. Plaintiffs and the Pennsylvania Class members are "buyers" within the meaning of 13 PA. CONS. STAT. § 2103(a).

573. The Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 PA. CONS. STAT. § 2104 and "sellers" of motor vehicles under § 2103(a).

574. The Class Vehicles were at all relevant times "goods" within the meaning of 13 PA. CONS. STAT. § 2105(a).

575. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 13 PA. CONS. STAT. §§ 2314, 2315.

576.  The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

577.  Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

578.  Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiffs and the Pennsylvania Class members' claims.

579.  As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiffs and the Pennsylvania Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

580.   Plaintiffs and the Pennsylvania Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiffs and the Pennsylvania Class members.

581.   Notwithstanding this, privity is not required in this case because Plaintiffs and the Pennsylvania Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs and the Pennsylvania Class members' Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

## COUNT 24

## FRAUDULENT OMISSION AND CONCEALMENT

582.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

583.   Plaintiff Brian Blights, Christina Blights, and Michael Turner (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania Class against Toyota.

584.   Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

585.   Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

586.   Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were

prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

587.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

588.   Plaintiffs and Pennsylvania State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

589.   Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

      a.   Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

      b.   The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

      c.   Toyota knew that Plaintiffs and Pennsylvania State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

      d.   Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading, deceptive, and incomplete

without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

590.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and Pennsylvania State Class members. Further, the Frame Defect is material because it poses a safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

591.   Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

592.   Plaintiffs and Pennsylvania State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs' and Pennsylvania State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or New Pennsylvania Class members.

593.   As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Pennsylvania State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

594.   Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and failure to disclose, the Frame Defect. Plaintiffs and Pennsylvania State Class members

have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

595.   Accordingly, Toyota is liable to Plaintiff and the other Pennsylvania Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

596.   Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.   Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

9.   **Utah Class**

**COUNT 25**

**VIOLATION OF UTAH**

**CONSUMER SALES PRACTICES ACT**

**(Utah Code Ann. § 13-11-1, *et seq.*)**

597.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

598.   Plaintiff Kyle Blumin (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Utah Class against Toyota.

599.   The Defendants are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

600.   Plaintiff and the Utah State Class members are "persons" under Utah Code § 13-11-3(5).

601.   The sales of the Class Vehicles to Plaintiff and the Utah Class members were "consumer transactions" within the meaning of Utah Code § 13-11-3(2).

602.   The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction." Utah Code § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.   Utah Code § 13-11-5.

603.   In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Utah Code § 13-11-4:

        a.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        b.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

        c.   Representing that the Class Vehicles were supplied in accordance with Defendants' prior representations, although they were not as represented.

604.   Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Utah Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Utah Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Utah Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

605.   Plaintiff and the Utah Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

606.   Toyota's violations present a continuing risk to Plaintiff and the Utah Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

607.   Toyota had an ongoing duty to Plaintiff and the Utah Class members to refrain from unfair and deceptive practices under the Utah CSPA in the course of its business. Specifically, Toyota owed Plaintiff and the Utah Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and

the Utah Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

608.   Plaintiff and the Utah Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

609.   Plaintiff and the Utah Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Utah CSPA.

**COUNT 26**

**VIOLATION OF UTAH**

**TRUTH IN ADVERTISING LAW**

**(Utah Code Ann. § 13-11a-1, *et seq.*)**

610.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

611.   Plaintiff Kyle Blumin (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Utah Class against Toyota.

612.   Plaintiff, the Utah Class, and the Defendants are "person[s]" within the meaning of Utah Code § 13-11a-1(7).

613.   Utah's Truth In Advertising law makes unlawful any deceptive practice undertaken in the course of a person's business. Utah Code § 13-11a-3.

614.   In the course of their business, the Defendants, through their agents, employees, and/or subsidiaries, engaged in one or more of the following unfair or deceptive acts or practices as defined in Utah Code § 13-11a-3:

        a.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

        b.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

c.    representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

d.    Advertising the Class Vehicles with the intent not to sell them as advertised;

e.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

615.    Toyota's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Utah Class members, and Toyota misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Utah Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Utah Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

616.    Plaintiff and the Utah Class members had no way of discerning that Toyota's representations were false and misleading, or otherwise learning the facts that Toyota had concealed and/or failed to disclose.

617.    Toyota's violations present a continuing risk to Plaintiff and the Utah Class, as well as to the general public. As such, Toyota's unlawful acts and practices complained of herein affect the public interest.

618.    Toyota had an ongoing duty to Plaintiff and the Utah Class members to refrain from unfair and deceptive practices under the Utah Truth In Advertising law in the course of its business. Specifically, Toyota owed Plaintiff and the Utah Class members a duty to disclose all the material facts concerning the Class Vehicles because

126

it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Utah Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

619. Plaintiff and the Utah Class members suffered ascertainable loss and actual damages as a direct and proximate result of Toyota's concealment, misrepresentations, and/or failure to disclose material information.

620. Pursuant to Utah Code Ann. § 13-11a-4, Plaintiff and the Utah Class seek an order enjoining Toyota's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Utah Truth In Advertising law.

**COUNT 27**

**BREACH OF IMPLIED WARRANTY**

**(UTAH CODE ANN. §§ 70A-2-314, 70A-2-315)**

621. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

622. Plaintiff Kyle Blumin (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Utah Class against Toyota.

623. Plaintiff and the Utah Class members are "buyers" within the meaning of UTAH CODE ANN. § 70A-2-313(1).

624. The Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under UTAH CODE ANN. §§ 70A-2-104(1) and "sellers" of motor vehicles under § 70A-2-103(1)(a).

625. The Class Vehicles were at all relevant times "goods" within the meaning of UTAH CODE ANN. §§ 70A-2-105(1).

626. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to UTAH CODE ANN. §§ 70A-2-314, 70A-2-315.

627. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

628. Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses.

629. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiff and the Utah Class members' claims.

630. As a direct and foreseeable result of the defect in the Class Vehicles' frames, Plaintiff and the Utah Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

631.    Plaintiff and the Utah Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiff and the Utah Class members.

632.    Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiff's and the Utah Class members' Class Vehicles are inherently dangerous due to the Frame Defect and nonconformities.

## COUNT 28

### FRAUDULENT OMISSION AND CONCEALMENT

633.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

634.    Plaintiff Kyle Blumin (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Utah Class against Toyota.

635.    Toyota is liable for both fraudulent concealment and non-disclosure. See, e.g., Restatement (Second) of Torts §§ 550-51 (1977).

636.    Toyota fraudulently concealed and suppressed material facts concerning the quality, durability, and safety of the Class Vehicles, including their frames, as well as the existence of the Frame Defect.  The Frame Defect poses a serious risk to vehicle occupants.

637.    Despite representing in its advertisements, sales brochures, and other marketing materials that the Class Vehicles and their frames were durable and of high quality, Toyota knew when it manufactured, marketed, and sold the Vehicles that they were equipped with frames that lacked adequate rust corrosion protection and were

prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

638.   Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold the Class Vehicles. Toyota did not disclose the Defect in its advertisements, sales brochures, or other marketing material. Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

639.   Plaintiffs and Utah State Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

640.   Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Frame Defect because:

      a.    Toyota had exclusive or far superior knowledge of the Frame Defect and concealment thereof;

      b.    The facts regarding the Frame Defect and concealment thereof were known and/or accessible only to Toyota;

      c.    Toyota knew that Plaintiffs and Utah State Class members did not know about, or could not reasonably discover, the Frame Defect and concealment thereof; and

      d.    Toyota made representations and assurances about the qualities of the Class Vehicles and their frames that were misleading,

deceptive, and incomplete without the disclosure of the fact that the Class Vehicles were equipped with frames that lacked adequate rust corrosion protection and were prone to excessive and premature rust corrosion, thereby subjecting the Vehicles' occupants to a significant safety risk.

641.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Class Vehicles, and because they substantially reduced the value of the Vehicles purchased by Plaintiffs and Utah State Class members. Further, the Frame Defect is material because it poses a safety threat to both drivers and occupants of the Vehicles and causes some Vehicles to no longer be drivable, having failed to pass safety check(s).

642.   Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were safe and free from known defects, as represented by Toyota and reasonably expected by consumers.

643.   Plaintiffs and Utah State Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs' and Utah State Class Members' actions in purchasing the Class Vehicles were justified, as Toyota was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or New Utah Class members.

644.   As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Utah State Class members suffered injury. Each Plaintiff purchased a Class Vehicle that suffers from a defect that diminishes the Vehicle's value and poses a safety risk to its occupants.

645.   Plaintiffs overpaid for their Class Vehicles by reason of Toyota's representations regarding the Vehicles, including their frames, and concealment of, and

failure to disclose, the Frame Defect. Plaintiffs and Utah State Class members have also paid substantial money to (unsuccessfully) repair the Frame Defect and/or have their Class Vehicles' frames replaced.

646. Accordingly, Toyota is liable to Plaintiff and the other Utah Class members for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

647. Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.  Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Classes, respectfully request that the Court certify the proposed Classes, including designating the named Plaintiffs as representatives of the respective State Classes, appointing the undersigned as Class Counsel, and designating any appropriate issue classes, under the applicable provisions of Federal Rule of Civil Procedure 23, and that the Court enter judgment in Plaintiffs' favor and against Toyota including the following relief:

(i)     A declaration that any applicable statutes of limitations are tolled due to Toyota's fraudulent concealment and that Toyota is estopped from relying on any statutes of limitations in defense;

(ii)    A declaration that (1) the Class Vehicles lack adequate rust corrosion protection and are defective; (2) all persons who purchased the Class Vehicles are to be provided the best practicable notice of the Defect; and (3) Defendants must establish an inspection, repair, and replacement program and protocol and notify Class members of such program, pursuant to which Defendants, including its authorized representatives, and at no cost to Class members, will inspect, upon request, Class members' Class Vehicles for frame rust corrosion, treat the Class Vehicles that have

not exhibited rust corrosion with adequate rust corrosion protection, and repair or replace the frames on the Class Vehicles that have experienced frame rust corrosion;

(iii)    Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

(iv)    Punitive and exemplary damages under applicable law;

(v)    Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by a Plaintiff or Class member to remedy the Frame Defect;

(vi)    A determination that Toyota is financially responsible for all Class notices and the administration of Class relief;

(vii)    Any applicable statutory or civil penalties;

(viii)    An order requiring Toyota to pay both pre-judgment and post-judgment interest on any amounts awarded;

(ix)    An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

(x)    Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

(xi)    Any such other and further relief the Court deems just and equitable.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs and Class members hereby demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated: November 22, 2022.            Respectfully submitted,


**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**

**By:**_____*/s/ Kristen Lake Cardoso*_____

Kristen Lake Cardoso (SBN 338762)
cardoso@kolawyers.com
Jeff Ostrow (*admitted pro hac vice*)
ostrow@kolawyers.com
Jason H. Alperstein (*pro hac to be filed*)
One West Las Olas, Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300

**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN 330990)
scott@edelsberglaw.com
1925 Century Park E #1700
Los Angeles, California 90067
Telephone: (310) 438-5355

**BLEICHMAR FONTI AND AULD LLP**
Lesley E. Weaver (SBN 191305)
lweaver@bfalaw.com
Joshua D. Samra (SBN 313050)
jsamra@bfalaw.com
555 12th Street, Suite 1600
Oakland, CA 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

**GORDON & PARTNERS, P.A.**
Steven G. Calamusa (*admitted pro hac vice*)
scalamusa@fortheinjured.com
Geoff S. Stahl (*admitted pro hac vice*)
gstahl@fortheinjured.com
Rachel A. Bentley (*admitted pro hac vice*)
rbentley@fortheinjured.com
4114 Northlake Boulevard
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050

**LAW OFFICE OF DENNIS O. COHEN, PLLC**
Dennis O. Cohen (*admitted pro hac vice* )

134

dennis@denniscohenlaw.com
157 13th Street
Brooklyn, NY 11215
Telephone: (646) 859-8855